UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE and NORTHWEST ENVIRONMENTAL DEFENSE CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>ATLANTA GOLD CORPORATION,<br><br>Defendant. | Case No. 1:11-cv-161-MHW<br><br>**MEMORANDUM DECISION AND ORDER** |

Idaho Conservation League and Northwest Environmental Defense Center ("Plaintiffs") filed this action against Atlanta Gold Corporation ("AGC") seeking an injunction, declaratory relief, and civil penalties pursuant to the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.* Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and 33 U.S.C. § 1365(a). All parties have consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c).

Idaho Conservation League ("ICL") is an Idaho non-profit corporation with a principal place of business in Boise. (Compl., ¶ 7, Dkt. 1). ICL and its members are interested in and work to protect Idaho's water, air, wilderness and public lands. *Id.* Northwest Environmental Defense Center ("NEDC") is an Oregon non-profit corporation

**Memorandum Decision and Order - 1**

with its principal place of business in Portland.  (*Id*. at ¶ 8).  NEDC and its members are interested in protecting the environment of the Pacific Northwest, including the waters of the Columbia River Basin and its tributaries within the Boise River watershed.  *Id*.  Both ICL and NEDC have staff and members who live, recreate and work throughout the Boise River watershed.  (*Id*. at ¶ 9).

Atlanta Gold Corporation is an Idaho corporation in the business of mineral exploration and development.  (Answer, ¶ 9, Dkt. 8).  AGC holds an EPA issued National Pollutant Discharge Elimination System ("NPDES") permit which regulates the discharge of water from the mine adit[1] which is the subject of this litigation.  (Hawley Decl., Ex. 1, Dkt. 22-1).

Currently pending before the Court are Plaintiffs' Motion to Strike (Dkt. 47), filed October 12, 2011, and Motion for Partial Summary Judgment (Dkt. 21), filed on August 12, 2011, and Defendant AGC's Motion for Summary Judgment (Dkt. 20), filed August 12, 2011.  At a July 5, 2011 Scheduling Conference the Court and the parties determined that this matter should be bifurcated: beginning with a liability phase and followed by a remedial phase, should it be necessary.  On November 1, 2010, the Court heard oral argument on the pending motions for summary judgment.

In brief, Plaintiffs contend that AGC's discharge of water from a mine adit near the town of Atlanta, Idaho and located within Elmore County is not in compliance with

---

[1]   An adit is a nearly horizontal entry passage from a mine to the surface.

**Memorandum Decision and Order - 2**

the CWA.  Plaintiffs assert standing via the CWA's citizen suit provision.  AGC asserts that the Plaintiffs lack standing and, even if they do have standing, their claim is moot.

## I.    Background

Gold was first discovered near Atlanta in 1863 and since then the area has undergone sporadic times of metal production.  (Simmons Aff., ¶ 2, Dkt. 20-5).  AGC's project site is located on top of Atlanta Hill (the "Project Site") and encompasses approximately 2,159 acres.  (*Id*. at ¶¶ 3, 4).  Prior to AGC's presence, the Project Site was previously known as Talache Mine, which is within the Boise National Forest.  (*Id*. at ¶¶ 3, 6).  This litigation involves discharges of water from a mine adit known as the 900 Level Adit ("the Adit") into Montezuma Creek, a tributary of the Boise River.  The Boise River flows through the City of Boise and eventually reaches the Snake and Columbia River systems.

AGC commenced its modern day exploration of the site in 1985.  (*Id*. at ¶ 2).  Since that time, AGC has submitted numerous plans of operations to the U.S. Forest Service ("USFS") to conduct exploration, exploratory drilling and excavation at the Project Site. (Compl., ¶ 32.)  AGC has only conducted exploratory activities at the site and has not produced or processed ore at the site.  (Simmons Aff., ¶5).  AGC submitted an initial Plan of Operations in 1988 under which the Adit was reopened.  (Hawley Decl., Ex. 5, Dkt. 22-1). Before initiating any action at the Adit, AGC contacted the Idaho Department of Health & Welfare ("IDDHW") expressing its concern about any liability it

**Memorandum Decision and Order - 3**

might assume related to the Adit discharges.  (Glaspey Aff., Ex. A, Dkt. 20-13).  IDDHW informed AGC that "as long as you do not adversely affect the existing water quality, you will not assume any liability."  (*Id.*, Ex. B).

In 1992, the EPA notified the Boise Ranger District that the discharges from the Adit were subject to NPDES permitting.  (Glaspey Aff., ¶13, Dkt. 20-12).  No NPDES permit was applied for or issued at that time; however, AGC did assume responsibility at that time for treating water discharged from the Adit in connection with its operations.  In 1994, the EPA notified AGC that discharges from the Adit required an NPDES permit.  (*Id.* at ¶ 17).  Also in 1994, AGC submitted a Plan of Operation which included an exploration program at the site which involved opening and excavating the Adit.  (*Id.* at ¶ 19).  AGC submitted an application for an NPDES permit at that time; however, no permit was issued.  (*Id.* at ¶ 20).  In 1998, AGC received permission to conduct underground exploratory drilling.  Approval of that plan required maintenance of a water discharge treatment facility and maintenance of water quality in accordance with EPA requirements.  (Hawley Decl., Ex. 26, Dkt. 22-5).

This case is not the parties first dispute over Adit discharges.  On May 25, 2005, ICL initiated an action in this Court against AGC alleging inappropriate discharges from the Adit in violation of the CWA.  *See Idaho Conservation League v. Atlanta Gold Corp.,* Case No. 1:05-cv-212-EJL.  On October 6, 2005, the parties memorialized the outcome of that suit by filing a Consent Decree which provided for construction of a Pilot Water

Treatment Facility ("PWTF") near the Adit.  (Case No. 1:05-cv-212-EJL, Dkt. 12).  The decree also required AGC to secure proper NPDES permitting for discharges made from the Adit.  (Simmons Aff., ¶ 6, Dkt. 20-6).  On December 9, 2005, the court entered an order approving the decree and dismissing the claims in that case with prejudice.  (Case No. 1:05-cv-212-EJL, Dkt. 15).  The decree states that so long as its provisions are met, ICL would be forced to bring a new civil action in order to redress any alleged CWA violations occurring after December 1, 2005.  (*Id*. at ¶ 5).

AGC submitted an NPDES application on February 28, 2005, and amended that application on February 26, 2006.  (Hawley Decl., Ex. 1, pp. 2-3, Dkt. 22-1).  That permit was ultimately issued on August 6, 2009, reflecting an effective date of July 1, 2007, and an expiration date of June 30, 2012.[2]  (*Id*. at 7).  Relevant here, the permit lists the proper effluent limit for arsenic as 10 µg/l and for iron as 1,000 µg/l. (*Id*. at 4-5).  The permit also requires that AGC monitor the Adit discharges weekly and submit monthly discharge monitoring reports ("DMRs") reflecting its collected data.  *Id*.

Turning back to an earlier time frame, in 1999, AGC entered into a "Mining Lease and Option to Purchase Agreement" with Monarch Greenback, LLC ("Monarch"), the owner of the claims on which the Adit and PWTF are situated.  (Points Aff., ¶ 2, Dkt. 20-3).  On April 28, 2011, ten days after the present action was filed, AGC exercised its

---

[2]  In 2006, AGC was also issued NPDES Permit No. ID-0002828-2 for historic mining discharges. That permit is separate from the permit issued for the 900 Level Adit. *See* Fereday Aff., Ex. B; Simmons Aff., Ex. K.

option to purchase certain of the mining property from Monarch, excluding the mining claims on which the Adit and PWTF are located.  (*Id.* at ¶ 4).  On May 5, 2011, Monarch relinquished its interest in the mining claims to which the PWTF and Adit are located. (*Id.* at ¶ 5).

AGC has submitted a plan to the USFS to close the Adit portal and also to close the PWTF and reclaim the property.  (Points Aff., ¶ 8.)  On June 7, 2011, the USFS responded that AGC must provide more information before it can consider the proposed plan.  (Hawley Decl., Ex. 5, Dkt. 22-1).  On October 27, 2011, AGC submitted a proposed draft Memorandum of Agreement regarding the closure of the Adit to the USFS.  (Points Supp. Decl., Ex. A, Dkt. 51).

On May 2, 2011, AGC sent a letter to the EPA stating the letter served "as notice of termination" of AGC's NPDES permit. (Points Aff. ¶ 6, Ex. B, Dkt. 20-4; Hawley Decl., Ex. 24, Dkt. 22-5.)  The EPA responded that the NPDES permit "does not automatically terminate upon notification . . . and the permit remains in effect."  (Hawley Decl., Ex. 25, Dkt. 22-5.)

In its Complaint, Plaintiffs allege that AGC has violated the terms of the NPDES permit every month since August 2009 by discharging higher levels of arsenic and iron into Montezuma Creek than are allowed by the NPDES permit.  (Compl., ¶ 16).

Plaintiffs allege that AGC has committed 1,447[3] discharge violations since the

---

[3] Plaintiffs assert this is the proper number of violations as of August 31, 2011. *See* Plaintiffs' Reply, Dkt. 48, at 13.

**Memorandum Decision and Order - 6**

permit was issued on August 6, 2009.  Plaintiffs assert standing to bring this complaint

pursuant to the Citizen Suit provision of the CWA, 33 U.S.C. § 1365(a).  In its Answer,

AGC denies that it is in violation of the permit.  (Answer, ¶ 62).  In its motion for

summary judgment, AGC contends that Plaintiffs lack standing to bring this complaint,

primarily because the third element of standing, redressability, cannot be met in this

instance.  AGC further contends that, should the court find that redressability is met for

standing purposes, summary judgment is still proper as the court cannot order any remedy

that will redress Plaintiffs' alleged injuries, and the claim is therefore moot.

  AGC also argues that ICL is estopped from asserting any claims against AGC

because the discharges that are the basis of the complaint were the basis of the earlier

litigation between the parties that resulted in the December 2005 Consent Decree.  AGC

contends that when the parties agreed to the decree, it was known that the PWTF could

not be expected to reduce arsenic in the water to less than 190 µg/l.  AGC asserts this is

relevant for two primary reasons.  First, AGC relied on ICL's agreement that arsenic

would not have to be treated to less than 190 µg/l and thus ICL is estopped from asserting

a claim which asserts liability against AGC on the theory that the arsenic level should be

no higher than 10 µg/l.  Second, AGC contends that when ICL entered into the decree, it

waived its ability to assert further claims related to discharges from the Adit.

**Memorandum Decision and Order - 7**

## II.   Motion to Strike

Before addressing AGC's estoppel and waiver arguments, the Court must first address Plaintiffs' motion to strike since it bears heavily on the ultimate resolution of those issues.  Plaintiffs move to strike six statements.  Two of the statements are paragraphs 9 and 10 in AGC's Statement of Disputed Material Facts (Dkt. 28-1) and four of the statements made by AGC Chief Operating Officer Wm. Ernest Simmons: paragraphs 12, 13 in his August 12, 2011 affidavit (Dkt. 20-5), and paragraphs 14, 15 in his September 14, 2011 declaration (Dkt. 29).[4]  Plaintiffs seek to strike these paragraphs to the extent they attempt to characterize statements made by ICL and others in the 2005 Consent Decree negotiations.

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  When a motion to strike challenges the admissibility of an affidavit or declaration, the Court must disregard only those portions of the submission which are inadequate pursuant to the rules.  *Perez v. Volvo Car Corp.,* 247 F.3d 303, 315 (1st Cir. 2001).  "Personal knowledge is the touchstone in this process."  *Id.*

Plaintiffs's argument for striking these statements is two-fold.  First, the decree states that neither the decree, nor the conduct or statements of the parties related to the

---

[4]  The two statements of disputed material fact are identical to paragraphs 14 and 15 of Simmons' declaration and will be analyzed together.

negotiation of the decree, may be admissible in any subsequent proceeding.  (Simmons

Aff., Ex. A, ¶ 3, Dkt. 20-6).   Second, Plaintiffs contend that Simmons was not present at

the negotiations and, therefore, cannot make these statements on his personal knowledge

as is required by Fed. R. Civ. P. 56(c)(4).  In addition to their motion and briefing,

Plaintiffs submit the October 12, 2011 declaration of Justin Hayes, the ICL employee

who was most involved in the decree negotiations.  (Hayes 2nd Decl., Dkt. 47-2).  Hayes

avers that Simmons was not part of those negotiations.  *Id.*

Simmons' August 12, 2011 affidavit and September 14, 2011 declaration each

state that he makes these statements on his own personal knowledge and in part on review

of "the business and other records of AGC that have been kept in the ordinary course of

business."  (Simmons Aff., ¶ 1, Dkt. 20-5; Simmons Decl, ¶ 1, Dkt. 29).  AGC contends

that because Mr. Simmons has served as Chief Operating Officer and Vice President of

Mining for AGC since 2008, as a corporate officer he can speak for the corporation and is

presumed to have personal knowledge of the acts of the corporation.  *See Meyer*

*Intellectual Properties v. Bodum,  Inc.*, 597 F. Supp. 2d 790, 796 (N.D. Ill. 2009) ("While

corporate officers are presumed to have personal knowledge of the acts of their

corporation, such knowledge is only presumed and may be overcome based on factual

circumstances . . . the personal knowledge requirement is not met automatically simply

because the affiant or declarant is such an officer" (internal quotations and citations

omitted)).  AGC asserts that since Mr. Simmons is not speaking to what was actually said

during the negotiations but rather AGC's interpretation of the Consent Decree and how the negotiations leading up to the Consent Decree were interpreted by AGC, his statements are admissible.

### *August 12, 2011 Affidavit*

Paragraph 12 addresses the fact of the decree and some of AGC's responsibilities pursuant to the decree.  It quotes portions of the decree and the decree is attached as an exhibit to support this paragraph.  It is the kind of information that Simmons could appropriately testify to upon review of the decree and is allowed under Fed. R. Civ. P. 56(c)(4).  The motion to strike paragraph 12 is denied.

Paragraph 13 speaks to the content of the negotiations.  It states that the EPA, the Department of Environmental Quality, and the USFS all agreed to certain effluent limits during the negotiations.  No supporting documentation is provided for this statement, and the record indicates that Simmons was not present at the negotiations.  It appears this statement could not have been made on his personal knowledge.  Further, the decree states that statements made during negotiations cannot not be used in subsequent proceedings.   The motion to strike paragraph 13 is granted.

### *September 14, 2011 Declaration and Statement of Disputed Material Facts*

Paragraph 14 states that AGC relied on ICL's representations during the decree negotiations that construction of the PWTF would satisfy ICL's water quality concerns. This paragraph also states that AGC did everything required of it in the Consent Decree.

**Memorandum Decision and Order - 10**

The first sentence of this paragraph is not admissible as it speaks to the contents of the negotiations.  The remainder of the paragraph is admissible because they are statements that could be based on Simmons' personal knowledge as a corporate officer.

Paragraph 15 asserts that ICL's decree negotiations could not have been in good faith and that ICL intentionally set AGC up to fail.  Specifically, Simmons asserts that ICL pressured agencies to issue AGC a permit with effluent limits that it knew the PWTF could not attain.  Again, no supporting documentation is provided to support this statement, and the record indicates that Simmons was not present at the negotiations.  Moreover, paragraph 15 is not a factual statement, but, rather, Simmons' opinion.  The motion to strike paragraph 15 of the declaration is granted.

In summary, the motion to strike will be granted in part and denied in part.

### III.   Motions for Partial Summary Judgment and Summary Judgment

#### A.   Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material facts are those which may affect the

outcome of the case.  *See id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings.  *Id.*  Direct testimony of the non-movant must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence.  *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or depositions excerpts) but may simply point out the absence of evidence to support the nonmoving party's case.  *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).  The non-moving party must go beyond the pleadings and show by its "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

In their Motion for Partial Summary Judgment, Plaintiffs allege that as of August 31, 2011, AGC has violated its NPDES permit 1,447 times.  Separately, AGC submits a

Motion for Summary Judgment contending that Plaintiffs lack standing to assert their claims and, even if they do have standing, their argument is moot. Each motion is analyzed below.

**B.      Clean Water Act**

The Clean Water Act was enacted in 1972 to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." *Gwaltney of Smithfield, Ltd., v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 52 (1987) (quoting 33 U.S.C. § 1251(a)). To achieve this goal, the CWA "prohibits the 'discharge of any pollutant' into navigable waters from any 'point source' without a permit." *Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.,* 13 F.3d 305, 309 (9th Cir. 1993) (quoting 33 U.S.C. § 1311(a)). Permits are issued pursuant to the National Pollutant Discharge Elimination System ("NPDES") program which, in section 402 of the CWA, authorizes the Environmental Protection Agency to issue a permit for the "discharge of any pollutant, or any combination of pollutants," on condition that the discharge will meet other sections of the Act. 33 U.S.C. § 1342(a)(1). The discharge of a pollutant or pollutants means any addition of any pollutant to navigable waters from any point source. *Id.* at § 1362(12). Pollutants include industrial, municipal, and agricultural wastes discharged into water. *Id.* at § 1362(6). A point source is "any discernible, confined and discrete conveyance" from which pollutants are or may be discharged. *Id.* at § 1362(14). Navigable waters are broadly defined as any waters of the United States. *Id.* at § 1362(7).

The NPDES program is the CWA's primary method of pollutant control; correspondingly, NPDES permits must include conditions that will ensure CWA compliance.  *See* 33 U.S.C. § 1342(a).  Permits must include technology-based effluent limitations,[5] any other more stringent limitations to meet water quality standards, and monitoring and reporting requirements.  *Id.* at §§ 1342, 1311, 1318.  Specifically, the CWA mandates the reduction of pollutant discharges by the use of specific control technologies; the type of technologies required are determined by the facility doing the discharging and the category of pollutants being discharged.  *Id.* at § 1311(b).  The treatment levels of the technologies are translated into effluent limitations, which are reflected in rates, quantities and concentrations of pollutants.  *Id.* at § 1311(b).  In addition to these technology based controls, a point source discharger must also meet "any more stringent limitation . . . necessary to meet water quality standards, treatment standards, or schedules of compliance."  *Id.* at § 1311(b)(1)(C).  The discharger must also comply with the monitoring and reporting aspects of its permit.  *Id.* at § 1318(a).

Relevant water quality standards define the water quality goals of a body of water by designating the uses to be made of the water and by setting criteria necessary to protect those uses.  40 C.F.R. § 131.2.  Water quality standards properly take into account the protection of fish and wildlife, as well as recreation in and on the water.  40 C.F.R.

---

[5] "Effluent limitations" are restrictions on quantities, rates, and concentrations of chemical, physical, biological or other constituents which are discharged from point sources into navigable waters. 33 U.S.C. § 1362(11).

§ 131.2.  Standards must include: (1) one or more designated uses of the body of water, (2) numeric and narrative criteria specifying water quality conditions that are required to protect the designated uses, i.e., maximum amounts of toxic pollutants and maximum temperature levels; and (3) an antidegradation policy and other implementation methods that ensure that existing water uses and the level of water quality be maintained and protected.  33 U.S.C. §§ 1313(c)(2)(A), 1313(c)(2)(B), 1313(d)(4)(B).

All of this is done to ensure compliance with the CWA; indeed, an NPDES permit may not be issued "when the imposition of conditions cannot ensure compliance with the applicable water quality requirements."  40 C.F.R. § 122.4(d).  A permittee has a duty to comply with all conditions of its permit.  40 C.F.R. § 122.41(a).  Any permit noncompliance constitutes a violation of the CWA and is grounds for an enforcement action.  40 C.F.R. § 122.41(a).  To establish a violation of the CWA's NPDES requirements, plaintiffs must prove that a defendant 1) discharged, i.e., added, 2) a pollutant 3) to navigable waters 4) from 5) a point source.  *Mokelumne,* 13 F.3d at 308 (citing *Nat'l Wildlife Fed. v. Gorusch*, 693 F.2d 156, 165 (D.C. Cir. 1982)).

In the absence of federal or state enforcement, private citizens may commence civil actions against any person alleged to be in violation of the conditions of an NPDES permit.  *Gwaltney,* 484 U.S. at 53.  Congress authorizes such citizen suits when they are initiated by "a person or persons having an interest which is or may be adversely affected."  *Friends of the Earth v. Laidlaw Envtl. Servs*., 528 U.S. 167, 173 (2000) (quoting 33 U.S.C.

§§ 1365(a), (g)).  Relevant here, a citizen may commence an action on his own behalf against any person alleged to be in violation of any "effluent standard or limitation."  33 U.S.C. § 1365(a)(1).  For the purpose of citizen suits, "effluent standard or limitation" includes "unlawful acts under 33 U.S.C. § 1311(a)", which states that a discharge of pollutants not in compliance with the CWA is unlawful.  An "effluent standard or limitation" also includes "a permit or condition thereof issued under" the NPDES program. 33 U.S.C. § 1365(f).  The CWA authorizes the district courts to enforce such effluent standards or limitations.  33 U.S.C. § 1365(a).  As well, "[i]f the citizen prevails in such an action, the court may order injunctive relief and/or impose civil penalties."  *Gwaltney*, 484 U.S. at 53.  Plaintiffs must demonstrate standing separately for each form of relief sought. *Laidlaw*, 528 U.S. 167, 185 (2000).

## C.    Plaintiffs' Motion for Partial Summary Judgment

In their Motion for Partial Summary Judgment, Plaintiffs allege that as of August 31, 2011, AGC has violated its NPDES permit 1,447 times, and that the violations are ongoing; Plaintiffs allege the majority of these violations are the result of discharging higher amounts of arsenic and iron than what the permit allows.  Plaintiffs allege standing to bring this complaint pursuant to the CWA citizen suit provision.

The following is undisputed: AGC holds an NPDES permit for the Adit discharges; that permit places effluent limitations on the allowed amounts of numerous pollutants; specifically, arsenic is held to 10 µg/l and iron is held to 1,000 µg/l.  In support of this

motion, Plaintiffs point to AGC's DMRs, (Hawley Decl., Exs. 16,17 & 18, Dkt. 22-3),

AGC's Noncompliance Statements (*Id*.), two EPA Notices of Violation (*Id*., Exs. 19 &

20), and the affidavit of environmental compliance professional Mark Torf reflecting that

AGC has repeatedly been in violation of the permit since the permit was issued (Torf Aff.,

Dkt. 25).  In response to these allegations AGC does not deny or admit that it is in

violation of its permit.  Instead, AGC challenges the Plaintiffs' standing to bring this

complaint.

      1.    Standing

In order to satisfy Article III's standing requirements in a CWA citizen enforcement

action, a "plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is

fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to

merely speculative, that the injury will be redressed by a favorable decision."  *Friends of*

*the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000).

An association has standing to sue on behalf of its members when its members

would have standing to sue in their own right, the interests at stake are relevant to the

association's purpose, and neither the claim nor relief requested requires that the

individual members participate in the lawsuit.  *Id*.

**Memorandum Decision and Order - 17**

a.      *Injury in Fact*

The relevant injury showing in a citizen suit is injury to the plaintiff as opposed to injury to the environment.  *Laidlaw,* 528 U.S. at 181.  Thus, in a CWA citizen suit, the plaintiff bears the burden of showing how permit noncompliance has actually injured him.  Environmental citizen suit plaintiffs adequately allege injury in fact when they aver that they use an affected area, and that the aesthetic and recreational values of that area will be lessened by the challenged activity.  *Id.* at 183.  However, "general averments" and "conclusory allegations" will not suffice to show injury in fact.  *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888 (1990).

In this case, Plaintiffs filed two member affidavits alleging actual, personal injury.  ICL Program Director Justin Hayes' affidavit attests that, in addition to being an ICL employee, he is also a member of the Northwest Environmental Defense Center.  (Dkt. 23).  Hayes' position with ICL causes him to review NPDES permits issued in Idaho and to track their compliance.  For this reason Hayes has specific knowledge of AGC's non-compliant discharges of arsenic and iron.  Hayes avers that he enjoys "hiking, canoeing, fishing, swimming, and camping on and around the river."  *Id.*  He states that, because of the high levels of arsenic that he knows are discharged from the Adit and into Montezuma Creek, he avoids recreating or having any contact with the creek.  *Id.*  He will not let his children get into the creek.  *Id.*  He states that AGC's discharges keep him from fishing on the Middle Fork of the Boise River anywhere near its confluence with Montezuma Creek.

*Id.* He states that he would visit the Montezuma Creek area more in the future if he knew that AGC were meeting its "permit standards and if the pollution were to abate." *Id.*

Similar to the plaintiffs who established standing in *Laidlaw* by stating that they no longer engaged in activities such as swimming and fishing in and near the river for fear of contamination, Hayes' affidavit indicates that he recreates in and otherwise appreciates the Montezuma Creek area, and that his recreational and aesthetic enjoyment of that area is lessened by AGC's violative discharges of arsenic and iron. Unlike the affiants in *Lujan* who only claimed that they used land 'in the vicinity,' Hayes names specific areas that are impaired and links his altered recreation and enjoyment to those areas.

Plaintiffs also submit the affidavit of ICL Public Land Director John Robison who is also a member of NEDC (Dkt. 24). A canoeist and kayaker, Robison avers that he is hesitant to recreate near Montezuma Creek's confluence with the Middle Fork of the Boise River because of the AGC discharges which he knows are in violation of their permit and water quality standards. *Id.* He states that he normally stashes a water bottle in creeks when he is hiking so that he can have cold water to drink on his return, but that he refuses to stash even a sealed bottle in Montezuma Creek for fear of the arsenic contamination. *Id.* He states that, though he would like to, he does not wade in Montezuma Creek for fear of exposing his skin to high amounts of pollutants. *Id.* He avoids eating fish he catches in the Middle Fork of the Boise River near the confluence with Montezuma Creek because of AGC's permit violations. *Id.*

**Memorandum Decision and Order - 19**

Robison's affidavit establishes injury in fact by his altered enjoyment of recreating along the Middle Fork Boise River near the confluence of Montezuma Creek. Additionally, his statement that he fears stepping into Montezuma Creek for health reasons also shows specific and actual injury in fact.

AGC argues that the Plaintiffs only assert speculative injury because the affiants complain about harm to the Middle Fork of the Boise River as opposed to Montezuma Creek. However, that is not what the record reflects. While both affiants state that AGC's violations have altered their enjoyment of the Middle Fork of the Boise River, they also each aver that their enjoyment of Montezuma Creek, its confluence with the Middle Fork and areas along the creek is also altered. This is specific enough to show injury in fact.

      *b.*    *Causal Connection*

The second element of standing is traceability, or a showing of a causal connection between the injury complained of and defendant's actions. *Lujan,* 504 U.S. at 560-61. Plaintiffs contend the DMRs are proof of the causal connection between their alleged injuries and AGC's actions. In response, AGC argues that: Plaintiffs cannot directly attribute any arsenic or iron in the Middle Fork Boise River to AGC; AGC has not taken any action which increased the flow from the Adit; and AGC does not add pollutants to Montezuma Creek, but, instead removes the majority of the pollutants. Specifically, AGC argues that the exploration work it in did in and around the Adit in 1994 and rehabilitation work completed in 2008 have done nothing to contribute to an increased flow out of the

Adit.[6]  (*See* AGC's Response, pp. 6-7, Dkt. 28).  AGC also points to the fact that there is a Superfund site, the Talache Mine Tailings Reclamation Site, less than a quarter-mile downstream which contributes to the high levels of arsenic in Montezuma Creek.

The traceability element of standing does not mean plaintiffs must show to a scientific certainty that a defendant's effluent caused the precise harm suffered by the plaintiffs.  *Natural Res. Def. Council, et al, v. Sw. Marine, Inc.,* 236 F.3d 985, 995 (9th Cir. 2000); *see also Idaho Rural Council v. Bosma*, 143 F. Supp. 2d 1169, 1176 (D. Idaho 2001).  "Rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern."  *Sw. Marine*, 236 F.3d at 995.  The "causal connection for standing purposes cannot be too speculative," but neither need it be so "airtight at this stage so as to demonstrate that plaintiffs would succeed on the merits."  *Bosma,* 143 F. Supp. 2d at 1172 (citing *Pub. Int. Research Group of N.J. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 72 (3d Cir. 1990)).  Plaintiffs need only show that there is a substantial likelihood defendant's conduct caused their harm.  *Id.*  In a CWA case, this substantial likelihood may be established by:

---

[6] The record reflects that before AGC asked for permission to do exploratory drilling in the Adit, the average daily discharge was 20 to 40 gallons per minute (gpm) in 1994.  After the exploratory mining activities, the daily discharge increased to 78 gpm in 2009 and 65 gpm in 2010.  Extrapolating to a daily discharge basis; in 1994, the discharge was 28,800 to 57,600 gallons per day, in 2009, 112,320 gallons per day and in 2010, 93,600 gallons per day.  While AGC argues that they have not increased the outflow of contaminated water from the Adit, the Court agrees with the conclusion of the Forest Service that it is "highly likely" that AGC is responsible for the increased water flow from the Adit.  (Hawley Decl., Ex. 5, Dkt. 22-1.)

showing that a defendant has 1) discharged some pollutant in concentrations greater than allowed by its permit, 2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that 3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs.

*Id.*

In this case, Plaintiffs have provided the DMRs showing that AGC has in the past and continues to discharge arsenic and iron into Montezuma Creek at levels higher than are allowed by its permit.  Plaintiffs have established that they have an interest in recreating both in Montezuma Creek and at its confluence with the Middle Fork of the Boise River.  Plaintiffs also state that it is the high levels of arsenic in the water which prevent them from eating the fish caught there or getting into the water.

As the court held in *Bosma*, plaintiffs need not prove their entire case in order to establish the traceability element of standing; instead, they need only show that there is a substantial likelihood that AGC's conduct caused their harm.  Plaintiffs have achieved that showing.

As to AGC's arguments that it has not increased flow from the Adit and that it removes, instead of adds, pollutants as they are discharged, *Committee to Save Mokelumne River v. E. Bay Municipal Utility District* is instructive.  13 F.3d 305, 309 (9th Cir. 1993). While not addressing the casual connection aspect of standing but rather liability, that Court held that arguments such as those made by AGC here "misapprehend the focus of the Clean Water Act."  *Id.*  "The Act does not impose liability only where a point source discharge creates a *net* increase in the level of pollution."  *Id.* (emphasis added).  "Rather,

the Act categorically prohibits any discharge of a pollutant from a point source without a permit." *Id.* Therefore, neither the level of flow nor the amount of a pollutants that a defendant is successful in eliminating is determinative. Instead, it is whether a defendant's discharge is in compliance with its permit.

### c.   Redressability

The final element of standing requires that it must be likely, as opposed to merely speculative, that plaintiffs' injuries can be redressed by a favorable ruling from the court. *Lujan*, 504 U.S. at 560-61. This inquiry examines the connection between the alleged injury and the judicial relief requested. *Allen v. Wright,* 468 U.S. 737, 753 n. 19 (1984).

A plaintiff seeking "injunctive relief satisfies the requirement of redressability by alleging a continuing violation or the imminence of a future violation of an applicable statute or standard." *Sw. Marine,* 236 F.3d at 995. In this instance, Plaintiffs allege that AGC's discharges from the Adit continue to be in violation of the permit. Plaintiffs' latest submission to the Court indicates continuing violations as of August 31, 2011, more than four months after the complaint was filed. Plaintiffs are not required to prove ongoing violations at this point; instead, they have to make good faith *allegations* of ongoing violations. *See Gwaltney*, 484 U.S. at 64. Plaintiffs have established redressability for their injunctive relief claim.

Where citizen suit plaintiffs seek to enjoin or otherwise abate ongoing violations, such plaintiffs may also seek civil penalties. *Gwaltney*, 484 U.S. at 59; *see also Laidlaw,*

**Memorandum Decision and Order - 23**

528 U.S. at 184.  In *Laidlaw,* the Court held that the civil penalties sought by the citizen plaintiffs "carried with them a deterrent effect that made it likely, as opposed to merely speculative, that the penalties would redress [plaintiffs'] injuries by abating current violations and preventing future ones."  *Laidlaw,* 528 U.S. at 187.  That court was clear to distinguish its holding from a prior holding that citizen suitors lacked standing to seek civil penalties for violations that *have abated by the time of suit.  Steel Co. v. Citizens for a Better Environment,* 528 U.S. 83, 106-07 (1998) (emphasis added).  That distinction is instructive here, where the citizen suitors allege both past and continuing violations.  *See also Bosma*, 143 F. Supp. 2d at 1177 (noting that the civil penalties sought would likely deter the defendants and other NPDES permit violators from polluting the affected waters in the future).

AGC contends that Plaintiffs ignore an important aspect of the *Gwaltney* redressability analysis: not only must the violations be ongoing, but there must be a "reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney*, 484 U.S. at 57.  AGC has notified both the EPA and the Forest Service that it wants to terminate its permit.  (Points Aff., Dkt. 20-3).  On April 28, 2011, AGC declined its opportunity to purchase the land upon which the Adit sits, providing an affirmative indication that it does not wish to maintain an interest in the property.  *Id.*  AGC submits that these attempts at relinquishment of its permit and its interest in the site means that there is no reasonable likelihood that it will continue to pollute in the future.  In support of

this proposition, AGC directs the Court to *Brossman Sales, Inc. v. Broderick,* 808 F. Supp.

1209 (E.D. Pa. 1992) and *Friends of Sakonnet v. Dutra,* 738 F. Supp. 623 (D.R.I. 1990).

In *Brossman,* a Pennsylvania District Court dismissed plaintiffs' CWA claim

because the defendants had "relinquished ownership of the source of the alleged violation

and no longer [had] the control to abate it." 738 F. Supp. at 1214.  In that case the

defendants had sold the property in question to the plaintiffs several years before the

complaint was filed.  *Id.* at 1211.

In *Sakonnet,* plaintiffs sued the prior owners of a parcel of land which had

extensive and longstanding septic violations.  738 F. Supp. at 628.  The defendants had

relinquished their interest in the land by actually selling it years before.  *Id*. at 632-33.

That court held that because the defendants had no way of abating pollution that was

discharged form a source over which they literally had no control and in which they no

longer had an interest, standing could not be met and the complaint was dismissed as to

those defendants.  *Id.* at 633.

The facts of the instant case are distinguishable from *Brossman* and *Sakonnet*, in

that, while AGC has attempted to relinquish its interest in the Adit site, it has not been

permitted to do so.  The EPA informed AGC that it is not allowed to self-terminate its

NPDES permit, and that the EPA will not allow termination unless and until a closure and

reclamation plan has been not only submitted, but also approved.  (Hawley Decl., Ex. 25,

Dkt. 22-5).  The record reflects that AGC has submitted a plan to the USFS, but no closure

**Memorandum Decision and Order - 25**

and reclamation plan has been approved.  (Points Supp. Decl., Ex. A, Dkt. 51-1).  AGC

contends that its attempt to terminate, coupled with the fact that it opted not to purchase

the Adit land or extend its lease on that land, means that there is no reasonable likelihood

that it will continue to violate its permit in the future.  However, AGC is not in the position

of the defendants in either *Brossman* or *Sakonnet* whose interest was found to be

relinquished because they had sold the property well before the lawsuits were filed.  AGC

still operates the PWTF and the EPA has specifically not allowed it to terminate its permit.

Even drawing reasonable factual inferences in AGC's favor as to its good faith

attempts to terminate its interest in the Adit site and its desire not to be in violation of its

permit, because of its consistent history of violation and because the violations have

continued well after the complaint was filed, it is difficult to accept that a reasonable

person might conclude that AGC will not continue to be in violation of its permit until the

permit expires or is terminated by EPA.  The permit is in effect until June 30, 2012, and

the record does not indicate that EPA is prepared to terminate the permit prior to that date.

Because Plaintiffs have alleged ongoing violations that are likely to continue, and

because the deterrent effect of civil penalties would likely redress Plaintiffs' complaints by

encouraging abatement of the violative discharges, Plaintiffs have established

redressability for the injunctive and civil penalty elements of their claim.

> d.    *Conclusion*

Plaintiffs have alleged actual and particular injury in fact, which can be traced to

AGC, and the alleged injuries could be redressed by a favorable ruling from this court. For all of these reasons, Plaintiffs have established standing.

**D.    AGC's Motion for Summary Judgment**

In its Motion for Summary Judgment, AGC argues that Plaintiffs lack standing to assert their claim and that, even if the Court makes a finding of standing, Plaintiffs' claim is moot.  In the prior section, the Court held that Plaintiffs do have standing to assert their cause of action under the Clean Water Act.  Therefore, the Court now analyzes whether the claim is moot.

1.    Mootness

A moot claim is one where the "issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)). "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted."  *Id.*  Longstanding principles of mootness prevent the maintenance of a suit when there is "no reasonable expectation that the wrong will be repeated."  *Gwaltney,* 484 U.S. at 66.  Said another way, "a claim becomes moot when an event occurs that makes it impossible for a court to grant the plaintiff effectual relief even if he should prevail."  *See id.; see also Riverkeeper, Inc. v. Mirant Lovett, LLC*, 675 F. Supp. 2d 337, 347 (S.D.N.Y. 2009).

A defendant seeking to have a case dismissed as moot carries a heavy burden.

*Gwaltney*, 484 U.S. at 66.  Such a defendant must prove that it is "absolutely clear" that the alleged violative behavior cannot reasonably be expected to recur.  *Id.*  In the CWA context, the mootness doctrine protects defendants from suits based wholly on violations unconnected to any present or future wrongdoing, while also protecting plaintiffs from defendants who seek to evade liability by "protestations of repentance and reform." *Gwaltney*, 484 U.S. at 66.

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Laidlaw,* 528 U.S. at 189 (quoting *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289 (1982)).  In *Laidlaw*, the Supreme Court held that the effect of a facility closure and of defendant's earlier substantial compliance with its permit were properly considered in a mootness analysis, so long as one or the other of those events made it "absolutely clear that Laidlaw's permit violations could not reasonably be expected to occur." *Id.* at 193. The Supreme Court stopped short of deciding whether those events did, in fact, moot a claim because they were both issues of fact left undetermined by lower courts. *Id.* at 194.

In this case, AGC submits it "no longer has any control to abate any continuing or ongoing alleged violations."  (Dkt. 46: Reply Memo at 4).  AGC further contends that it simply does not hold sufficient interests in the Adit site to conduct any "wrongful behavior" in the future and that, instead, it continues to go onto the property to operate the PWTF only because it has the permission of the USFS to do so. *Id.*  Specifically, AGC

argues that the relinquishment of their interest in the Adit and PWTF, the notice of termination of its NPDES permit and the submission of its closure and reclamation plan to the USFS, make it "absolutely clear" it will not to continue to allegedly violate the terms of its permit.  AGC also points out that it obtained the Project Site after its predecessors in interest had drove the Adit and again argues that no action taken by AGC has increased the flow from the Adit.  It contends that the claim against it is moot.  AGC directs the Court to *Laidlaw* and *Riverkeeper v. Mirant Lovett* to support that proposition.

In *Riverkeeper*, the defendant had not only physically demolished the facility at issue but also had received a letter from the New York State Department of Environmental Conservation that the permit was in fact discontinued and any future discharge would require a new permit.  675 F. Supp. 2d at 347-48.  The court concluded that "[t]he termination of the SPDES permit, in conjunction with the complete demolition of the plant and cessation of all operations, demonstrates that [defendant] can now neither legally (by permit) nor physically commit the wrongful conduct alleged in the Complaint."  *Id*. at 348. Therefore, there was no realistic prospect of continuing violations.  *Id*.

In response, Plaintiffs contend that their claims are not moot as AGC continues to violate its permit, continues to operate the PWTF at the Adit site, and retains extensive interests all of the area surrounding the Adit and PWTF.  (Plaintiffs' Resp., p. 12, Dkt. 36).

It is reasonable to conclude that it is not "absolutely clear" that AGC's discharges are not likely to recur in the future, but that, instead, the evidence indicates they will

continue.  The EPA has not released AGC from the requirements of its permit, nor has AGC taken steps to upgrade the PWTF so that its discharges will come into compliance with the effluent limitations stated in the permit.  Because contaminated water continually flows from the Adit and because the PWTF has yet to treat that water so that its discharge complies with the permit, it is reasonable to conclude that AGC's "wrongful behavior", i.e., its non-compliant discharges, will continue.

At the same time, AGC did not renew its lease for the land which houses the Adit and the PWTF.  Not only did it not renew that lease, but ten days after this lawsuit was filed it expressly opted out of its opportunity to purchase the land which houses the Adit and PWTF.  AGC contends that it is in negotiations with EPA and the USFS regarding the cessation of its operation of the PWTF.  However, at this time, the PWTF is still operating and AGC still falls under the permit.  These facts are distinguishable from *Riverkeeper* where the facility had been completely dismantled and the permit officially terminated. There is no evidence in the record that AGC's proposed cessation and reclamation plan has been approved by the USFS and importantly, the EPA specifically stated that the NPDES permit was *not* terminated following AGC's notice of termination.  (Hawley Decl., Ex. 25, Dkt. 22-5).  While the permit's termination date is June 30, 2012, approximately six months remain until that time.  At this time, it cannot be said that "it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to occur." *Laidlaw*, 528 U.S. at 189.  Instead, it appears that at least for the remaining term

of the permit, it can be expected that the allegedly wrongful behavior *will* occur.

Accordingly, the claims are not moot.

2.    Waiver & Estoppel

AGC argues that ICL should be estopped from bringing this litigation because in

the prior litigation the parties agreed that the PWTF was a temporary test facility and

could not attain less than 190 µg/l of arsenic discharge into Montezuma Creek and ICL

should not now be able to bring suit for constructing, operating and maintaining the very

facility they agreed should be built.  AGC states it relied on ICL's agreement that arsenic

would not have to be treated to less than 190 µg/l and thus is estopped from asserting a

complaint which bases liability upon an arsenic level less than 190 µg/l.  AGC contends

that it did everything required of it under the Consent Decree and ICL taking the position

that AGC should pay millions of dollars in fines because it installed the PWTF is

affirmative misconduct on the part of ICL.  Additionally, AGC submits that ICL lobbied

the governmental agencies that AGC be issued a permit that only allowed 10 µg/l, when it

knew the PWTF could not attain that.[7]

AGC also argues that ICL has waived its right to bringing this litigation because

when it entered into the Consent Decree, it affirmatively asserted that if AGC constructed

the PWTF, it would forego litigation.  AGC chose to construct the PWTF and seek an

NPDES permit rather than defend that litigation.

---

[7] Notably, the Consent Decree does not mention any specifics related to acceptable effluent
levels for pollutant discharges.

In response, ICL states that the Consent Decree does not specifically address

effluent limitations and AGC cannot show any reliance upon any assurance that would be

reasonable.  ICL also submits that the provisions in the decree (*i.e.*, that "additional

technologies for treating the Adit waters will be incorporated if required") indicate that

applicable standards could change and the PWTF would need to change as well and

AGC's contention to the contrary is without merit.  (*See* Simmons Aff., Ex. A, Dkt. 20-6).

Further, the Consent Decree states that any statements made during negotiations are not

admissible in subsequent proceedings. (*Id*. at ¶ 3).   ICL also points out that the Consent

Decree envisions future lawsuits to enforce any violations that occurred after the decree

was entered into and specifically states: "ICL shall be required to bring a new action to

redress any CWA violation that occurs after December 1, 2005."  (*Id*. at ¶ 5).

In a CWA case, a defendant must show he (1) reasonably relied on plaintiff's

conduct, (2) in such a manner as to change its position for the worse in order to establish

equitable estoppel.  *Conn. Fund for the Envt'l Inc. v. Upjohn Co.*, 660 F. Supp. 1397, 1411

(D. Conn. 1987) (citing *Heckler v. Comty. Health Serv. of Crawford County, Inc.*, 467

U.S. 51, 59 (1984)).  A defendant must show "affirmative misconduct" by plaintiff.  The

doctrine of waiver also requires reliance.  Waiver is an implied "election by one party to

dispense with something of value or to forego some right or advantage which [the party]

might at [the party's] option have demanded and insisted upon."  *Hecla Mining Co. v.*

*Star-Morning Mining Co.*, 839 P.2d 1192, 1196 (Idaho 1992) (quoting *Crouch v. Bischoff*,

**Memorandum Decision and Order - 32**

304 P.2d 646, 649 (Idaho 1956)).  In order to assert waiver, the party must show "it acted in reliance upon the waiver and altered the party's position."  *Id*.

The Court agrees with Plaintiffs that even if statements during the negotiations were admissible, which they are not by the very terms of the Consent Decree, any reliance by AGC on statements as to what effluent limits would be acceptable would not be reasonable.  It would not be for ICL to say whether AGC could violate the terms of its NPDES permit and any reliance as to such would not be reasonable.  *See Upjohn*, 660 F. Supp. at 1412 ("Non-compliance with an effluent limitation is a violation of law. Defendant could not reasonably have relied on statements to the contrary.")  Further, AGC's argument that ICL would forego litigation if the PWTF was constructed is contradicted by the very language of the Consent Decree which states:  "ICL shall be required to bring a new civil action to redress any violation of the Clean Water Act allegedly committed by Atlanta Gold after December 1, 2005."  (Hawley Decl., Ex. 12, ¶ 5.)  The Consent Decree envisions future litigation by ICL against AGC if necessary. AGC's arguments of estoppel and waiver fail.[8]

## IV.  Conclusion

The Court's findings of standing and that the claims are not moot coupled with the proof of past and continuing violations established by the DMRs, which are not disputed

---

[8]  Although many of the statements that AGC relies on in making their estoppel and waiver arguments were stricken, the Court notes that even if they were considered, it would not alter its conclusion on these issues.

**Memorandum Decision and Order - 33**

by AGC, warrants granting partial summary judgment to Plaintiffs on the issue of liability.

AGC's motion for summary judgment will be denied for the reasons expressed in this

opinion.  This case will now proceed to determine the appropriate remedy for AGC's

violations of the Clean Water Act.

## ORDER

**IT IS HEREBY ORDERED:**

1)      Plaintiffs' Motion to Strike (Dkt. 47) is GRANTED IN PART and DENIED

IN PART;

2)      Plaintiffs' Motion for Partial Summary Judgment (Dkt. 21) is GRANTED;

and

3)      Defendant AGC's Motion for Summary Judgment (Dkt. 20) is DENIED.

DATED: January 9, 2012

_____
Honorable Mikel H. Williams
United States Magistrate Judge