# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE and NORTHWEST ENVIRONMENTAL DEFENSE CENTER,<br><br>                Plaintiffs,<br><br>    v.<br><br>ATLANTA GOLD CORPORATION,<br><br>                Defendant. | Case No.1:11cv-00161-MHW<br><br>**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES** |

Plaintiffs Idaho Conservation League and the Northwest Environmental Defense Center ("Plaintiffs") filed this action against Atlanta Gold Corporation ("AGC") seeking an injunction, declaratory relief, and civil penalties pursuant to the Clean Water Act ("CWA") 33 U.S.C. § 1251 *et seq.* The litigation centers around discharges of water containing high levels of arsenic and iron issuing from a historic mining tunnel known as the 900 Level Adit ("the Adit")[1] The Adit is located alongside a stream known as Montezuma Creek, on lands within the Boise National Forest. (Complaint at ¶¶ 32-33, Dkt. 1)

Currently pending before the Court is Plaintiffs' Motion for Remedies (Dkt. 60), which was filed on March 22, 2012. Also pending in connection with that motion is a Motion

---

[1]An adit is a nearly horizontal passage from the surface of the earth into a mine, from which the mine can be entered, drained of water, and ventilated. (Simmons Aff. at ¶ 7, Dkt. 20-5).

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      1**

to Strike (Dkt. 72), filed by AGC on April 16, 2012.  All parties previously consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. 12).

In accordance with the parties' Stipulated Litigation Plan, this litigation was bifurcated into two separate phases, a liability phase and a remedial phase.  (Scheduling Order, Dkt. 17). In a Memorandum Decision filed on January 9, 2012 (Dkt. 54), the Court granted partial summary judgment in favor of Plaintiffs on the issue of liability, holding that AGC's discharges from the Adit violated the effluent limitations for both arsenic and iron contained within a National Point Source Discharge Elimination System  Permit (the "NPDES Permit" or "the Permit") issued by the EPA in August of 2009.

The Plaintiffs now ask that this Court enter an injunction, effective ninety days from the date of this Order, prohibiting AGC from discharging pollutants into Montezuma Creek in violation of the NPDES Permit.   They have also requested that the Court impose a civil penalty of some $3,694,000, as authorized under 33 U.S.C. § 1319(d), for daily violations of the effluent limitations for both arsenic and iron that have occurred since the issuance of the NPDES Permit.  AGC acknowledges that civil penalties are mandatory under 33 U.S.C. § 1319(d), but argues that nothing more than a *de minimis* penalty should be imposed.  It also argues that because it is already working with the Forest Service to implement a plan to treat the water and eventually close the Adit, that an injunction at this point would be futile.

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      2**

The Court has reviewed the voluminous submissions of the parties on these motions,[2] and entertained oral argument on the matter on June 4, 2012.  The Court has also reviewed the reports the parties submitted on June 27, 2012, describing the results an informal meeting that occurred between the parties, their attorneys, and representatives of the United States Forest Service  and the EPA in which the feasibility of AGC's current plans to treat the water and close the 900 Adit were discussed.[3]  Having reviewed all these materials, the Court now issues the following ruling.

## BACKGROUND

Gold was first discovered near Atlanta, Idaho in 1863 and the area has undergone various periods of metal production since then.  (Simmons Aff. at ¶ 2, Dkt 20-5).  AGC is a mining company in the business of mineral exploration and development and has extensive interests in a historic mining site (the "Project Site")  located at the top of Atlanta Hill.  (*Id.* at ¶ 3, Dkt. 20-5).  The Project Site was previously known as the Talache Mine and consists of various patented and unpatented mining claims, lode claims, and mill

---

[2]The relevant briefs and affidavits are contained at Docket Entries 60-67, 71, 72, 74-77, and 80-82.

[3]This meeting occurred at the instruction of the Court, pursuant to an in-chambers discussion between the Court and counsel for the parties after the June 4, 2012 hearing.  The purpose of the meeting was to obtain insight as to the Forest Service's position as to what measures AGC could take, in the near term, to achieve compliance with the terms of the NPDES Permit, and also with respect to the overall feasibility of AGC's most recent Supplemental Plan of Operations as a potential viable solution to contamination at the 900 Adit.  The informal reports that the parties submitted to the Court will be made part of the record in this case. (Dkt. 86).  The report by Plaintiff contained additional legal arguments, which the Court has previously indicated it would not consider. (Dkt. 84).

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      3**

site claims, which total approximately 2,159 acres. (*Id.* at ¶ 4).

The 900 Adit that is the subject of this litigation was first drilled as a haulage tunnel in 1917 and is part of the historic Talache Mine. (*Id.* at ¶¶ 6 & 7, Dkt. 20-5). The Adit is situated alongside Montezuma Creek, which flows through the town of Atlanta approximately a mile downstream from the Adit.  Montezuma Creek is a tributary of the Middle Fork of the Boise River.  (Complaint at ¶ 33, Dkt. 1). The Boise River flows through the City of Boise, and its waters eventually reach the Snake and Columbia River systems.

AGC first attained an interest in the Adit site in 1985.  (Simmons Aff., at ¶ 2, Dkt 20-5).  From 1999 until 2011, AGC conducted operations at the site under the auspices of a "Mining Lease and Option to Purchase Agreement" that it entered into with Monarch Greenback, LLC in 1999.  (Points Aff. at ¶ 2, Dkt. 20-3).  Although AGC has never actually processed or produced ore at the Adit site, it has, over the years, conducted exploratory activities such as core drilling and excavation.  (*Id.* at ¶ 2 & 5). These ventures began in 1988, when AGC  reopened about 200 feet of the previously collapsed Adit. (Glaspey Aff. at ¶¶ 8-11 & Hawley Decl., Exh. 26, Dkt. 22-5).   In 1994, as part of a joint venture with Ramrod Gold USA, AGC submitted a Plan of Operation to the Forest Service for an exploration program at the Project Site, which included opening and further excavation of the 900 Adit. (*Id.* at ¶ 19).  Once these activities were completed, the Adit portal was kept open to allow for future exploration.  (*Id.*  at p. 21.)  In 1998, the Forest Service approved another Plan of

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      4**

Operations to conduct exploratory drilling. (Hawley Decl., Exh. 26, Dkt. 22-5). As components of both the 1994 Plan and the 1998 Plan, the Forest Service required AGC to treat the water issuing from the Adit to a level consistent with applicable state and federal water quality standards. *Id*.

For many years, AGC treated the Adit waters either by piping them through a single settling pond to filter out suspended solids or by using a land-application system of disposal. (Glaspey Aff. at ¶¶ 9, 15, & 19-21, Dkt. 20-12 & Hawley Decl., Exh. 26, Dkt. 22-5). In 2005, the company was working with the EPA to draft a Consent Order covering various discharges within the Project Site, including those from the 900 Adit. (Simmons Aff. at ¶¶ 8-10, Dkt. 20-5). However, before that Consent Order could be finalized, the Idaho Conservation League filed a lawsuit alleging that AGC was illegally discharging pollutants from the 900 Adit in violation of the CWA. *See Idaho Conservation League v. Atlanta Gold Corp.,* Case No. 1:05-cv-212-EJL. This prior litigation between ICL and AGC was resolved by means of a Consent Decree in which AGC agreed to construct a Pilot Water Treatment Facility ("the PWTF") to treat the waters issuing from the 900 Adit. (Simmons Aff. at ¶ 12 & Exh. A, Dkt. 20-5 & 20-6). Also as part of this Consent Decree, AGC agreed to apply to the EPA for an NPDES Permit that would authorize discharges of pollutants from the 900 Adit. (*Id.,* Exh. A, Dkt. 20-6). This Permit, which was eventually issued on August 6, 2009 with an effective date of July 1, 2007, lists the applicable effluent limitations at 10 µg/L for arsenic and 1,000 µg/L for iron. (Hawley Decl., Exh. 1, pp. 4-5 & 7, Dkt. 22-1).

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      5**

The PWTF consists primarily of two lined settling ponds and associated pipeworks. A third pond predates the PWTF but is apparently not in use at this time.   Water coming out of the Adit is routed through these ponds and allowed to remain long enough for a significant amount of pollutants to precipitate out, a process that is aided by the addition of a chemical coagulant mixture.   After being treated in the settling ponds, the waters are discharged into Montezuma Creek.   (Simmons Aff., Exh. 1, Dkt. 20-6, p. 9).

Though the PWTF does remove a significant amount of toxic materials from the Adit waters, it has never been able to meet the effluent limitation standards imposed in the NPDES Permit, and indeed, AGC acknowledges that it was not designed to do so.  *Id.* at ¶¶ 26 & 27.) As part of the Permit's requirements, AGC must monitor, among other things, the amounts of arsenic and iron in the discharge flow.   (Torf. Decl., at ¶¶ 8-9).   Data is recorded on a weekly basis and forwarded to the EPA in monthly "Discharge Monitoring Reports" ("DMRs").  (*Id.* at ¶ 10.)   These records show that the arsenic levels in the discharge waters have ranged from three to three hundred times greater than the 10 µg/L effluent limitation. *(See id.,* at ¶¶ 7-17 & 21, and Benner Decl. at ¶¶ 14-19, Dkt. 63.)   On average, the discharge waters have contained 265 µg/L of arsenic–-over twenty-six times the allowable amount. (Benner Decl. at ¶ 16, Dkt. 63.)   The situation with iron is similar: all monthly DMRS for the period beginning in August of 2009 reflect numbers far in excess of the 1000 µg/L effluent limitation.   (Torf Decl. at ¶ 13, Dkt. 25 & Hawley Decl., Exhs. 16-21, Dkt. 22-3).[4]

_____

[4]The Torf Declaration addresses the period from August of 2009 through June of 2011; however, at intervals throughout these proceedings Plaintiffs submitted affidavits containing

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES     6**

Turning to the condition of the affected streams, in 2009, the Idaho Department of Environmental Quality designated tributaries of the Middle Fork of the Boise River as impaired water bodies, due to arsenic pollution in Montezuma Creek.  (Hayes Decl., Exhs. 3 & 4, Dkt. 22-1 &Third Hayes Decl. at ¶ 18, Dkt. 62). Though the 900 Adit contributes to this problem, it is by no means the sole source of pollution.   Approximately 3,000 feet downstream of the Adit is a Superfund Site known as the Talache Mine Tailings Reclamation Site, which, according to AGC, is a source of direct discharges into Montezuma Creek that consistently reflect arsenic levels of 1,000 µg/L.  (Simmons Aff. at ¶ 33, Dkt. 20-5).

The State of Idaho regulates both Montezuma Creek and the Middle Fork of the Boise River to protect certain beneficial uses of their waters.[5]  For Montezuma Creek, the beneficial use known as "primary contact recreation" requires "water quality appropriate for prolonged and intimate contact by humans or for recreational activities when the ingestion of small quantities of water is likely to occur."   IDAPA 58.01.02(100)(02)(a).   Primary contact recreation includes uses such as swimming, water skiing, or skin diving.  *Id.*  In addition, Idaho's water quality standards recognize that Montezuma Creek could be used as an

---

updated weekly data and monthly DMRs, which reflect that the permit exceedances for both arsenic and iron continued up to the time of the June 4, 2012 hearing on the Motion for Relief. (*See* Ruether Decl., Exh. 27, Dkt. 38; Second Ruether Decl., Exh. 34, Dkt. 49; and Third Ruether Decl., Exh. 40 & 41, Dkt. 64).

[5] Montezuma Creek is not individually addressed in Idaho's applicable regulatory scheme, but is instead regulated as an "undesignated" water body to which certain default standards apply. Undesignated water bodies must meet water quality standards consistent with "beneficial uses, which includes all primary contact recreational use in and on the water and the protection and propagation of fish, shellfish, and wildlife."  IDAPA 58.01.02.101.01.a.

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      7**

agricultural water supply and, therefore, the "water quality [must be] appropriate for the irrigation of crops or as drinking water for livestock." IDAPA 58.01.02.100.03(b).  Consistent with this designation, the inhabitants of Atlanta use the creek's waters to irrigate their crops and lawns.  (Third Hayes Decl., at ¶ 29, Dkt. 62).  Citizens of Atlanta also have unrestricted access to the waters of Montezuma Creek, because it is diverted into open irrigation ditches that run directly through the town.  *Id.*

Water quality standards for the Middle Fork of the Boise River include criteria to support several designated uses, including primary contact recreation and the protection of aquatic life. (Third Hayes Decl. at ¶ 10; *See also,* IDAPA 58.01.02(140)(09)). The Middle Fork of the Boise River is also subject to the "domestic water supply" designation, which means that water quality must be appropriate for drinking supplies.  (Third Hayes Decl. at ¶ 19; *see also,* IDAPA 58.01.02(140)(09) & 58.01.02(100)(03)(a)).

At the time that it was constructed, the PWTF was not intended to be a permanent solution to arsenic and iron pollution from the 900 Adit.  (*See,* Atlanta Gold's Statement of Material Facts at pp. 8-9, Dkt. 20-2; *see also* Fereday Aff., Exh. F, Dkt. 20-11 and Hawley Decl., Exh. 13.  p. 2 & Exh. 14, p. 6, Dkt. 21-2).  Though the PWTF does remove significant amounts of pollutants from the Adit waters, as constructed, it was never designed to meet the applicable arsenic effluent limitation of 10 μg/L contained within the NPDES Permit. (Simmons Aff. at ¶ 27, Dkt. 20-5).  In fact, AGC had originally intended to operate the PWTF only until November 15 of 2008, by which time it anticipated constructing a more permanent water treatment facility.  (Simmons Aff. at ¶¶ 19 & 20, Dkt. 20-5, & Exh. E at p. 33, Dkt. 20-

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      8**

6).     During the years following the construction of the PWTF, AGC made several

representations to governmental agencies regarding its intentions to take more permanent

steps to address contamination at the 900 Adit.  For example, in the 2006 Supplemental Plan

of Operations (the document under which the Forest Service authorized the construction and

operation of the PWTF), AGC stated that the more permanent facility would be constructed

by November of 2008.  *Id.*   In October of 2009, AGC stated in a Quality Assurance Project

Plan that was circulated to the EPA and Idaho Department of Environmental Quality,  that

"the PWTF was built as a temporary structure which will be replaced in the near future by a

permanent WTF." (Hawley Decl., Exh. 14 at p. 6, Dkt. 22-2 at p. 30).

Though AGC never did install such a facility, over the years, the company contacted

a number of contractors and/or engineering firms who submitted various proposals designed

to address water treatment issues on a more permanent basis. (Third Reuther Decl., Exhs. 43-

49, Dkt. 64).  Some of these predate the construction of the PWTF and some do not.  In 2005,

AGC commissioned a study from a company known as Blue Water Technologies, which

conducted a bench-scale test of water samples taken from the Project Site and succeeded in

lowering arsenic levels to less than the applicable 10 μg/L standard.  (*Id.,* at Exh. 46, pp 1-3).[6]

 In 2009, AGC commissioned a report from a company known as "AdEdge," which set up a

pilot test at the Adit site and succeeded in lowering the arsenic levels to "between non-

---

[6]As the Court understands it, a "bench scale test" is a test in which water samples are
treated in an off-site lab, whereas a "pilot test" occurs on site. With respect to the 2005 bench
scale test conducted by Blue Water Technologies, it is not clear whether this was commissioned
specifically to address the 900 Adit or whether it was designed to address water treatment issues
that AGC faced within the Project Site as a whole.

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      9**

detectable and 10 ppb." *Id.,* Exh. 47 at p. 6, ¶ 8.  This pilot test consisted of a temporary filtration system that was installed at the Adit site and run for approximately eight hours a day for a period of three weeks. *Id.* at p. 4.   In its summary of findings following this test, the AdEdge report states:

> The current treatment process employed using coagulation/lime addition and gravity settling (using the impoundments as clarifier(s)) does appear to provide some benefit for reducing arsenic from the raw Adit 900 water.  However, this treatment alone is clearly not achieving the desired targets.   Additional or substitutionary treatment is needed.  AGC could elect to utilize a combination of this existing treatment system coupled with the AdEdge AD26/E33 integrated system for a total solution or eliminate the pretreatment altogether if desired.

(*Id.,* at p. 5, ¶ 2.) Also in 2009, AGC also purchased a water treatment plant from a company called Newmont ("the Newmont Plant"),  which it represented to the EPA would be installed to treat Adit waters by 2012. (Third Ruether Decl., Exh. 52, pp. 18-20, Dkt. 67-2).  However, as with the other proposed treatment systems, the Newmont Plant was never installed.  (*Id.* at pp. 17-37).

Though it is fair to say that each option for treating the water involved some degree of logistical difficulty,[7] it is also critical to understand that AGC anticipated  that construction

---

[7]Atlanta Gold's Chief Operating Officer, Ernest W. Simmons, discussed these difficulties at length in his deposition that occurred on March 12, 2012.  For example, he explained that installing the Newmont Plant would have proved difficult for the following reasons: 1) it was too big to get over the area roads without "cutting it in half;" 2) AGC lacked private land to put it on, 3) because power sources in the Atlanta, Idaho, area were insufficient, and the plant therefore would have required the installation of an eighteen mile power line or the constant use of noisy generators, and 4) because AGC did not have the ability to collect and hold sufficient quantities of water to feed the plant on a continuous basis.  (Simmons depo., Third Ruether Decl., Exh. 52, at pp. 18-24, Dkt. 67-2).  Mr. Simmons also cited the lack of sufficient ponding capacity to manage the water as the reason that other proposals–such as those from Blue Water and AdEdge-

of the more permanent water treatment facility would occur in conjunction with the commencement of active mining operations. (Third Ruether Decl, Exh. 51 at p. 14, Dkt. 67-1; *See also,* Simmons Aff. at ¶ 20, Dkt. 20-5). Indeed, the company has insisted that long-term water treatment can ___**only**___ be a component of a mine plan. (*Id.,* at ¶ 43).

In 2006, AGC represented that it would construct a more permanent water treatment facility to replace the PWTF as part of its future plan to conduct a heap leach mining operation. According to a plan of operations that AGC submitted to the Forest Service at that time, this was to be achieved by November of 2008. (Simmons Aff. at ¶ 20, Dkt. 20-5). However, in 2008, AGC withdrew the pending plan to conduct a heap leach mining operation. (*Id.* at ¶¶ 20 & 22). It is not clear when AGC does plan to begin mining, since it has submitted no plan for mining operations on the overall Project Site since that time. *Id.*

Turning to more recent events, the Plaintiffs issued their notice of Intent to Sue on December 24, 2010 (Hawley Decl. Exh. 23, Dkt. 22-5), and filed this lawsuit on April 18 2011. (Complaint, Dkt. 1). Several days later, on April 28, 2011, AGC declined to exercise its option to purchase the mining claims upon which the 900 Adit is located. (Points Affidavit at ¶¶ 2-4, Dkt. 20-3). AGC then attempted to terminate its NPDES permit on May 2, 2011, claiming that it no longer had any interest in the site. (Points Aff. at ¶ 6 & Exh. B). In a letter dated June 9, 2011, the EPA rejected this effort, informing AGC that coverage under the Permit "does not automatically terminate upon notification." (Hawley Decl., Exh. 25,

---

-were never implemented. (*Id.,* at pp. 34-37).

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      11**

Dkt. 22-5).  On June 19, 2012, AGC sent a letter to the EPA in which it expressed its intent

to continue operation under the Permit and "request[ed] extension of coverage of that permit

for an unspecified period of time." (Dkt. 86).  The EPA granted this request on June 28, 2012.

(Dkt. 85).

Since it has now abandoned its interest in the 900 Adit, AGC's current plan is to close

the Adit off and reclaim the site.  On May 1, 2012, AGC submitted a Supplemental Plan of

Operations to the Forest Service ("the 2012 Supplemental Plan") that addresses its proposals

for closure and reclamation of the Adit.  The Supplemental Plan also contains a new proposal

for treating the Adit waters until these objectives can be achieved.  (*Id*. at ¶¶ 4 & 8, & Third

Simmons Decl., Exh. A, Dkt. 77).  The 2012 Supplemental Plan states that AGC can bring

the discharges from the 900 Adit into compliance with the terms of the NPDES Permit by

October 2012.  (Third Simmons Decl., Exh. A, p. 2, Dkt. 77-3).  AGC asserts that compliance

can be achieved on this time frame by means of the following measures: 1) diverting

Montezuma Creek above the 900 Adit to reduce the flow of water through the Adit; 2)

constructing another settling pond to increase holding capacity and settling times at the PWTF

so that more arsenic and iron can precipitate out; and 3) adding a layer of sand to the floor at

mouth of the Adit to assist in the removal of toxins.  (*Id.* at pp. 1-2.) Therafter, the Plan

proposes installing a bulkhead to seal off the Adit by 2013, and completing reclamation of the

site by 2014.  (*Id.,* Dkts. 77-15 & 77-16). The 2012 Supplemental Plan also stated that "[i]f

the proposed settling pond and sand filtration system are unable to meet required water quality

parameters, a future filtration system will be constructed downstream of the ponds." (*Id*., Dkt.

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES       12**

77-13 at p. 4).  AGC has referred to this potential future filtration system as a "contingency filter."

At the time of the hearing on Plaintiffs' Motion for Remedies, the Forest Service had neither approved nor rejected AGC's 2012 Supplemental Plan, and  has not done so as of the date of this opinion.  Accordingly, after the hearing, the Court instructed the parties and their counsel to meet informally with the Forest Service to discuss that agency's opinion of the 2012 Supplemental Plan as a potential viable solution for contamination at the 900 Adit.  The Court also instructed the parties to discuss with the Forest Service what steps it believes AGC could take, in the near term, to achieve compliance with the terms of the NPDES Permit or to bring it as close as possible to that goal.  The parties reported back to the Court with the results of this meeting on June 27, 2012.  (Dkt. 86).   During this meeting, the Forest Service requested that AGC provide it with design and engineering specifications for the "contingency filter," so that the need to obtain approval of such a filter would not cause further delays if the additional pond and sand filtration system did not achieve compliance.  (*Id.).*  The Court will make these reports part of the record and take them into account in fashioning the remedy best suited to ensure compliance.

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      13**

## LEGAL STANDARDS

The Clean Water Act authorizes the district court "to order that relief it considers necessary to secure prompt compliance with the Act.  That relief can include, but is not limited to, an order of immediate cessation." *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 320, 102 S.Ct. 1798, 1087 (1982).   Discretion is vested in the district court to either grant or deny a request for injunctive relief, depending upon its view of the range of public interests at issue.  *Id.*  If a district court chooses to grant an injunction, however, it must meet the requirements of Federal Rule of Civil Procedure 65(d), which states that every injunction must "a) state the reasons why it was issued, b) state its terms specifically, and c) describe in reasonable detail–and not by referring to the complaint or other document–the act or acts restrained or required." F.R.C.P. 65(d). *See also, Reno Air Racing Ass'n. Inc. v. McCord,* 452 F.3d 1126, 1132 (9th Cir. 2008).

In addition, the Act mandates civil penalties if violations of the CWA are found.  33 U.S.C. § 1319(d) is couched in mandatory language, and states that any person who violates the Act "***shall*** be subject to a civil penalty not to exceed $25,000 per day." (emphasis added). *See also, Natural Resources Defense Council v. Sw. Marine, Inc.,* 236 F.3d 985, 1001 (9th Cir. 2000) (holding that penalties are mandatory if a violation of the Act is found).  The maximum **daily** penalty has increased periodically since the statute was enacted and is currently set at $37,500.00.  40 C.F.R. § 19.4. Unlike damages in a civil case, these penalties do not inure to the citizen plaintiffs, but are payable to the United States Treasury.  *See, Friends of the Earth v. Laidlaw Environmental Svcs., Inc.* 528 U.S. 167, 173, 120 S.Ct. 693, 700 (2000).  Section

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      14**

1365(a) of the Act also authorizes the imposition of penalties in citizen suits.

**DISCUSSION**

**I.      Atlanta Gold's Motion to Strike.**

AGC has filed a Motion to Strike the Third Declaration of Justin Hayes, (Dkt. 72), which the Court will address before turning to Plaintiff's Motion for Remedies.

Mr. Hayes is an employee of the Idaho Conservation League and holds undergraduate degrees in Human Biology and Earth Systems, and a masters degree in Earth Science from Stanford University. (Hayes Affidavit, at ¶ 2, Dkt. 62). His affidavit discusses, generally, the following topics: 1) the reasons why the EPA set the water quality limits for arsenic and iron their current levels, and 2) the various water quality standards and beneficial use categories generated by the Idaho Department of Environmental Quality (DEQ) to protect Montezuma Creek and the Middle Fork of the Boise River.  Mr. Hayes's affidavit also offers opinions about the conditions of the affected streams, (*Id.* at ¶ 27), and explains how the waters of Montezuma Creek are used by the community of Atlanta, Idaho and by persons who recreate in Montezuma Creek and the Middle Fork of the Boise River.  (*Id.* at ¶ 29-30.).

AGC asks that the Court strike paragraphs 7 through 30–the bulk of the affidavit. AGC does not take issue with the contents of the statements, but rather, argues that Mr. Hayes is not qualified by virtue of education or experience to give opinions on scientific and technical matters that are typically the purview of expert witnesses.  It also argues that Mr. Hayes has impermissibly opined as to the meaning of EPA and Idaho regulations, and that his opinion that the discharges from the Adit have contributed to the high levels of arsenic

downstream is conclusory and unreliable.

On the whole, Mr. Hayes's affidavit is admissible for the primary purposes for which it was offered–as a summary of various water quality standards and criteria, all of which are independently available in various documents and web sites to which the affidavit refers. Though Plaintiffs characterize the statements in his affidavit as lay opinion that is admissible under Rule 701 of the Federal Rules of Evidence, the Court finds that it is more appropriate to consider the bulk of his testimony as a species of expert testimony under Rule 702.  By virtue of his educational background and his professional experience with water quality standards and water quality issues, Mr. Hayes is qualified to set forth the information contained in his affidavit.  The affidavit is summary and does not offer opinions on contested legal issues.  *See, e.g. Nationwide Transport Finance v. Cass Information Systems, Inc.,* 523 F.3d 1051, 1058 (9th Cir. 2008). Especially outside the context of a jury trial, a person generally familiar with water quality standards through professional experience with Clean Water Act and DEQ permitting, enforcement, and rule-making is qualified to provide a summary of the relevant standards.  To the extent that Mr. Hayes's affidavit is offered for this purpose, the Court finds that it is helpful, relevant and admissible.[8]

Some of the statements in Mr. Hayes's affidavit, however, cannot be characterized as mere summary or background.  His opinions as to the comparative lack of diversity among

---

[8]The Court has also checked the sources referenced by Mr. Hayes where it was necessary to refer to his statements in this opinion.  In each case, Mr. Hayes's summary accurately reflected the regulation or other document referenced.

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES     16**

fish species in Montezuma Creek fall into this category. (Third Hayes Decl. at ¶¶ 25-27, Dkt. 62). In paragraph 27 he states that "[i]n my judgment the elevated concentrations of arsenic in Montezuma Creek and downstream waters play a role in the observed absence of fish in portions of Montezuma Creek, decreased species diversity in other portions of the creek and decreased fish presence (i.e. fish density in the Middle Fork of the Boise River). However, the affidavit does not establish that Mr. Hayes is qualified to opine as to matters of scientific causation. The opinions as to the lack of species diversity are also speculative. The final sentence of paragraph 27 will therefore be stricken.

The remaining portions of Mr. Hayes' affidavit address personal observations about how people use Montezuma Creek and the Middle Fork of the Boise River, and explain his concerns about safety hazards posed by those uses. Specifically, Mr. Hayes explains that he has observed people fishing in the Middle Fork of the Boise River downstream from the 900 Adit. (*Id.* at ¶ 30.) He also explains that the that the residents of Atlanta, Idaho use the waters of Montezuma Creek to irrigate their crops and lawns. (*Id.* at ¶ 29.) These statements are based on personal observation, and are therefore admissible under rules 401, 402, and 701 of the Federal Rules of Evidence.

## II.    Injunctive Relief.

The Court will now address Plaintiff's Motion for Remedies, turning first to the question of whether an injunction is necessary to ensure timely compliance with the terms of the NPDES Permit.

As the Plaintiffs themselves acknowledged at oral argument, entering an injunction in

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      17**

this case does present some practical difficulties.  The discharges from the Adit are of a continual nature and are, at least in part, result from groundwater seeps and springs that exist naturally in or near the Adit. Thus, the illegal discharges cannot be halted simply by ordering AGC to shut down its operations.  Rather, AGC must take active steps to stop the discharges, such as by installing a filtration system on site, by constructing additional settling ponds, or, as a potential long term solution, by installing a bulkhead to seal off the Adit.  Because of the Adit's location within the Boise National Forest, all of these measures are subject to approval by the Forest Service. Nonetheless, despite these difficulties, the Court concludes that an injunction is appropriate.  Considering the longstanding, serious, and ongoing nature of the violations, and considering AGC's history of attempting to delay compliance until it had its mine up and running, an injunction may well be the only way to ensure that the company complies with the CWA in a timely fashion.

### A.    Standards for Granting an Injunction

In order to demonstrate that an injunction should be entered, a plaintiff must demonstrate the following: "1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Monsanto Co. v. Geerston Seed Farms,* 130 S.Ct. 2743, 2756 (2010).

### B.    Irreparable Injury and Inadequacy of Money Damages

The Plaintiffs can easily meet the first two prongs of this test.  "Environmental injury,

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      18**

by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable." *Sierra Club v. Bosworth,* 510 F.3d 1016, 1033 (9th Cir. 2007) (quoting *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545 (1987). "[I]f environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* at 1033.

Arsenic is a well-known poison.  It is highly toxic to humans and the environment and because it is an element, it does not degrade over time.  (Benner Decl. ¶ 6, Dkt. 63).  The Court has no difficulty concluding that discharging water containing arsenic in amounts well in excess of applicable effluent limitations is highly likely to cause long-term environmental damage.  Apart from this general observation, Plaintiffs have also offered the following evidence to demonstrate that the specific amounts of arsenic being discharged into Montezuma Creek are likely to cause irreparable harm to the environment in both the near and long term.  In particular, the Declaration of Shawn Benner establishes the following facts:

 • That arsenic is a versatile toxin that causes a suite of adverse health impacts in both humans and aquatic organisms.  For humans, these can include "hypertension, cardiovascular disease, diabetes, immunity supression, and a suite of cancers including cancer of the skin, bladder, lung, kidney, and liver." (*Id.* at ¶ 9.) Chronic exposure to arsenic in drinking water can cause "skin lesions, neurological problems, high blood pressure, diabetes, respiratory and cardiovascular diseases as well as skin, lung, and bladder cancer." *Id.*

 • The toxicity of arsenic is believed to vary with whether it takes a dissolved or particulate form, with dissolved arsenic being more dangerous to human health because the

primary pathway of ingestion is through drinking water. (*Id.* at ¶¶ 7 & 15.)[9] While dissolved arsenic can leave the water column via processes of precipitation or adsorption, (and thus reduce the toxicity of the water itself), if it does so, it settles into the underlying stream beds and can become incorporated into the food web via macro-invertebrate insects living in the sediment. *Id.* at ¶ 7-8.

• During the reporting period from August of 2009 onwards, upstream of the 900 Adit, Montezuma Creek had average arsenic concentrations of 41 µg/L, and a maximum observed concentration of 95 µg/L. The discharge waters from the 900 Adit indicated an *average* arsenic concentration of 265 µg/L, with a maximum observed value of 3070 µg/L. (*Id.* at ¶ 16.) Thus, the average concentrations of arsenic in the Adit waters were over twenty-six times higher than the maximum concentrations allowed under the Permit, and on one occasion, *three hundred* times as high. Downstream of the Adit, the average arsenic load in the Montezuma Creek was 125 µg/L, with a maximum observed level of 509 mg/L. Thus, the discharges from the PWTF waters have increased the arsenic levels in Montezuma Creek, on average, by a factor of three. (*Id.* at ¶ 16.).

• Lifetime consumption of drinking water containing 50 µg/L of arsenic will produce a fatality rate of one person in 100; at an arsenic concentration of 500 µg/L the fatality rate is one in ten. This means that in a community of 100,000 people, lifetime consumption of

---

[9]It was not clear whether the arsenic in the discharge waters was in dissolved or particulate form, because appropriate tests were not undertaken to determine that information. (*Id.* at ¶ 15.). According to Dr. Benner, if it is not known what form the arsenic takes, EPA standards require assuming that it is in its dissolved (i.e. more dangerous) state. *Id.*

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES    20**

water containing arsenic levels of 50 µg/L will result in early deaths of 1,000 members of that community.   (*Id.* at ¶ 8.)   Citizens of Atlanta Idaho have easy and unfettered access to Montezuma Creek where it is diverted through the town and used for irrigation of crops and lawns.  (Hayes Aff. at ¶¶ 29, Dkt. 62).   Montezuma Creek is also regulated by the State of Idaho as a body of water which should meet quality standards for primary contact recreation and agricultural use.  It does not meet these standards.

These facts are sufficient to convince the Court that there is a significant possibility that harm to human health may result if the discharges continue unabated.  In AGC's defense, it should be clarified that there is no evidence that the *untreated* waters of Montezuma Creek or the Middle Fork of the Boise River serve as a source of drinking water for Atlanta, Idaho or any other downstream community, and therefore no evidence that AGC's discharges are *currently* causing or contributing to a serious public health problem.  However, this makes no difference with respect to the Court's analysis on injunctive relief.   Harm to the environment exists, even if municipal suppliers eventually remove the toxins from the water before it enters household taps.  *Cf. Hawaii's Thousand Friends v. City and County of Honolulu,* 821 F.Supp. 1368 (D. Hawaii 1993) (recognizing that *potential* as well as actual harm to human health is a consideration in assessing CWA penalties); *see also United States v. Hartsell,* 127 F.3d 343, 351 (4th Cir. 1997) (recognizing that regulated pollutants can "harm waterways and aquatic life, and could introduce chemicals which hamper treatment facilities ability to treat waste water" even if human health is not implicated).  It is not necessary for Plaintiffs to establish that an immediate and catastrophic threat to public health exists before a federal Court can

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      21**

step in and order a defendant to stop its illegal discharges.

The affect on fish and other aquatic life provides another basis for concluding that irreparable harm to the environment is resulting, and will continue to result, from AGC's illegal discharges.  The EPA has established two standards designed to protect aquatic life, known as the "acute criteria" and the "chronic criteria."  The acute criteria for arsenic is set at 340 μg/L and is designed to protect aquatic life from the "lethal impact of significant short term exposure to a toxic substance." (Third Hayes Decl. at ¶ 10).  The chronic criteria is set at 150 μg/L (IDAPA 58.0.02), and was developed to protect aquatic life from the harmful impacts of exposure to a toxic substance for periods of four days or longer.  (*Id.* at ¶ 11.)  Both the chronic and acute standards are designed to adequately protect aquatic life if they are not exceeded more than once every three years. (*Id.* at ¶¶ 10-11.)  The waters discharged from the PWTF have exceeded the chronic criteria of 150 μg/L on all but two occasions, and exceeded the acute standard of 340 μg/L on fifteen separate sampling events.  (*Id.* at ¶ 18.)

As one would expect, the concentrations of arsenic in Montezuma Creek are significantly lower than those in the discharge waters. Even so, the arsenic concentrations in Montezuma Creek below the Adit have exceeded the EPA acute criteria of 350 μg/L on two separate sampling events since data collection began in August of 2009, and have exceeded the EPA chronic criteria on eight separate sampling events, including a continuous five month period from May through September of 2011.  (Benner Decl. at ¶ 19, Dkt. 63).  Upstream of the Adit, the arsenic concentrations in Montezuma Creek have never exceeded the chronic criteria of 150 μg/L.  Therefore, Dr. Benner attributes all the violations of the chronic life

criteria downstream of the Adit to the Atlanta Gold discharge.  *Id.*  Putting this in stark terms, above the Adit, according to the EPA's criteria, Montezuma Creek would be capable of supporting healthy aquatic life.  Below the Adit, it is not.  These facts are more than sufficient to demonstrate that irreparable harm to the environment will occur if the illegal discharges continue.  These are not the kinds of harms that are readily compensable by money damages; therefore, the Plaintiffs have met the first two prongs of the test for granting injunctive relief.

### C.    Balancing the Hardships and Public Interest

Even where environmental injury is established, the Court must still engage in the traditional balancing of harms test before entering an injunction, which includes a consideration of the economic injury to the defendant that will result from imposition of an injunction.  *See, The Lands Council v. McNair,* 537 F.3d 981 (9th Cir. 2008), *abrogation on other grounds recognized by American Trucking Ass'ns. Inc. v. City of Los Angeles,* 559 F.3d 1046, 1052 (9th Cir. 2009).  *See also, National Parks & Conservation Ass'n. v. Babbitt,* 241 F.3d 722 (9th Cir. 2001), (requiring traditional balancing of harms even in the case of environmental injury).

The parties have submitted a variety of proposals for treating the Adit waters, which vary greatly in terms of scale, and also, the Court presumes, in terms of expense.  On one end of the scale, AGC's expert, Robert Vince, has maintained that compliance can "more than likely" be achieved in the short term by adding an additional settling pond to the PWTF.  (Vince Decl. at ¶ 6, Dkt. 71-3).   In the 2012 Plan of Operations, AGC proposes that the

installation of another pond, plus the addition of sand filter at the mouth of the Adit, will bring about compliance by October 2012.[10]  (Third Simmons Aff. at Exh. A, Dkt. 77-3).

At the other end of the scale, Plaintiffs have submitted the affidavit of James Kuipers, an engineer with expertise in the mining industry, who  proposed the installation of a modern water filtration system, essentially a water treatment plant.  His primary recommendations include the following: 1) modification of existing chemical processes to allow for rapid and prolonged fluctuations in the discharge rates; 2) the addition of a coagulation mix tank and vertical plate clarifier for primary removal of precipitate sludge; 3) addition of a sand filter for "polishing" the effluent prior to discharge; 4) the addition of a sludge plate and frame filter disposal bin system; and 5) the addition of an "all season-primary water treatment building" together with power and other utilities and ancillary requirements.  (Kuipers Decl., ¶¶ 17-18, Dkt. 61).   Mr. Kuipers estimates the capital costs associated with this system would be $773,875, and that the annual operating cost would be $507,600.  Thus, if AGC successfully seals off the adit by October 2013, as it represents it can do in the 2012 Plan of Operations, the cost to install a facility of this type would be $1,281,475.  If the reclamation project takes

---

[10]The 2012 Plan of Operations also proposed diverting Montezuma Creek above the 900 Adit because AGC believed that there was a hydrologic connection between Montezuma Creek and the 900 Adit.   The Plaintiffs have contested whether this hydrologic connection in fact existed, (Dkt. 80, p. 4), and the parties do not appear to have focused upon the creek diversion project in their informal meeting on June 26, 2012.   Thus, it is not clear whether AGC still wishes to go forward with this aspect of the 2012 Plan of Operations.  Further, whether or not the diversion of Montezuma Creek will be beneficial in helping to address the problem of contaminated water coming from the Adit is the type of detail and decision making process best left to the expertise of the Forest Service and not the Court.

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES    24**

an additional year to complete, this figure would rise to $1,789,075.

Though the Kuipers Declaration was offered primarily as a means of estimating the economic benefit realized by AGC as a result of its noncompliance, the Court finds that the projected costs for the type of system he describes are also useful in estimating the financial burden on AGC that an injunction would impose.   Expenses of this nature would do not constitute an extreme economic hardship that would militate against the entry of an injunction. Harm to environment outweighs a defendant's financial interests, particularly where violations are of a longstanding and continual nature.  *See, e.g. Oregon State Public Interest Research Group v. Pacific Coast Seafoods Co.,* 374 F.Supp.2d 902, 908 (D. Oregon 2005). Water is the West's most precious resource.  Keeping Idaho's waters sufficiently clear of toxic elements so that they can support all the beneficial uses for which the State has designated them is a critical public interest that profoundly outweighs a company's  bottom line.   Thus, the Court finds that both the public interest prong and the traditional "balancing of the harms" test favor the entry of an injunction.

### D.    Other Factors

Various other factors also favor the entry of an injunction.  First is the fact that AGC's violations are of a continual, and long-standing nature, going back to August of 2009.  Second is the fact that AGC passed up opportunities to fix the problem, strongly suggesting that the added impetus of an injunction is necessary.  Over the years,  AGC obtained numerous reports from consultants who were all asked to prepare proposals for treating the Adit waters.  (See

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES       25**

Third Ruether Decl., Exhs. 42 - 48, Dkts. 64-3 to 65-1). Two of these consultants, BlueWater and AdEdge recommended that filtration systems be installed on site. (*Id*., Exh. 52 at p. 36, Dkt. 67-2).  Although AGC had proposals suggesting that filtration systems could solve the problem, either alone or in combination with settling ponds, AGC never asked the Forest Service for permission to install such a system. (*Id.* at pp. 36-37.)

Mr. Simmons testified at length as to the reasons why AGC declined to implement the various proposals that were suggested to the company over the years. (*Id.,* at pp. 17-25, 34-37, 50-57).  While the Court is cognizant of the fact that many, if not all, of these systems presented logistical difficulties, the overall impression one gets from reading his testimony and comparing it to the options that were available, is that Atlanta Gold rejected a number of potentially viable proposals because they were not easy, or because they could not guarantee one hundred percent success.  The following deposition testimony, in which Mr. Simmons was asked to explain generally why AGC had never installed a permanent facility, is illuminating:

> Q:    Okay.  I'd like to ask a couple questions about the treatment facility.  I understand the pilot water treatment facility contains the word "pilot" because it was designed to be replaced with a permanent facility.  Why has AGC never installed that permanent facility?
>
> A:    I don't believe that the permanent facility would be capable of treating the water to achieve the Clean Water Act of ten parts per billion.  There wasn't enough research in the property on the project.  It requires additional research.
>
> Q:    And what do you mean when you said "the permanent" treatment

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      26**

facility?  Are you talking about a particular facility or any facility?

A:      No.  You were asking why we have a pilot and not a permanent.  I don't think there's enough research to determine that we can meet the water quality standards of ten parts per billion.

(*Id.* at pp. 17-18.).  It is not lost on the Court that AGC rejected more sophisticated filtration systems because they did not provide a sufficient guarantee of success, but now wants to avoid having an injunction imposed on it because it believes that lesser measures (i.e. expanded ponding and the addition of a sand filter) will do the trick.  Even in the face of this uncertainty and the logistical difficulties the company admittedly faced, doing nothing was not justified.

The Court is also troubled by the notions–expressed by AGC in evidence and in arguments to this Court–that permanent or long term treatment of the Adit waters was **only** feasible in connection with an active plan of mining operations.  (Simmons Aff. at ¶ 43, Dkt. 20-5; s*ee also* AGC's Memorandum in Opposition to Plaintiffs' Motion for Remedies at p. 15, Dkt. 71).  In the first place, AGC's position that it has never mined at the Adit site is inaccurate.  Federal regulations governing mining operations on public lands do not address "mining" narrowly, but rather, focus broadly on "operations."   "Operations" are defined as "all functions, work, and activities in connection with prospecting, exploration, development, mining or processing of mineral resources, and all uses reasonably incident thereto." 36 CFR § 228.3. Thus, the activities AGC has undertaken at the 900 Adit, such as excavation,

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      27**

exploration, and core drilling, fall within this definition.[11]

From the standpoint of financial efficiency, AGC's desire to put off the installation of a more permanent plant until it began active mining operations is understandable, perhaps even commendable.  Postponing as many costs as possible until money starts coming in would be a natural goal for any company that must answer to shareholders and investors.  The Court is also aware that the 900 Adit was only one of many point sources within the overall Project Site, and that AGC may well have desired to avoid a "piecemeal" approach to treating these various sources of pollution.   However, what may have been good management from a financial perspective was very poor management from an environmental perspective. Compliance with the Clean Water Act is not  dependent upon whether the polluter has actually begun to turn a profit. The statute contains no qualification for the profitability of an enterprise, and no exception for companies who are engaged only in preliminary, exploratory activities as opposed to those who are actively producing ore.  *See, e.g.,  Sierra Club v. El Paso Gold Mines, Inc.,* 421 F.3d 1133, 1146 (10th Cir. 2005) ("exempting point source owners without a clear exemption from Congress . . . would undermine a primary objective of the Act.").  AGC's history of attempting to delay compliance until it could actively start mining

---

[11]The Court also previously found that AGC's exploration activities were highly likely to have  increased the outflow of contaminated water from the Adit portal.  (Memorandum Decision and Order, p. 21, n. 6, Dkt. 54).  Even if this were not true, however, for many years AGC kept the Adit open in order to allow for the possibility of future exploration activities.  As long as AGC wished to keep its options open, the Adit itself remained open, and the contamination of the creek continued.

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES     28**

operations suggests that its financial motivations may have blinded it to the needs of the environment and to its legal obligations under the CWA, and is another factor suggesting that an injunction is necessary.

Finally, and critically, it is far from certain whether the measures proposed in the 2012 Plan of Operations will work. Plaintiffs' expert, James Kuipers, has stated that additional settling ponds will not be effective, (Kuipers Decl at ¶ 26, Dkt. 61), and AGC's evidence on the efficacy of ponds is not especially convincing. AGC's expert, Robert Vince, states in his affidavit that "the effluent limits of the NPDES permit can more than likely be met with existing technology at the site with construction of additional settlement ponds." (Vince Decl., at ¶ 6, Dkt. 71-3). However, at another point, Mr. Vince states that "[improved settling **_and filtration_** of solids after treatment will more than likely bring the treated effluent within the NPDES effluent limitation standard." *Id.* (emphasis added). Thus, it is not clear whether Mr. Vince believes that it is ponds alone, or ponds *plus* filtration that is necessary, nor does his affidavit address what type of filtration system would be required. It is also not clear whether Mr. Vince actually reviewed the current proposals contained in the 2012 Proposed Plan of Operations, and the affidavit also does nothing to establish that Mr. Vince is qualified to make these statements in the first place.

The Court need not, and should not, make a factual determination as to what type of treatment system is most likely to prove effective. However, the existence of the uncertainty about the efficacy of AGC's proposed solution  suggests the added impetus of an injunction

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      29**

is necessary in order to insure that the burden is firmly placed upon AGC to achieve compliance within a reasonable time frame.

## E.    Type of Injunction

Turning now to the specific type of injunction to be entered, the Court believes that a broadly drafted injunction ordering AGC to come into compliance by a date certain, but not directing the specific steps it must take to achieve compliance, is best suited to the facts presented in this litigation.   Contrary to AGC's protestations, such an injunction is not a vague "obey the law" injunction that would be impermissible under the specificity standards of Rule 65(d).   The Supreme Court has observed that the Clean Water Act "permits the district court to order that relief it considers necessary to secure prompt compliance with the Act." *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 320 (1982).   Moreover, "[i]njunctions are not set aside under rule 65(d) unless they are so vague that they have no reasonably specific meaning." *E&J Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280 (9th Cir.1992). "[T]he mere fact that [an] injunction is framed in language almost identical to the statutory mandate does not make the language vague." *See, U.S v. Miller,* 588 F.2d 1256 (9th Cir. 1978).   Courts in Clean Water Act cases have approved injunctions requiring defendants to comply with the terms of existing NPDES permits and have rejected challenges to such injunctions on the grounds that they were not sufficiently specific. *See, e.g. PIRG of New Jersey v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 82 (3rd Cir. 1990) (upholding injunction that essentially instructed defendant to comply with the terms of an existing

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES     30**

NPDES permit); *Rosemere Neighborhood Ass'n. v. Clark Co.,* 2011 WL 6815851 at *8 (W.D. Wa. 2011).

Further, federal courts are generalists with no special expertise in mining, hydrology, or the efficacy of various water treatment systems. This Court is not in a position to determine for the parties what the best solution to resolve the contamination at the 900 Adit might be. An injunction of the type suggested by Plaintiffs–i.e. one that clearly places the burden on AGC to comply by a date certain, but that leaves the method of compliance up to the company and the permitting authorities of a federal agency–is therefore the most appropriate. The Court will therefore enter an injunction directing Atlanta Gold to come into compliance with the terms of the NPDES Permit by October 31, 2012, which is the date by which the company has represented it can achieve compliance in the 2012 Supplemental Plan of Operations.

The Court will also include one additional specific directive in the injunction: namely, it will instruct AGC to submit to the Forest Service specifications for the "contingency filter" that was mentioned, briefly, in the 2012 Supplemental Plan of Operations. At the informal meeting that occurred on June 26, 2012 between the Plaintiffs, AGC, and the Forest Service, all parties appeared to agree that it would be best if the Forest Service were given specifications on this "contingency filter" now, so that the need to obtain approval for the filter does cause additional delays if it does turn out to be necessary. (See, June 27, 2012 Letter from Kristin F. Ruether, p. 3, Dkt. 86). In its informal report to the Court following

that meeting, AGC stated that it was prepared to provide the Forest Service with any information it required regarding this filter.  (See, June 27, 2012 email report from Jake Grady, p. 2, Dkt. 86).  The CWA violations have now been occurring for nearly three years, and as explained above, it is questionable whether the measures AGC proposes in the 2012 Plan of Operations will work.   The Court will not countenance additional delays that will result from the necessity of having the Forest Service approve AGC's "Plan B" if the measures it currently proposes fail. Therefore, as part of the injunction, the Court will order AGC to provide the Forest Service with specifications regarding the "contingency filter," by August 10, 2012.

Nothing in this Order should be taken to mean that AGC is obligated to treat the "contingency filter" as a back-up plan, to be implemented only if the expansion of the PWTF and the addition of the layer of sand at the mouth of the Adit do not succeed.  Again, the injunction will be drafted so as to require compliance by October 31, 2012, but leave the means of compliance up to AGC.  If AGC believes in the feasibility of the expanded ponding system and the sand filter in the mouth of the Adit, it is free to implement these measures.  It is also free to simply install the "contingency filter" in the first instance, and to take any different or additional measures that it believes might remedy, or improve, the situation at the 900 Adit, consistent with all applicable approved Plans of Operations.

The Court will issue an injunction in a separate document, consistent with Rule 65(d) of the Federal Rules of Civil Procedure.  Plaintiffs are directed to submit a draft injunction

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      32**

reflecting the discussion herein, within three business days of the date of this Order.

**III.    Civil Penalties Under 33 U.S.C. § 1319(d).**

Next, Plaintiffs ask that the Court impose some $3,694,000 in civil penalties. The Clean

Water Act provides that:

> In determining the amount of a civil penalty, the court shall consider [1] the seriousness of the violation or violations, [2] the economic benefit (if any) resulting from the violation, [3] any history of such violations, [4] any good faith efforts to comply with the applicable requirements, [5] the economic impact of the penalty on the violator, and [6] other such matters as justice may require.

33 U.S.C. § 1319(d).   As AGC acknowledges, penalties are mandatory if a Plaintiff

proves that the defendant discharged pollutants in violation of a permit.  33 U.S.C. § 1319(d).

When considering the statutorily enumerated factors, district courts generally employ

either a "top-down" or "bottom-up" approach. *Compare Sierra Club v. Cedar Point Oil Co.,*

73 F.3d 546, 573-74 (5th Cir.1996) (employing a top-down approach) *with United States v.*

*Smithfield Foods, Inc.,* 191 F.3d 516, 528-29 (4th Cir.1999) (taking a bottom-up approach).

The top-down approach requires the Court to first calculate the maximum penalty, and then,

if necessary, to adjust that penalty downward in consideration of the six statutory factors.

*Cedar Point,* 73 F.3d at 573. The bottom-up method begins with calculating the economic

benefit realized by the defendant as a result of its non-compliance, and then adjusts that

amount upward or downward based on the court's evaluation of the same factors. *Smithfield*

*Foods*, 191 F.3d at 528.

**A. The Court Will Employ the "Bottom Up" Approach.**

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES      33**

Plaintiffs have asked that this Court impose a penalty that takes into account 2004 separate violations of the CWA.  (Fifth Ruether Decl., Exh. 58, Dkt. 80).  The CWA imposes a maximum penalty "per day for each violation."  Though AGC's data was collected on a weekly basis and reported on a monthly basis, AGC has never contested that the violations in fact occurred on a daily basis.   Courts have held that "a violation of a monthly average limit shall be treated as a violation for every day in the month in which the violation occurred, rather than as a single violation." See, *United States v. Smithfield Foods, Inc.,* 191 F.3d 516, 527 (4th Cir. 1999) (citing *Chesapeake Bay Foundation Inc. v. Gwaltney,* 791 F.2d 304, 313-15, *rev'd on other grounds, Gwaltney of Smithfield, Ltd. v. Chesapeake,* 484 U.S. 49 (1987).

It is also appropriate to treat the violations for the effluent limitations of arsenic and iron separately, for a total of 2,004 violations. "If multiple violations of the Permit occur on the same day, defendants are liable for a separate day for each violation of the Permit." *See id.,* 191 F.3d at 527.  As of May 31, 2012, (the date upon which Plaintiffs filed their most recent supplemental information regarding AGC's violations), 2,004 separate violations of the Permit had occurred.  Thus, if the Court were to apply the "top down" approach these violations would justify up to $75,150,500 in civil penalties.

Nonetheless, the "bottom up" approach is more practical in this scenario, as arsenic and iron differ greatly in terms of the degree of the environmental harm they cause.  The Plaintiffs acknowledge that "iron compounds are generally not toxic to the environment, [though] excessive amounts may cause or contribute to violations of water quality standards including

color, turbidity, solids, and odor, as well as fouling of the treatment systems themselves."
(Third Hayes Decl. at ¶ 17, Dkt. 62 (quoting EPA Fact Sheet, Groundwater Remediation
Discharge Facilities in Idaho at p. 46).  Although the reddish appearance of Montezuma Creek
is likely due to iron discharged from the Adit, no information has been presented as to whether
the iron levels in the creek are harmful to wildlife or water treatments systems.  Attempting to
assign a dollar value to each separate violation for arsenic and iron would be impracticable,
and the Court will therefore employ the "bottom up" approach.

## B.    Economic Benefit to AGC

Plaintiffs' economic expert, Jonathan Shefftz, has opined that the economic benefit to
AGC as a result of its delayed compliance is between and $1,016,143 and $1,679,411.[12]
(Shefftz Report, Dkt. 67-4, p. 11).  Essentially, the Shefftz report arrives at its conclusion by
taking the figure that it would cost to install and operate a modern water treatment facility of
the type described in the Kuipers Affidavit, and applying present value calculations in order
to arrive at a figure for economic benefit.  "Economic benefit is simply a term for the financial
gains that accrue through such delayed and/or avoided expenditures." (*Id.* at p. 5).  Mr. Shefftz
then performs his present value calculations by selecting a discount rate that reflects his
estimate of the weighted-average cost of capital ("WACC"), which represents "the average
return a company expects to make for its investors, in order to maintain its current level of

---

[12]  The wide range offered is due to the difficulty of predicting the applicable marginal
tax rate.

investors and its current level of business operations." *See, United States v. Smithfield Foods, Inc.,* 972 F.Supp. 339 (E.D.Va. 1997).

AGC has also submitted the report of an economic expert, Keith Pinkerton, which attacks the conclusions of the Shefftz Report on various grounds.  (Pinkerton Report., pp. 4-16, Dkt. 71-2). This Court has the discretion to determine the credibility of expert witnesses, *Smithfield,* 191 F.3d at 531, and finds the Pinkerton report to be of little value.  For the most part, its criticisms of the Shefftz report are inconsistent with case law, or have been effectively refuted by Supplemental Shefftz Report. (Supplemental Report, Fourth Reuther Decl., Exh. 56, Dkt. 76).  For example, simply because gold is a commodity subject to uniform pricing does not mean that AGC did not derive a competitive advantage as a result of its non-compliance.  Every dollar not spent in bringing the 900 Adit into compliance was a dollar that it could spend elsewhere, presumably on activities that it deemed more critical to its ultimate goals.  Likewise, the assertion that a parent corporation's assets cannot be considered in assessing a penalty is contrary to every case of which this Court is aware.  *See, e.g. United States v. Municipal Authority of Union Pt.,* 150 F.3d 259 (3rd Cir. 1998) (holding that the assets of a parent corporation can be used to assess the economic impact of a penalty on a violator); *Cf. Adams v. Teck Cominco Alaska Inc.,* 199 F.Supp.2d 1031 (D. Alaska 2005) (assets of parent may be considered as one factor when assessing defendant's ability to pay, though not when assessing economic benefit).  Mr. Pinkerton also declines to give any opinion at all as

to the economic benefit realized by AGC, other than to make the inherently incredible assertion that it realized none.  Though he criticizes the Shefftz report for its use of the WACC, he offers no alternative means of calculating present value.  (Dkt 71-2 at p. 19.).  In short, the Pinkerton Report provides no guidance to the Court in its task of fixing mandatory penalties under the statute.

On the whole, the Court finds the approach of the Shefftz Report to be reasonable and consistent with case law. *See, e.g., Smithfield Foods,* 191 F.3d at 530 (approving of district court's application of the WACC).  Accordingly, the Court will deem the economic benefit to AGC as a result of non-compliance to be approximately **1.4 million dollars.**[13]  The Court also deems it appropriate to rely on the numbers that were proposed in the Shefftz opinion, even though these numbers reflect the cost of a full-fledged water treatment facility–i.e. a system that is likely quite high up on the scale in terms of elaborateness and expense.   Though other, less expensive measures (such as ponds and the sand filter, or some kind of temporary filtration device) may ultimately prove effective, the Pinkerton report does not provide the Court with a comprehensive picture of what these measures would cost.  The Court will not comb the record in an attempt to determine the cost to AGC of various other possible solutions.  The

---

[13]This figure represents a number about halfway between the upper and lower bounds offered by Mr. Shefftz. Though the Court acknowledges that it is essentially splitting the difference between the upper and lower numbers offered, such an approach is reasonable in the absence of information as to what applicable tax rates would be.

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES     37**

Shefftz report provides the only firm numbers as to economic benefit, and the Court will therefore rely on those numbers.

### C.      Seriousness and History of the Violations

As for the remaining factors, the Court also finds that the violations were serious. While this is much more the case for arsenic than for iron, in both cases, AGC was discharging pollutants far in excess of the applicable effluent limitations on a daily, ongoing basis.  In the case of arsenic, it was discharging water with concentrations of pollutants at a level that is toxic to aquatic life and that rendered that stretch of Montezuma Creek unfit for primary contact recreation–one of the uses for which the creek is designated.  Morever, the arsenic is likely to remain in the food web in perpetuity, even if some amount of it eventually does settle out of the water column.  These facts, together with the discussion in Section IIB, supra, establish that AGC's violations are quite serious.   Moreover, AGC's violations stretch over what is now a nearly three-year period. Thus, the seriousness and history of the violations justify a significant upward adjustment of the total penalty.

### D.      Good Faith Efforts at Compliance

Nor does the Court believe that AGC is entitled to a downward adjustment due to a history of good faith efforts to comply with the conditions of the NPDES Permit.  As discussed previously, the evidence on the record shows that AGC rejected a number of potentially viable solutions to contamination at the 900 Adit on the basis that they were not guaranteed to achieve

full compliance.  (Third Reuther Decl., Exh. 52, pp. 17-18, Dkt. 67-2).  The Court is also troubled by the fact that AGC neglected to take even very simple steps to improve the situation at the PWTF, such as cleaning the ponds, or putting a third, smaller, pond back "online," for the stated reason that these actions would not have achieved full compliance. (Third Ruether Decl., Exh. 52, pp. 44-47).   While the Court does not diminish the difficulties that AGC faced in terms of terrain, weather, lack of power, and the need to manage the water to provide a continuous flow, the fact remains that it did nothing to address, or even to mitigate, the situation at the 900 Adit over a period of nearly three years.  This does not constitute good faith.

Much of AGC's argument regarding good faith is premised upon its claim that the Forest Service was dilatory in rejecting a Draft Plan of Operations ("the 2010 Draft Plan") that it submitted in February of 2010. This 2010 Draft Plan, which, as far as the Court can discern, has not been placed in the record, proposed adding two additional settling ponds to the PWTF as a means of treating the Adit discharges.  The Forest Service ultimately rejected this plan in March of 2011, on the basis that it was incomplete. (Ruether Decl., Exh. 28, Dkt 38-2). AGC now claims that "it is readily apparent from the evidence that had the USFS accepted the [2010 Plan of Operations] AGC almost certainly would have come into compliance with the terms

of the NPDES permit." (AGC's Brief at p. 9, Dkt. 71). AGC is essentially asking for a reduction of the penalty based upon speculation. However, the evidence that  increased ponding capacity alone will solve the problem is thin at best.  Finally, since the 2010 Draft Plan has not been placed in the record, it is impossible for the Court to evaluate it.   The Court will not adjust the penalty downward based on AGC's speculative assumption that the expansion of the PWTF proposed in 2010 would have achieved compliance.

      **E.**      **Whether AGC is entitled to Offsets**.

AGC also requests that any penalty the Court might impose be adjusted for sums it has previously spent on environmental compliance, specifically, the $1,362,873 it spent in constructing and maintaining the PWTF from 2005 through 2011. (Dkt. 67-1 at p. 2).  AGC is not entitled to offsets for these expenditures because none of these efforts brought the company into compliance with the terms of the NPDES Permit.   In order to achieve compliance, AGC clearly needed to take additional steps beyond simply maintaining the PWTF in its current state.  Money spent on environmental compliance efforts generally cannot be used to reduce a CWA penalty when those expenses are not the same as the expenses the defendant avoided by not complying with the terms of its permit. *See,* S*mithfield,* 972 F.Supp. at 348, n. 16.

All of these factors warrant the imposition of a penalty somewhat above the figure the Court has deemed to be a reliable estimate of the economic benefit to AGC.  Further, the Court also finds that the penalties must be somewhat greater than the economic benefit realized in order to have the desired deterrent effect.  However, the Court also believes that the total penalty should take into account sums that Atlanta Gold will eventually be required to expend on compliance.  Because these efforts will occur in the future, however, the Court has no means of predicting what these costs might be.

Accordingly, the Court will order as follows with respect to civil penalties.  First, it will impose at this time a **<u>partial</u>** penalty of **<u>$2,000,000,</u>** to be paid on or before October 31, 2012. Consistent with the goal of deterrence, this figure is significantly, but not extravagantly, greater than the 1.4 million dollar number that the Court has deemed to represent the economic benefit realized by AGC as a result of its non-compliance.   This figure represents the **<u>minimum</u>** penalty that the Court will impose in this case.  It also represents less than three percent of the total amount authorized under 33 U.S.C. § 1319(d), which as of May 31, 2012, was **<u>$75,150,500</u>**.

Additional penalties may be warranted, or not, depending on the level of expense that AGC will incur in connection with addressing contamination at the 900 Adit site during the

ninety-day period granted for compliance with the injunction. Whether additional penalties are warranted, or not, will also be affected by the level of compliance that AGC is able to achieve by October 31, 2012.  Therefore, the Court will require AGC to report back to the Court regarding these matters no later than October 31, 2012. This report should include an **itemized** list of expenses AGC incurs in connection with its clean-up efforts during the period granted for compliance.  Plaintiffs will also have an opportunity to respond to AGC's submissions on a briefing schedule to be determined by the Court.

In leaving assessment of the total penalty for the future, the Court is not in any way rewarding AGC for its delay.   Indeed, "[a] citizen suit would lose much of its effectiveness if a defendant could avoid paying penalties by post-compliant compliance." *NRDC v. Texaco Refining and Marketing, Inc.,* 2 F.3d 493, 502 (3rd Cir. 1993) (addressing standing issue where defendant had come into compliance after the filing of the complaint).   The Court recognizes that penalties are mandatory, and it is very clear that AGC's violations call for a significant one.  Indeed, the total penalty may well end up being **more than** the $2,000,000 minimum the Court has already imposed.  But despite the mandatory nature of the penalties, the Court does not believe it is required to impose a penalty that fails to account, to the extent possible, for the economic effect of compliance.   Where penalties do not inure to the benefit of the citizen suitors, past a certain point, the public interest is better served by having a violator spend its money on efforts aimed at thorough, effective, and timely compliance.  Ensuring that arsenic

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES     42**

does not continue to contaminate Idaho's waters is a far more important goal than enriching the United States Treasury.  Accordingly, the Court will reserve ruling on whether to impose additional penalties above and beyond the $2,000,000 minimum until October 31, 2012.

### F.      Economic Impact on AGC.

 Finally, the Court must consider the economic impact that such a penalty will have on AGC and its ability to pay the penalty.  Although the Court may impose additional penalties, it will consider whether AGC has the ability to sustain the minimum $2,000,000 penalty that the Court is ordering at this time.

As Plaintiffs point out, AGC does not appear to argue seriously that it cannot sustain the impact of a substantial penalty, or that a substantial penalty will affect its ability to continue its otherwise lawful operations.  It simply argues that "there is no evidence" that either AGC or its parent corporation, AGI, has the ability to finance a penalty.  (Memorandum in Opposition to Plaintiffs' Motion for Remedies, at p. 25, Dkt. 71.).  Arguments of this nature are primarily remarkable for what they do not say.

Beyond this observation, the evidence in the record establishes that AGC does have the ability to pay the $2,000,000 minimum penalty that the Court is imposing at this time.  In its most recent tax return, AGC lists assets of some $33,982,447.  (Third Ruether Decl., Exh. 49, pp. 1 &14, Dkt. 66).  Together with its parent corporation, Atlanta Gold Inc., AGC reported assets (primarily in the form of mineral properties) of over $41.4 million dollars.  (Fourth

Ruether Decl., Exh. 54, at p. 14, Dkt. 67-4). Cases uniformly make clear that so long as the penalties are not actually imposed on the parent, consideration of a parent's assets is one factor, among many, that is appropriate in a Clean Water Act case. *See*, *Municipal Authority of Union Township*, .150 F.3d 259, 268 (3rd Cir. 1998) (holding that district courts may consider assets of parent in setting appropriate CWA penalty so long as corporate veil is not pierced); *see also, PIRG v. Powell Duffryn Terminals, Inc.,* 720 F.Supp. 1158, 1166 (D. N. J. 1989) *overruled on other grounds,* 913 F.2d 64 (3rd Cir. 1990) (holding that assets of parent can be considered in Clean Water Act case where defendant is a wholly-owned subsidiary). AGC and Atlanta Gold, Inc. file joint annual reports which refer to "the Company" without making any distinction between the two entities. (Fourth Reuther Decl., Exh. 56 at p. 4, Dkt. 76-1). AGC has also frequently raised money from Atlanta Gold, Inc. through "cash calls," which are recorded as intercompany loans. (Fourth Ruether Decl., Exh. 54, pp. 14-16, Dkt. 67-4). Where AGC is a wholly owned subsidiary of Atlanta Gold, Inc., and where the parent company has provided AGC with a steady source of financing, consideration of AGI's assets is appropriate.

## CONCLUSION

To summarize, the longstanding and serious nature of the violations in this case require injunctive relief. A substantial civil penalty is also necessary in order to have a deterrent effect on future pollution, and the Court will therefore impose a minimum $2,000,000 penalty, to be paid on or before October 31, 2012. The Court will consider whether additional penalties

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES    44**

beyond this minimum are warranted after the period for compliance with the injunction has expired.

## ORDER

1.    With respect to the request for an injunction, the Plaintiff's Motion for Remedies (Dkt. 60), is **GRANTED.**  An injunction consistent with this opinion will be issued as a separate order.

2.    With respect to the request for civil penalties, the Plaintiffs' Motion for Remedies is **GRANTED**.  The Court will order Defendant to pay a partial penalty of **$2,000,000** to the United States Treasury by October 31, 2012.

3.    The Court will reserve ruling on whether an additional penalties are warranted until the end of period granted for compliance with the injunction.  Upon the expiration of that period, the Court will require AGC to submit a report regarding its progress in achieving compliance with the terms of the NPDES Permit and the injunction, and with respect to the expenses that it has incurred in connection with those efforts. This report may be provided as soon as compliance is achieved, but in any event, no later than October 31, 2012.

4.    The Defendant's Motion to Strike (Dkt. 72) is **GRANTED IN PART AND DENIED IN PART.**

5.    Plaintiffs are instructed to provide the Court with an appropriate draft of an

**MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR REMEDIES     45**

injunction, consistent with this Court's opinion and the requirements of Rule 65(d) of the Federal Rules of Civil Procedure, within three (3) business days of date of the filing of this Order.

DATED: July 19, 2012.

_____
Honorable Mikel H. Williams
United States Magistrate Judge