## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE and NORTHWEST ENVIRONMENTAL DEFENSE CENTER<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>ATLANTA GOLD CORPORATION,<br><br>　　　　Defendant. | Case No.: 1:11-cv-00161-REB<br><br>**MEMORANDUM DECISION AND ORDER ON MOTION FOR CIVIL CONTEMPT** |

This decision resolves a Motion for Civil Contempt, filed by Plaintiffs Idaho Conservation League and Northwest Environmental Defense Center (collectively, "ICL"). (Dkt. 128). This is a re-opened Clean Water Act case, first filed in 2011. The case, and the pending motion, concern discharges of water containing arsenic and iron from a mining adit into Montezuma Creek, a tributary stream of the Middle Fork of the Boise River, located near Atlanta, Idaho.

Previously, this case was presided over by U.S. Magistrate Judge Mikel L. Williams.  In 2013, Judge Williams entered an injunction requiring the Defendant, Atlanta Gold Corporation ("Atlanta Gold"), to bring the arsenic and iron pollutants into compliance with the terms of the applicable Clean Water Act permit. ICL contends, however, that the waters flowing from the mining tunnel adit still contain levels of arsenic and iron in excess of the Clean Water Act permit that requires Atlanta Gold to treat the

**MEMORANDUM DECISION AND ORDER- 1**

water coming from the adit. In the pending motion, ICL requests that Atlanta Gold be held in civil contempt under Rule 70(e) of the Federal Rules of Civil Procedure.[1] The Court has carefully reviewed the briefing and affidavits submitted in connection with this motion, as well as Judge Williams' prior orders.  The Court also conducted an evidentiary hearing on April 25 and 26, 2017.  Being fully advised, the Court now enters the following decision.

## I. SUMMARY OF DECISION

In this second round of litigation, the Court must decide whether to impose additional penalties for continued violations of the Clean Water Act, whether to impose sanctions for contempt of court, and whether to issue a new injunction requiring Atlanta Gold to bring the adit waters into compliance with the terms of its Clean Water Act permit by a date certain. The situation at the adit has improved significantly compared to several years ago, in that Atlanta Gold has been able to treat the effluent water so that it meets all requirements of the permit about eighty percent of the time. Further, when violations do occur, levels of both arsenic and iron are often lower than they were when this lawsuit was initiated in 2011. Nevertheless, violations of the allowable arsenic and iron levels continue to occur with some regularity. Of those, large "spikes" in the amount of iron and arsenic passing out of the treatment system frequently occur during the spring and summer months, when the amount of water flowing out of the adit is particularly

---

[1] This case, upon being reopened, was assigned to the undersigned. Judge Williams is no longer managing a civil case docket.

**MEMORANDUM DECISION AND ORDER- 2**

high. Violations in lesser amounts, but still exceeding permit limits, also have occurred on a regular basis over the last several years.

In defending against the current contempt motion, Atlanta Gold argues that it has done everything it reasonably can do to remove arsenic and iron from the adit waters, and that the geographical and climate challenges of the site (e.g. its small footprint, its remoteness, sometimes unreliable power sources, and sometimes severe weather conditions) make further improvements impossible. In the context of a civil contempt motion, it is Atlanta Gold's burden to prove that further compliance is not reasonably possible.

After hearing testimony on this issue, the Court is not persuaded by Atlanta Gold's assertions that it is unable to treat the contaminated water more effectively such that full compliance with the terms of the Permit could be achieved. The Court is mindful that there are logistical challenges and additional expense that will be incurred in improving the existing water treatment facilities. But the fact that such improvements may require site-specific engineering solutions and the associated expense needed to implement such solutions does not mean that such improvements are impossible, and does not mean that Atlanta Gold would be unable to accomplishment such improvements.  Testimony at the evidentiary hearing established that there are reasonable means for Atlanta Gold both to expand the capacity of the current treatment system and to better control the flow of contaminated water into and through the treatment system. The Court also concludes that Atlanta Gold has not diligently and sufficiently pursued additional solutions that could

**MEMORANDUM DECISION AND ORDER- 3**

bring the treatment system into full compliance with the terms of the Clean Water Act permit, despite the significant improvements that have occurred in recent years.

The Court rules in this decision:

(1) that a new injunction will issue requiring that Atlanta Gold make improvements to its treatment system so as to bring the system into compliance with the Clean Water Act permit no later than August 30, 2018;

(2) that additional penalties for Clean Water Act violations are imposed upon Atlanta Gold in the amount of $251,000; and

(3) that monetary sanctions in the amount of $251,000 are imposed upon Atlanta Gold, in the form of a civil contempt order, for Atlanta Gold's failure to comply with Judge Williams' prior orders on these matters, with payment of that amount held in abeyance to allow Atlanta Gold the opportunity to fully comply with the Clean Water Act permit.

## II. BACKGROUND

This case centers around discharges of arsenic and iron-contaminated water issuing from a historic mining tunnel known as the 900 Level Adit ("the 900 Adit" or "the Adit"). Atlanta Gold is a mining company in the business of mineral exploration and development and has ownership interests in a mining site near Atlanta, Idaho, of which the 900 Adit is a part. First drilled as a haulage tunnel in 1917, the 900 Adit is part of the historic Talache Mine. (Id. at ¶¶ 6 & 7, Dkt. 20–5). Next to the 900 Adit is Montezuma Creek, a stream which flows through the town of Atlanta approximately a mile

**MEMORANDUM DECISION AND ORDER- 4**

downstream, and then into the Middle Fork of the Boise River. (Complaint at ¶ 33, Dkt.

1). The Middle Fork of the Boise River combines with other tributaries to form the main

Boise River, which is itself a tributary of the Snake River.

Historically, the Adit waters have contained very high levels of pollutants,

specifically arsenic and iron. Other sources of pollution exist in the same vicinity.

Testing of waters upstream of the Adit have routinely shown elevated levels of arsenic,

and a Superfund site tied to the old Talache Mine is located nearby.

Atlanta Gold obtained its ownership interests in the mining claims and mine

operations that include the Adit site in 1985.  Atlanta Gold has never processed or

produced gold ore at the Adit site, but it has conducted exploratory activities. For a

portion of the period that Atlanta Gold has conducted activities at the site, it treated water

flowing from the Adit either by piping the water into a single settling pond to filter out

suspended solids (including arsenic and iron), or by using a land-application system of

waste disposal.

The water flowing from the Adit was the subject of a lawsuit brought in 2005 by

the ICL against Atlanta Gold under the Clean Water Act. That lawsuit ended in a Consent

Decree in which Atlanta Gold agreed to construct a Pilot Water Treatment Facility (the

"PWTF") to treat the waters coming from the Adit. Further, Atlanta Gold agreed to apply

for a discharge permit under the National Pollutant Discharge Elimination System

(NPDES) provisions of the Clean Water Act, that would authorize discharges of certain

levels of pollutants into Montezuma Creek. An NPDES permit issued on August 6, 2009

**MEMORANDUM DECISION AND ORDER- 5**

with an effective date of July 1, 2007 (the "Permit"), which is implicated by the present litigation. The Permit puts a ceiling on arsenic levels at 10 micrograms/liter and iron levels at 1,000 microgram/liter.[2]

Atlanta Gold constructed two additional settling ponds in an effort to bring the 900 Adit discharges into compliance with Permit limits. However, operation of the PWTF did not result in full compliance with the Permit limits; hence, in 2011, the Idaho Conservation League brought suit again, along with the Northwest Environmental Defense Center.

In the 2011 lawsuit, Judge Williams first considered a motion for summary judgment on standing issues, and ruled in favor of ICL. Judge Williams then ruled upon a Motion for Remedies. On July 19, 2012, Judge Williams granted injunctive relief requiring Atlanta Gold to take the necessary actions to bring the 900 Adit discharge waters into compliance with the terms of the Permit. He imposed upon the company a $2,000,000 penalty for violations of the Clean Water Act. In his decision, Judge Williams also said he would consider imposing additional penalties if Atlanta Gold did not bring the Adit discharge waters within applicable effluent limitations.

The injunction issued on July 27, 2012. (Dkt. 88). It required that Atlanta Gold bring the Adit site into compliance with the applicable Permit standards by October 31, 2012. The Court did not specify how Atlanta Gold was to achieve compliance, intending

---

[2] 10 μ/L equates to about 10 parts per billion.

**MEMORANDUM DECISION AND ORDER- 6**

to leave the method by which compliance would be obtained to the decisions and actions of Atlanta Gold.

Following Judge Williams' decision, Atlanta Gold began to undertake steps to comply with the court's decision and order.  Those efforts ran into impediments, however.  In the late summer and early fall of 2012, a large forest fire known as the "Trinity Ridge Fire" was burning near Atlanta, making access to the Adit site extremely difficult if not impossible. Atlanta Gold asked for additional time in which to comply with the terms of Judge Williams's injunction, and this additional time was granted by the court.  The deadline for compliance was extended to December 15, 2012. (Dkt. 97). The deadline for payment of the monetary penalty was also extended to July 31, 2013.  (Dkts. 101, 110).

Atlanta Gold described its compliance efforts in a status report filed in December of 2012. The report indicated that compliance with the Permit effluent limits was achieved in the prior month (November 2012) – for the first time.  Because there had only been one month of compliance in that time span, Judge Williams ordered that the compliance efforts would be monitored for several more months to see if there would be a record of consistent and steady compliance.  Atlanta Gold's second status report, made in June of 2013, showed some permit violations.  However, the report also showed dramatic improvement from the fall of 2012 to the spring of 2013 in treatment results and a steady downward trend in both arsenic and iron levels. The last month of records provided to the Court also showed no violations for either arsenic or iron.

**MEMORANDUM DECISION AND ORDER- 7**

Judge Williams then issued a final judgment on September 12, 2013. (Dkt. 125). The case was administratively terminated, but the Court retained jurisdiction for purposes of enforcing the injunction.

Since that time, Atlanta Gold's compliance record has been uneven. The company has made progress in treating the Adit waters since the case was first filed and the overall situation has improved. Even so, there have been 567 violations of the injunction requirements and the Permit since December of 2012. (Exhibit 1008).[3]  Many of these violations have been caused by arsenic concentrations of 11 or 12 parts per billion – just over the allowable limits of 10 µ/L. But many other violations were much higher.  For example, during the months of July through September of 2013, weekly measurements of arsenic were recorded at 24, 57, 41, and 31 µ/ liter.[4] Much higher arsenic levels were measured during certain parts of 2014, 2015, and 2016.  Such high measurements

_____

[3]  Under the terms of the permit, Atlanta Gold is required to test obtain measurements of the amount of arsenic and iron in the effluent waters on a weekly basis, and to report the results to the Environmental Protection Agency in monthly "Discharge Monitoring Reports," or "DMRS." This process was generally described in the testimony of Becky Shull, an Atlanta Gold employee who is responsible for preparing the DMRs. Under the Clean Water Act, "where a violation is defined in terms of a time period longer than a day, the maximum penalty assessable for that violation should be defined in terms of the number of days in that time period," rather than treated as only one day of violation. *Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd.,* 791 F.2d 304, 314 (4th Cir. 1986), vacated on other grounds, 484 U.S. 49 (1987). *See also Sierra Club v. City & Cnty. of Honolulu,* 486 F.Supp.2d 1185, 1190–91 (D. Haw. 2007) ("a violation of a monthly average will be counted as a violation of every day of the month."). Atlanta Gold does not contest ICL's proposed method of calculating the number of violations, and this approach is also consistent with how the Court has calculated the number of violations at earlier stages of this litigation. Following this approach, the Court finds that there have been some 567 separate violations as of February of 2017.

[4] The information reflecting these spikes in the early summer of 2013 was not in the record before Judge Williams at the time the case was administratively terminated.

**MEMORANDUM DECISION AND ORDER- 8**

occurred with regularity during the spring and early summer months, when Atlanta Gold said (and common sense would suggest) that water reaching the Adit from snow melt and rain was at its most plentiful. The Discharge Monitoring Reports ("DMRs") for May and June of 2014 showed arsenic levels at 659 and 1216 μ/ liter – 65 and 120 times the allowable amount. Dramatically high arsenic levels also occurred at other times in the period of  2014 through 2016. For example, other DMRs reflect that the arsenic levels of 310, 342, and 179–also much higher than then 10 μ/L allowed under the Permit. The DMRs also reflect similar spikes in iron levels around these times.[5]

When ICL filed its Motion to Reopen, it filed a Motion for Civil Contempt the same day. The Court set an evidentiary hearing, which took place on April 25, 2017 and at which testimony of multiple witnesses was presented upon a variety of subjects, including  the number and relative seriousness of the violations that have occurred since the July 27, 2012 injunction was imposed, the work already undertaken by Atlanta Gold to treat the water coming from the Adit, and the nature and practicality of possible additional steps that could be undertaken to bring the company's operations into compliance with the Permit. Testimony included discussion of whether additional treatment capacity could be added to the existing treatment facility, and whether a literal "plug" could be placed into the tunnel at some distance from the Adit entrance, which

---

[5] The information contained in this Decision concerning compliance with Permit limits is tied to the records presented to the Court prior to the evidentiary hearing.  Obviously, there is a portion of time between when the case was briefed and argued to the Court and the date of the Decision which is not reflected in the Record nor accounted for in this Decision.

**MEMORANDUM DECISION AND ORDER- 9**

would either stop or lessen the passage of contaminated water out of the mine through the Adit.

## III. LEGAL STANDARDS

Civil contempt consists of a "party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *In re Dual Deck Video Cassette Recorder Antitrust Litigation,* 10 F.3d 693, 695 (9th Cir. 1993). The party seeking the contempt order has the burden of showing by clear and convincing evidence that the opposing party violated a prior order of the Court. Once the moving party makes this demonstration, the burden then shifts to the opposing party to demonstrate why it was unable to comply. *See, e.g. FTC v. Affordable Media,* 179 F.3d 1228 (9th Cir. 1999). Impossibility, or an inability to comply with a court's prior order is an affirmative defense to a contempt action. *Id.* (quoting *United States v. Rylander,* 460 U.S. 752, 757 (1983)).  Technical or minor violations of an order may fall short of contempt where perfect compliance is not necessary to achieve the goals of the order. However, technical violations are not excused unless the party has taken "all reasonable steps" to achieve compliance. *Id.*

## IV.  ANALYSIS AND RULINGS

### A.    AGC Has Violated Both the Injunction and the Terms of the Permit

That Atlanta Gold has violated the terms of the Permit and the Court's prior injunction, is established by clear and convincing evidence. The DMRs show that concentrations of arsenic and iron exceeded allowable levels on multiple occasions.

**MEMORANDUM DECISION AND ORDER- 10**

Atlanta Gold admits to such violations, as it is their own record keeping (required of them under the terms of the  Permit) that evidences such violations in the period dating back to the December 15, 2012 compliance deadline imposed by Judge Williams.

However, the Court also considers Atlanta Gold's explanations as to why it allegedly was unable to comply, and the company's assertion that nothing more can reasonably be done to improve the situation.  In essence, Atlanta Gold contends that it has substantially complied with Judge Williams' orders, and that complete compliance with the Permit may be impossible.[6]

---

[6] Atlanta Gold raised an additional argument, which the Court will address before turning to the issues of substantial compliance and impossibility. Specifically, Atlanta Gold contends that there is naturally occurring arsenic in Montezuma Creek above the Adit in an amount already several times higher than the effluent limit requirements of the Permit.  Hence, according to Atlanta Gold, it is required to make the water flowing out of the Adit cleaner than the upstream waters.

Atlanta Gold contends that because of the naturally occurring arsenic, it is inequitable to require that Atlanta Gold comply with the Permit and the Court's prior orders structured around the Permit.  Such an argument is misplaced.  The Permit requires treatment of the discharges from the 900 Adit, not treatment of any waters otherwise carried by Montezuma Creek.  Atlanta Gold may feel burdened by its responsibilities under the Permit (responsibilities it undertook as part of an earlier consent judgment), but the route to change such responsibilities is to request that the permit conditions be modified.  There was reference during the hearing that Atlanta Gold is apparently attempting to do so. But whether the stream is already polluted, or whether the Permit requires the 900 Adit effluent waters to be made cleaner than the stream they run into, is not a legal defense to the contempt motion. The circularity of such an argument should be obvious.

**MEMORANDUM DECISION AND ORDER- 11**

**B.**     **Summary of Hearing Testimony**

This issue of whether further steps are available to improve the situation at the Adit was addressed extensively at the evidentiary hearing through the testimony of several witnesses: Ernest Simmons (Atlanta Gold's CEO); Jeff Gabardi (an engineer with the United States Forest Service); and ICL's expert witness James Kuipers, (a mining engineer with Kuipers & Associates in Butte, Montana).

**1.**     **Testimony of Ernest Simmons**

As the CEO of Atlanta Gold, Mr. Simmons has been directly involved in the actions taken since 2012 to treat the effluent issuing from the 900 Adit.  He testified extensively about difficulties he said that the company has faced in those endeavors. He detailed the existing treatment method and the changes the company has made to that system over the years.

Mr. Simmons said that Atlanta Gold's existing method of treating the contaminated water consists of several steps. First, a "spider plate" located a short distance into the mouth of the Adit regulates the flow of water. Second, a "filter" of sand and rock placed in the mouth of the Adit at the location of the spider plate helps remove some sediments. Third, after passing the spider plate and its related filter, the contaminated water leaving the Adit flows into one of two settling ponds. Those ponds allow the filtering of additional precipitate. Then, the water leaves the settling pond and is piped into one of several tanks containing filters that further remove arsenic and iron. From there, the water goes into a discharge pipe that empties into Montezuma Creek.

**MEMORANDUM DECISION AND ORDER- 12**

Mr. Simmons said that practical and logistical difficulties at the 900 Adit site inhibit the company's ability to make further progress in meeting the Permit requirements. These factors include the site's remoteness, large temperature variations between the seasons, large amounts of rainfall, significant spring runoff, a sometimes unreliable power source at the Adit Site, and terrain conditions that make it difficult to obtain a sufficient hydrostatic head for effective water treatment.

Other problems with water treatment, according to Mr. Simmons, relate to the inability to control the flow of water coming out of the mouth of the 900 Adit.  Mr. Simmons said "no one in this room could control the water."  He also testified to a plan of his creation that he said would control the water flow by installing a bulkhead, or "plug," in the Adit.  Mr. Simmons said that such a bulkhead would not completely stop the flow of water out of the Adit, but would significantly reduce it, to the point where the remainder could be "land applied" rather than returned to Montezuma Creek. Such a plug or bulkhead, he went on to say, would require safety valves in order to prevent water from building up behind it, because a plug without such valves could eventually collapse.

Mr. Simmons also testified that the 2011 lawsuit (which began this case) had prevented the company from being able to raise capital and that Atlanta Gold has been in a financially perilous condition ever since.

### 2.    Jeff Gabardi's Testimony

Jeff Gabardi, a mining engineer with the U.S. Forest Service, testified that Atlanta Gold faces some unique challenges at the 900 Adit site in treating the contaminated water

**MEMORANDUM DECISION AND ORDER- 13**

effectively enough to routinely meet the terms of the Permit. Mr. Gabardi said a huge amount of arsenic must be removed from the water because the Adit is located in the midst of a large "shear zone" in which the earth has been extensively disturbed. As did Mr. Simmons, Mr. Gabardi testified that the site's small footprint made expansion of the capacity of the current system problematic. Mr. Gabardi testified that the site is "boxed in" by Montezuma Creek on one side and Forest Service land on the other. Mr. Gabardi also described arsenic removal treatment operations at certain other mining sites in Idaho, and testified that such other systems are rudimentary compared to Atlanta Gold's system at the Montezuma Creek site.

Mr. Gabardi said that "on the whole," he believed that Atlanta Gold has been "pretty successful" in removing the arsenic from the water. He said that controlling the flow of water was key to bringing the Permit violations under control. Mr. Gabardi was skeptical, however, that a plug or bulkhead in the 900 Adit would solve the problem of high water flows. It would be unusual to block a mining tunnel that carries flowing water, Mr. Gabardi said, and even if a bulkhead were put in place, it would have to be a "stopper with a faucet," and not just a simple plug, in order to avoid the possibility of a collapse. Despite his skepticism about the bulkhead idea, Mr. Gabardi stated that the Forest Service would consider whatever design that Atlanta Gold might submit.

### 3.    Summary of James Kuipers' Testimony

ICL's expert witness, James Kuipers, is a mining engineer who works as a consultant to both industry and environmental organizations. Mr. Kuipers agreed that the

**MEMORANDUM DECISION AND ORDER- 14**

current water treatment system at the 900 Adit was effective about 80% of the time, but disagreed with Mr. Simmons that an 80% compliance rate represented success. In order to completely fix the problem, which he said was primarily related to high water flows, Mr. Kuipers testified that Atlanta Gold would need to take more substantial steps. Those steps, according to Mr. Kuipers, would require (1) commissioning a site characterization study, preferably from an independent engineer, in order to better understand inefficiencies in the system; (2) identifying a method of either storing or minimizing the high flows of water that occur regularly in the spring and summer months; and (3) installing a final "polishing" filter, possibly consisting of a nano-filter or reverse osmosis filter, to remove excess arsenic from the water.

In his rebuttal testimony, Mr. Kuipers addressed Mr. Simmons' claim that nothing can be done to control the flow of water and that a better level of compliance is essentially impossible. Mr. Kuipers identified a number of steps that Atlanta Gold could take, despite the limited size of the PWTF's ground footprint and other difficulties posed by the site. According to Mr. Kuipers, Atlanta Gold could create a new settling pond or ponds down gradient, or simply increase the capacity of the existing ponds. Mr. Kuipers testified that during high flows coming from the adit, Atlanta Gold could capture the overflow at the mouth of the Adit and then direct it down stream to a surge pond, where it could be stored indefinitely. This excess water could then be pumped back up to the existing tanks during periods of low water flow. Additionally, he said that Atlanta Gold

**MEMORANDUM DECISION AND ORDER- 15**

could purchase additional filters or replace the existing filters with more efficient equipment.

Mr. Kuipers also explained that the small footprint of the Adit site was no obstacle to further improvement of the treatment facilities because the necessary equipment could be placed on pillars, or the filters could be stacked one above the other. Mr. Kuipers characterized the site limitations described by Atlanta Gold as largely "self-imposed" rather than insurmountable obstacles.

## V.  ANALYSIS AND RULINGS

The Court has carefully considered the entirety of the evidentiary record, to include the affidavits, declarations and other documentary evidence presented with the briefing prior to the hearing. (Dkts. 128-3 & 132-1). On that record, as enlarged and supplemented in the evidentiary hearing, the Court holds that Atlanta Gold has violated the terms of the Permit, that Atlanta Gold has violated the requirements of this Court's prior orders requiring that it bring its water treatment system into compliance with the Permit, and that Atlanta Gold has failed to carry its burden of demonstrating that it has done everything that reasonably could have been done to accomplish compliance with the Court's prior orders and the Permit. This is true not only with respect to controlling the flow of water to bring the large spikes of arsenic under control, but also with respect to seeking to eliminate the lower level permit violations that occur throughout the year.

In reaching those conclusions, the Court is aware that there has been improvement in the treatment of the contaminated waters from the Adit compared to several years ago,

**MEMORANDUM DECISION AND ORDER- 16**

and Atlanta Gold's efforts in accomplishing those improvements are commendable. The Court acknowledges as well that the task before Atlanta Gold is arguably challenging, for the reasons described in the testimony of Mr. Simmons and Mr. Gabardi. Mr. Gabardi's testimony in this regard was particularly helpful because Mr. Simmons's testimony on those matters was at times disjointed and difficult to follow. Nevertheless, the Court is not persuaded by Mr. Gabardi's agreement with Mr. Simmons that, as a practical matter, there is not much more that Atlanta Gold can do to treat the water more effectively.  Mr. Gabardi's duties have never required him to study carefully whether further measures are possible.  Rather, his duties are to consider and evaluate the improvement measures Atlanta Gold might propose. Hence, his opinion, though completely relevant, is not persuasive. Further, the Forest Service may inherit the problems that exist at the 900 Adit, should the site be abandoned – a prospect, so to speak, that the Forest Service no doubt would prefer not to face.

On the whole, the Court finds Mr. Kuipers' testimony more persuasive on the most important question at issue in this motion, which is the extent to which additional treatment options are available to Atlanta Gold.  The Court reaches that conclusion despite the fact that Mr. Kuipers' demeanor on the stand was at times heated with the tone of an advocate rather than an independent expert, and his credibility suffered as a result. Nevertheless, in sorting through the engineering possibilities described by Mr. Kuipers against the practical impediments described by Mr. Simmons and seconded by Mr.

**MEMORANDUM DECISION AND ORDER- 17**

Garbardi, the Court is persuaded by Mr. Kuipers' testimony that additional measures reasonably can be taken to improve the treatment of the 900 Adit effluent waters.

Atlanta Gold would say that further improvement is not a reasonable assignment or even possible.  The sum of the evidence, however, persuades the Court that even though further improvements may present some logistical and financial challenges, such improvements are nonetheless achievable. Such a conclusion is based in part upon the Court's assessment of the relative credibility of the testimony of Mr. Kuipers in relation to the testimony of Mr. Simmons and Mr. Gabardi, but also upon particular credible details of that testimony. To begin, it is not a surprise that the system as currently designed cannot handle high volumes of water.  Mr. Kuipers testified that it is entirely predictable that the current system only works about 80% of the time, and that significant permit violations have been occurring during the spring/summer months for several years. Common sense supports that testimony, because it is the nature of Idaho's climate that the mountain freshets would carry the greatest amount of snowmelt in the spring and early summer months, and these months also have the greatest likelihood of significant rainfall.

Further, there is a fundamental disconnect between Atlanta Gold contending on one hand that it cannot control the flow of water and then contending on the other that it has a plan for a bulkhead to achieve precisely that result.  Atlanta Gold has described a proposed bulkhead as a viable solution for the ongoing problems at the Adit. However, Mr. Simmons' plans for such a bulkhead or plug appear nearly as inchoate now as when Atlanta Gold first floated such an idea five years ago. As Mr. Simmons admitted on cross-

**MEMORANDUM DECISION AND ORDER- 18**

examination, the bulkhead idea was raised as early as 2012 in the Supplemental Plan of

Operations Atlanta Gold submitted to the Forest Service. Yet, at least as of the date of the

contempt evidentiary hearing, no detailed engineering proposals for such a bulkhead had

been submitted. The record does contain a somewhat rudimentary drawing prepared by

Mr. Simmons. But, the record also indicates that no planning was undertaken until after

Atlanta Gold received an April 19, 2016 letter from ICL stating an intent to seek

contempt sanctions for Atlanta Gold's alleged failure to comply with Judge Williams'

prior orders. (Dkt. 128-2 & Defendant's Exhibits 2003 & 2004). These facts, together

with Mr. Kuipers' testimony detailing the options available for improving the current

treatment facilities, indicate that Atlanta Gold's approach to solving the treatment

problems at the 900 Adit site has been dilatory, and not proactive.

Civil contempt consists of a "party's disobedience to a specific and definite court

order by failure to take all reasonable steps within the party's power to comply." *In re

Dual Deck Video Cassette Recorder Antitrust Litigation,* 10 F.3d 693, 695 (9th Cir. 1993).

The party seeking the contempt order has the burden of showing by clear and convincing

evidence that the opposing party violated a prior order of the Court. Once the moving

party makes this demonstration, the burden then shifts to the opposing party to

demonstrate why they were unable to comply. *See, e.g. FTC v. Affordable Media 179

F.3d 1228 (9th Cir. 1999).* Impossibility, or an inability to reasonably comply with a

court's prior order is an affirmative defense to a contempt action. *Id (quoting United

States v. Rylander,* 460 U.S. 752, 757 (1983)). Technical or minor violations of an order

**MEMORANDUM DECISION AND ORDER- 19**

may fall short of contempt where perfect compliance is not necessary to achieve the goals of the order. However, technical violations are not excused unless the party has taken "all reasonable steps" to achieve compliance. *Id.*

On balance, based upon the full record, the Court is persuaded that more can be done by Atlanta Gold, and that more should have been done before now. Among other things, there needs to be an engineered means of receiving and containing a greater amount of water, so that high flows from the Adit do not overwhelm the treatment system. Further, additional treatment mechanisms can be added, and improvements in the process may be available for the system already in place.  In sum, Atlanta Gold has not met its burden of persuading the Court that there is nothing more that reasonably can be done to increase the capacity of the treatment system to contain and treat contaminated water, or that there is nothing more that reasonably can be done to increase the effectiveness of the treatment process. So long as opportunities are present to do so, then Atlanta Gold must seek out and implement additional means to come into compliance with the Permit requirements.

For these reasons, the Court finds that there is clear and convincing evidence that Atlanta Gold has disobeyed specific and definite requirements of Judge Williams' prior orders, specifically his Injunction of July 27, 2012 (Dkt. 88), his October 10, 2012 Order extending the time for compliance (Dkt. 97), and the Final Judgment retaining jurisdiction for purposes of enforcing the original injunction. (Dkt. 125). Further, the Court finds that Atlanta Gold has not met its burden of persuasion upon the affirmative defense of

**MEMORANDUM DECISION AND ORDER- 20**

impossibility or inability to comply with such order. Finally, the Court is not persuaded that any of the violations are so technical or minor in nature such as not to constitute contempt because perfect compliance may not be necessary to achieve the goals of the order. The Court makes this latter ruling because Atlanta Gold has not taken all reasonable steps to achieve compliance with the Permit.[7]

In making these rulings, the Court focuses on the continuing Permit violations, not on Atlanta Gold's failure to make payments to the U.S. Treasury on the previous $2,000,000 penalty. The previous penalty has already been reduced to judgment, and interest is accruing at the rate set by statute. The United States as a judgment creditor is represented by the U.S. Attorney's office. There is nothing in this procedural context for the Court to consider as to that prior penalty or any failure to make payment upon the same.

## VI. REMEDIES

Having made the rulings described above, the Court must then address the question of remedies. Specifically, the Court must decide whether a new injunction should issue, whether additional Clean Water Act penalties should be imposed, and whether a monetary sanction should be imposed for civil contempt of court.

---

[7] Such a ruling does not preclude the possibility that the Court might rule on a different record in the future that technical or minor violations would not constitute contempt, if such violations occur after such improvements are in place.

**MEMORANDUM DECISION AND ORDER- 21**

ICL requests three separate types of remedies: (1) additional Clean Water Act penalties of $1,000 per violation per day;[8] ( 2) penalties for contempt of court in the same amount, which can be held in abeyance in order to give Atlanta Gold time to bring the Adit site into compliance with the Permit, and thus purge its contempt; and (3) additional "enforcement remedies" stemming from the civil contempt. As for enforcement remedies, ICL requests that the new injunction include a new compliance deadline, and a new plan for compliance, prepared by a certified engineer, describing how the existing treatment facilities are to be updated. This plan, according to the ICL, should also include "an operations and maintenance plan," which would demonstrate that Atlanta Gold has adequate resources to treat the water and how it will utilize those resources to maintain the water treatment facilities. Finally, ICL requests that the Court require Atlanta Gold, every six months, to provide ICL with all reporting data required under the Permit.

A.      **Financial Penalties–Legal Framework**

Regarding penalties, the basic approach advocated by the ICL – i.e. imposing additional monetary sanctions both for violation of the Clean Water Act and for civil contempt, but holding the latter in abeyance – is generally sensible and consistent with applicable law. Clean Water Act penalties are mandatory. In contrast, courts may take a different approach when imposing monetary sanctions for civil contempt, because civil contempt sanctions are employed primarily to coerce compliance with a court's prior

---

[8]  Specifically, ICL requests Clean Water Act penalties under 33 U.S.C. § 1319(d) in the amount of $567,000, for the 567 violations up through February of 2017.

**MEMORANDUM DECISION AND ORDER- 22**

order. *Whittaker Corp. v. Execuair Corp.,* 953 F.2d 510, 517 (9th Cir. 1992).[9] Therefore,

sanctions "must always give to the alleged contemnor the opportunity to bring himself

into compliance, [and] the sanction cannot be one that does not come to an end when he

repents his past conduct and purges himself." *Id.*

The Court agrees that the approach proposed by ICL is appropriate to these

circumstances, but the Court will set a different penalty amount than that proposed by

ICL.  In making that decision, the Court evaluates a number of factors in deciding the

civil penalty amount, including: (1) the seriousness of the violation or violations, (2) the

economic benefit (if any) resulting from the violation, (3) any history of such violations,

(4) any good faith efforts to comply with the applicable requirements, (5) the economic

impact of the penalty on the violator, and (6) other such matters as justice may require. 33

U.S.C. § 1319(d).  Factors three and four cut in opposite directions, in that while Atlanta

Gold does have an extensive history of violations, it has also made progress over the last

several years and there now is less arsenic entering Montezuma Creek as a result. As for

factor two – the economic benefit accruing to Atlanta Gold as a result of continued

noncompliance – there is no information in the record as to the cost to bring the existing

system into full compliance with the terms of the CWA Permit.

---

[9]  Contempt sanctions may also be imposed to compensate a complainant for losses occasioned by the violation of the order. *Whittaker Corp.,* 953 F.2d at 517. However, that particular rationale is not present in a citizen lawsuit where, as here, the ICL cannot make a claim for damages in its own right distinct from penalties payable to the U.S. Treasury.

**MEMORANDUM DECISION AND ORDER- 23**

As to the economic impact consideration called for in factor five, the evidence is equivocal. Atlanta Gold contends it is in imperiled financial circumstances. However, it has some $48 million in assets and is engaged in exploration activities in various locations and is engaged in joint business ventures with other entities. The Court cannot and will not presume on this record that Atlanta Gold's book assets are illusory, nor presumably would Atlanta Gold want to argue such to the Court. The Court acknowledges that book assets can be illiquid, but on the existing record the Court is not persuaded that no financial avenue exists for Atlanta Gold to pay additional penalties.[10] "Where a violator cannot show that a penalty will have a ruinous effect, the economic impact factor under [Clean Water Act] Section 309(d) will not reduce the penalty." *United States v. Gulf Park Water Co., Inc*., 14 F.Supp.2d 854, 868 (S.D.Miss.1998); see also *United States v. Smith*, 1998 WL 325954, at *3 (4th Cir. Feb. 27, 1998) (holding that burden is on violator "to show an inability to pay the penalty"); *Sierra Club v. El Paso Gold Mines, Inc.*, 2003 WL 25265873 at *11 (D.Colo. Feb. 10, 2003) ("Defendant bears the burden of proving its inability to pay a civil penalty"). *United States v. Mountain State Carbon*, LLC, 2014 WL 3548662 (N.D. W. Va. 2014).

---

[10] The Court previously struck the Affidavit of Peili Miao, which discussed Atlanta Gold's financial condition in more detail and purported to explain why the approximately $48 million dollars in assets listed on the company's balance sheets would be difficult to turn into capital. This Court struck that affidavit because allowing it would have meant that the ICL would not have the benefit of cross-examination, but Atlanta Gold was given the opportunity to call Miao as witness. Atlanta Gold did not call Miao at the hearing.

**MEMORANDUM DECISION AND ORDER- 24**

For all these reasons, the Court concludes that most important factor in setting a penalty for the most recent permit violations is the relative seriousness of those violations.

**B.     Calculation and Amount of Penalties**

**1.     Clean Water Act Penalties**

ICL arrives at its suggested per violation penalty of $1,000 by dividing the total penalty imposed by Judge Williams in 2012 (i.e. $2 million) by 2,004–which is the number of violations on record at the time that penalty was imposed. This approach yields an average per day violation figure of $998, which the ICL has rounded up to $1,000. This method, even if useful as a starting point, does not account for the fact that not all of Atlanta Gold's violations were of equal severity. Arsenic in water is obviously of significant concern at *any* level; however, the violations involving arsenic concentrations of one or two micrograms per liter above allowable limits are not comparable to the larger spikes involving much greater concentrations of up to 120 fold the allowable amounts.

In considering these distinctions, the Court specifically relies upon the testimony of ICL Program Director Justin Hayes.  Mr. Hayes explained at the hearing that an amount of 150 μ/L – called the "chronic aquatic life criteria" – is the maximum concentration of arsenic that a stream can bear and still support healthy aquatic life. (These criteria are set by regulations promulgated by the Idaho Department of Environmental Quality). According to Mr. Hayes, arsenic levels above this amount  "can kill aquatic life all the way downstream." In an earlier written declaration,  Mr. Hayes explained that the chronic aquatic life criteria of 150 μ/L was developed to protect aquatic

**MEMORANDUM DECISION AND ORDER- 25**

life from the harmful impacts of a *four day* exposure to a toxic substance. If exposure to arsenic at these levels does not occur more than once every three years, aquatic life receives adequate protection. Conversely, failure to comply with the chronic criteria results in significant harm to aquatic life. (Hayes Decl., Dkt. 62, ¶ 11).

In this case, the effluent waters *after* treatment have exceeded the chronic aquatic life criteria five times from May 2014 through June of 2016. In other words, the effluent water coming from the Adit still has arsenic levels sufficient to interfere with the health of the stream's aquatic life.  Therefore, considering the severity of the violations, the impact of the violations upon in-stream aquatic life, the circumstances that affect the treatment system, and the other evidence in the record, the Court will impose a $1,000 per day penalty for violations on those days where the arsenic in the effluent waters spiked to concentrations in the amount of or in excess of 150 µ/L.

The Court finds that there were 35 arsenic violations on record (five recorded weekly violations multiplied by seven days in a week) in which the arsenic level measured at or in excess of 150 µ/L. This results in a total penalty of $35,000 for those days.

The Court will impose a penalty of $500 per day for the remaining violations on the record, for those involving concentrations of arsenic of less than 150 µ/L. Even though an occasional permit violation involving arsenic concentrations of 11 or 12 micrograms per liter might not be cause for extreme concern, the lower level violations have occurred frequently and often involved arsenic concentrations of many times what

**MEMORANDUM DECISION AND ORDER- 26**

the Permit allows. Arsenic is a deadly poison.  Because it is an element, it does not

degrade over time but instead settles into the stream bed or dissolves into the water and

eventually finds its way into the food chain. Further, as Mr. Hayes pointed out, the 10 μ/L

arsenic limit is intended to protect human health in addition to the health of aquatic life.

Thus, the numerous smaller permit violations are collectively more significant and are not

inconsequential simply because they individually do not rise to the level of the dramatic

violations that occurred at other times.

Accordingly, the Court rules that Clean Water Act penalties are imposed in the

amount of $500 for 432 violations for the period from May of 2013 to February of 2017,

in the total amount of $216,000.[11]  Added to the $35,000 total penalty for the violations in

excess of 150 μ/L, the total amount of Clean Water Act penalties is $251,000.

## 2.    Civil Contempt

The Court imposes the same amount, that is $251,000, as a civil contempt penalty

for the actions and inactions of Atlanta Gold that constitute failure to comply with the

Court's prior orders, for the reasons described previously in this decision.  Payment of the

sanction amount will be held in abeyance in order to allow Atlanta Gold the opportunity

to remedy such contempt.

## 3.    Future Penalties or Contempt

---

[11] This number does not count the violations that occurred between December of 2012 and May of 2013, because Judge Williams already declined to impose any additional penalties for  violations occurring during this time frame. (Dkt. 122).

**MEMORANDUM DECISION AND ORDER- 27**

Finally, the Court leaves open the possibility of additional Clean Water Act penalties along the same parameters as described above, (1) for violations that have occurred, if any, *after* February of 2017 and up to the date of this decision; and, (2) as to any violations that might occur after the date of this decision. Leaving open the possibility of additional penalties is necessary because, as explained below, the Court will impose a somewhat distant compliance deadline, and the fact of an additional period for compliance should not become a financial benefit to Atlanta Gold other than as an opportunity to avoid the requirement that it pay the contempt sanctions set out in this decision.[12]  Similarly, the time needed for the Court to consider and then decide the pending Motion should not create a financial benefit for Atlanta Gold, particularly when the Court's docket is bursting at the seams.

### 4.    Enforcement Remedies

The Court now addresses the request for "enforcement remedies." A new injunction setting a new compliance deadline is necessary, which will be issued in a separate document. As to the specific parameters of that injunction, ICL has requested that Atlanta Gold be required to submit a "Plan for Compliance" to the Court, which plan would include "a Treatment Facilities Plan," explaining how the existing facilities are to be upgraded so as to

---

[12] On September 14, 2017, the ICL filed a "Notice of Continuing Violations" (Dkt. 157) indicating that further violations of allowable arsenic levels had occurred during the months of of March through July, 2017.  At the time of that filing, this decision was nearly complete. To avoid delay in issuing this decision, the Court will not address these alleged additional violations at this time but instead, will take them up in the context of a future status conference, consistent with the schedule announced in this decision.

**MEMORANDUM DECISION AND ORDER- 28**

achieve compliance and an "Operations and Maintenance Plan," which would demonstrate how Atlanta Gold intends to utilize its resources to maintain the treatment facilities. (Plaintiffs' Motion, Dkt. 128, p. 3). At the evidentiary hearing, counsel for ICL also clarified that ICL seeks to have the Court require Atlanta Gold to hire an independent engineering expert to conduct a site evaluation and submit a plan for bringing the Adit waters into compliance, rather than allowing Atlanta Gold to create its own plan.

At this stage, notwithstanding the obvious skepticism of ICL, the Court will assume that Atlanta Gold is capable of identifying solutions on its own without the requirement of specific directions from the Court.  Nor is it necessary at this time to require the company to submit to the Court detailed plans for improving the water treatment facilities and detailed explanations as to how it will utilize its financial resources to achieve that goal. The history of this litigation, dating back to the first lawsuit in 2005, shows a pattern of the company making improvements toward effective water treatment while it is under active Court supervision, but then taking a considerably more lax approach when no one is watching. This pattern suggests that continued supervision of the Court is plainly necessary, but specific directives from independent experts as to how to treat the water may not be. But the Court makes specific admonishment here to Atlanta Gold that part of the Court's thinking on this issue stems from the belief that it may be less expensive for the company, and likely also less adversarial, if Atlanta Gold is allowed to take this specific responsibility on its own.  In other words, the Court believes that the likelihood of successful water treatment that will meet Permit standards is actually increased by requiring Atlanta Gold to take on that responsibility

**MEMORANDUM DECISION AND ORDER- 29**

directly. However, if what transpires going forward suggests that these assumptions are not true, and that more direct court involvement as to the means of achieving compliance is necessary, then the Court will impose more specific requirements and enlarge the scope of injunctive relief to include the same.

For these reasons, the Court concludes that an injunction requiring compliance by a date certain consistent with the rulings in this decision, is sufficient. In addition to this general injunction, the Court will require that Atlanta Gold provide periodic reports detailing its progress to both the ICL and the Court. Made a part of that will be regular status conferences with the Court and the Plaintiffs, in which Atlanta Gold will be required to detail under oath the planning, progress, and implementation of the necessary improvements.

Accordingly, the Court sets a new compliance deadline of **August 30, 2018**, by which time Atlanta Gold must achieve substantial compliance with the terms of the Permit. "Substantial compliance" in this setting means improving control of the volume of water to be treated so that the system is not overwhelmed, and improving the effectiveness of such treatment in general.

If substantial compliance is not achieved, the Court will remove the stay on implementation of the additional $251,000 contempt amount, and require that immediate payment of that amount be made. Further, if Atlanta Gold does not achieve substantial compliance by the expiration of this deadline, the Court will 1) obtain independent recommendations as to the actions  necessary to bring the treatment of the effluent from the Adit under control and within Permit limits, 2) require that Atlanta Gold pay the expenses

**MEMORANDUM DECISION AND ORDER- 30**

of such independent experts, and 3) will then require that Atlanta Gold undertake, complete, and pay the expense of  the actions recommended by such independent experts.

## ORDER

1.    Plaintiffs' Motion to Hold Defendant in Civil Contempt (Dkt. 128) is hereby **GRANTED.**  A new injunction imposing the new compliance deadline of August 30, 2018  will be issued as a separate order. Counsel for each party are instructed to lodge a proposed draft of such injunction and any related orders, with a copy to be served upon opposing counsel on the business day after such lodging, by **Friday, September 22, 2017.  Alternatively, counsel can submit a stipulated form of proposed injunction, and any related orders, by the same date.**

2.    The Court orders Defendant to pay additional Clean Water Act penalties, in the amount of **$251,000,** plus interest, to the United States Treasury no later than **DECEMBER 31, 2017.**  Interest shall accrue at the rate specified in 28 U.S.C. § 1961(a) and (b). Such interest shall begin to accrue as of the date of this Order.

3.    Defendant is ordered to pay an additional amount of $251,000 for civil contempt, to be paid to the United States District Court for the District of Idaho; provided, however, that this portion of the Order is held in abeyance until **September 30, 2018**, to allow Defendant an opportunity to comply with the terms of this decision and its related injunction and other orders, to include substantial compliance with the Permit.  Should substantial compliance be achieved, this portion of the Order will be rescinded *nunc pro tunc*.

**MEMORANDUM DECISION AND ORDER- 31**

4.      Atlanta Gold shall file periodic status reports detailing the steps it has taken to reach compliance with the terms of the Permit and the results achieved (including all relevant DMRs). The first such status report shall be due no later than **October 31, 2017.**  The second shall be due **February 1, 2018**. The third shall be due by **June 1, 2018**. The fourth shall be due **August 1, 2018**.  The information in the report shall be verified by declaration or affidavit of an officer of the corporation with knowledge of the matters contained in the declaration or affidavit.  The Court will review these filings and hold a status conference if the Court deems appropriate, and particularly it appears that significant progress toward substantial compliance is not occurring.

5.      This case shall be administratively terminated after entry of the injunction and any related orders, but the Court will retain continuing jurisdiction over this matter and it may be reopened at any time upon the Court's own action, or upon motion of a party for good cause, for purposes of ensuring compliance with the injunction and other requirements.

DATED:  **September 15, 2017**

Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER- 32**