Bryan Hurlbutt (ISB #8501)
Laurence ("Laird") J. Lucas (ISB #4733)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024 x206
(208) 342-8286 (fax)
bhurlbutt@advocateswest.org
llucas@advocateswest.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE and NORTHWEST ENVIRONMENTAL DEFENSE CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>ATLANTA GOLD CORPORATION,<br><br>Defendant. | Case No. 1:11-cv-161-REB<br><br>**PLAINTIFFS' BRIEF ON SUBSTANTIAL COMPLIANCE (ECF No. 176)** |

## INTRODUCTION

Plaintiffs Idaho Conservation League and Northwest Environmental Defense Center ("ICL") file this Brief, as the Court requested (ECF No. 176), about whether Defendant Atlanta Gold Corporation ("AGC") has substantially complied with its National Pollution Discharge Elimination System ("NPDES") Permit and the November 6, 2017 Second Injunction Order (ECF No. 166) requiring compliance with the Permit by August 30, 2018.

AGC has failed to substantially comply. As shown below, AGC failed to take all reasonable steps to improve its wastewater treatment system at the 900 Level Adit, and the system continues to perform poorly and unlawfully pollute Montezuma Creek with arsenic.

AGC's status reports filed over the last year show the company continues to merely discuss potential fixes without hiring engineers and taking other reasonable steps to to identify, design, and implement solutions.  As a result, AGC committed <u>56 more</u> Clean Water Act  ("CWA") violations since this Court's September 15, 2017 Memorandum Decision And Order On Motion For Civil Contempt (ECF No. 159) by discharging arsenic in excess of the levels allowed in the Permit.  Most of these new violations—42 violations—occurred during the last four months (May through August 2018) leading up to the compliance deadline.

## BACKGROUND

I. **This Court's Contempt Decision & Second Injunction Order**

In the Contempt Decision, this Court found AGC violated the CWA and the First Injunction Order by exceeding the Permit's arsenic and iron pollution limits on 567 occasions from December 2012 through February 2017.  *See* ECF No. 159, p. 8.[1]  The Court described the violations as follows:

> Many of these violations have been caused by arsenic concentrations of 11 or 12 parts per billion – just over the allowable limits of 10 u/L.  But many other violations were much higher.  For example, during the months of July through September of 2013, weekly measurements of arsenic were recorded at 24, 57, 41, and 31 u/ liter.  Much higher arsenic levels were measured during certain parts of 2014, 2015, and 2016.  Such high measurements occurred with regularity during the spring and early summer months, when Atlanta Gold said (and common sense would suggest) that water reaching the Adit from snow melt and rain was at its most plentiful.  The Discharge Monitoring Reports ("DMRs") for May and June of 2014 show arsenic levels at 659 and 1216 u/ liter – 65 and 120 times the allowable amount.  Dramatically high arsenic levels also occurred at other times in the period of 2014 through 2016.  For example, other DMRs reflect that the arsenic levels of 310, 342, and 179–also much higher than [] 10u/L allowed under the Permit.  The DMRs also reflect similar spikes in iron levels around these times.

*Id.* at 8–9.

---

[1] All citations herein are to the ECF page number.

Based on these violations, the Court held AGC in contempt. The Court was "not persuaded that <u>any</u> of the violations are so technical or minor in nature such as not to constitute contempt." *Id.* at 21 (emphasis added). The Court also found "more can be done by Atlanta Gold" to improve the treatment system. *Id.* at 20. "Among other things, there needs to be an engineered means of receiving and containing a greater amount of water, so that high flows from the Adit do not overwhelm the treatment system." *Id.* "Further, additional treatment mechanisms can be added, and improvements in the process may be available for the system already in place." *Id.*

This Court set "a new compliance deadline of August 30, 2018, by which time Atlanta Gold must achieve substantial compliance with the terms of the Permit." *Id.* at 30. The Court explained that substantial compliance in this setting means both (1) "improving control of the volume of water to be treated so that the system is not overwhelmed" and (2) "improving the effectiveness of such treatment in general." *Id.*

On November 6, 2017, this Court entered the Second Injunction Order, ordering:

> No later than **August 30, 2018**, Defendant Atlanta Gold Corporation shall achieve substantial compliance with the terms of its National Pollution Discharge Elimination System (NPDES) Permit No. ID-G91-0006, (Dkt. 22-1), as extended, (Dkt. 85-1), governing waters issuing from the 900 Level Adit discharged into Montezuma Creek. "Substantial compliance" means improving control of the volume of water to be treated so that the system is not overwhelmed, and improving the effectiveness of the treatment of such effluent waters to meet the Permit limit concentrations for arsenic (10 ug/L) and iron (1,000 ug/L).

ECF No. 166, pp. 1–2 (emphasis in original).

This Court ordered that if substantial compliance is not achieved by August 30, 2018, the Court will:

> (a)   remove the stay on the implementation and require immediate payment of the $251,000.00 contempt amount against Defendant ordered in the Memorandum Decision and Order on Motion for Civil Contempt (entered on September 15, 2017, Dkt. 159); and

    (b)       obtain recommendations from independent experts in the relevant fields as to the actions necessary to bring the effluent from the Adit under control and to treat the same within Permit limits, require Defendant to pay the expenses of such independent experts, and require Defendant to undertake, complete, and pay the expenses for and implement such actions recommended by such independent experts that the Court deems to be appropriate in the circumstances.

*Id.* at 2–3.

## II. AGC's Status Reports & Other Information Before the Court

Since the September 2017 Contempt Decision, AGC submitted a series of status reports to the Court. The status reports include AGC's monthly discharge monitoring reports (DMRs) for the months of September 2017 through July 2018. The accompanying 4th Declaration of Bryan Hurlbutt includes AGC's discharge monitoring report from August 2018. These documents and other recent filings by AGC are discussed below.

On October 30, 2017, AGC submitted its first Verified Status Report. ECF No. 164. David Russell, acting President of AGC, reported that AGC was working to optimize the current system and identify sources of water entering the Adit. *Id.* at ¶ 2. Mr. Russell reported that AGC consulted with engineers, purchased various filter supplies, and took steps toward identifying and addressing potential water drainage into the Adit system. *Id.* at ¶¶ 3–5. Mr. Russell also reported that AGC hoped to drill a hole into the Adit system to pump out water, and AGC hoped to extend the Adit bed filter to help during high water. *Id.* at ¶¶ 6–7. However, AGC provided little detail. For example, AGC did not disclose the engineers' names or qualifications, what the engineers recommended, or whether AGC hired any of them to complete any tasks. Furthermore, AGC did not provide any engineering plans or other details regarding AGC's plan to drill a hole to dewater the Adit and to expand the Adit bed filter.

DMRs submitted with the first status report show AGC met its Permit pollution limits during the month of September 2017. *See* ECF No. 164-1.

On January 26, 2018, AGC submitted its second Verified Status Report.  ECF No. 169.  Mr. Russell stated "AGC is still hopeful" that it will complete the drill hole and dewatering project prior to the next spring runoff, but he also stated "[i]mplementation of the drill and pump project are pending receipt of requested funds."  *Id.* at ¶ 3.  Mr. Russell stated "AGC has also requested additional funds to complete an extension of the Adit bed filter," and "[i]f the designated funds are timely received, AGC should be able to have this additional filter in place before Spring runoff."  *Id.* at ¶ 4.  The status report also included a one-page "Status Update" document, which stated that AGC increased its efforts to monitor groundwater and that "AGC has planned future actions to pipe water flowing down a drainage that is likely leaking above the 900 adit from the surface."  *Id.*, p. 10.  Once again, however, AGC failed to provide any detailed documents regarding the investigation, planning, and implementation of any of these projects.

DMRs submitted with the second status report show no violations during the months of October through December 2017.  *See id.* at 4–9.

On June 1, 2018, AGC submitted its third Verified Status Report.  ECF No. 172.  AGC mentioned routine maintenance and operation tasks performed to the treatment system, but AGC did not discuss whether it completed any tasks to upgrade and improve the system (such as the piping, drilling, and filter bed plans previously discussed) and did not even mention whether it still had any plans to do so.  *See id.*

DMRs and other information AGC submitted with the third status report show that from January 2018 through the first half of May 2018 AGC exceeded the 10 ug/L arsenic limit in four weekly samples, representing 28 days of Permit violations (seven days per week times four weeks of exceedances).  *Id.* at 7.  Samples for those four weeks show arsenic levels were 11 (February), 15 (March), 27 (May), and 21 (May) ug/L.  *Id.*

On July 31, 2018, AGC submitted its fourth Verified Status Report. ECF No. 173. Again, AGC mentioned only routine tasks performed at the Adit, including monitoring and maintenance. *See id.* AGC failed to mention whether it made any of the improvements previously discussed and failed to indicate whether it still planned to make those or other improvements.

DMRs and other information provided with the fourth status report show that from mid May to early July AGC exceeded the Permit's arsenic limit during two weeks, representing 14 more violations. *Id.* at 8. Samples for those two weeks show arsenic levels were 33 (May) and 14 (July) ug/L. *Id.*

On August 21, 2018, AGC submitted a motion to extend the deadline to pay the CWA civil penalty due to the U.S. Treasury on August 30, 2018. ECF No. 175. The accompanying Declaration of David Russell included some discussion of AGC's plans for the treatment system. ECF No. 175-1. Mr. Russell asserted that AGC met the Court's mandate to achieve substantial compliance, stating:

> As set forth in the several status reports filed with the Court, AGC has diverted surface water at or near the 600 Level Adit from running through the 900 Level Adit, which has substantially reduced the volume of water in the tunnel and dramatically improved AGC's ability to successfully remove the requisite amount of Arsenic and Iron to be in compliance with its NPDES permit.

*Id.* at ¶ 11. AGC did not provide any further information documenting when, where, and how it diverted surface water or what the results have been.

Additionally, Mr. Russell admitted further improvements to the system are needed. Mr. Russell added:

> Improvements will continue to be made over the Spring, Summer and Fall (weather permitting) to the filter system and a potential land application and pond system may be put in place to provide additional capacity for water storage during those times when run off is high. All plans have been discussed with USFS and will progress only with USFS authorization, where said authorization is required.

*Id.* at ¶ 12.  AGC provided no drawings or other details for this new plan for a potential land application and pond system and no explanation as to why it had not considered and pursued this plan earlier.  *See id.*  Additionally, it is unclear from this filing whether AGC still plans to drill a hole to dewater the Adit and to expand the Adit bed filter.

On September 10, 2018, AGC submitted its fifth Verified Status Report.  ECF No. 180.  Even though this was AGC's final status report, there was no description—let alone detailed documentation—of improvements to the water treatment system that AGC already completed, has underway, or plans to make.

AGC's July 2018 DMR submitted with the fifth status report shows the one week of violations in early July (which AGC had previously reported in the fourth status report) and no more violations that month.  *See id.* at 7.  The August 2018 DMR was not yet available when AGC submitted its final status report.  *Id.* at 1.

Subsequently, ICL's counsel obtained the August 2018 DMR from AGC.  *See* 4th Hurlbutt Decl. (providing copy of August 2018 DMR).  The DMR shows AGC exceeded the arsenic limit during two more weeks, representing 14 more Permit violations.  *See id.*  During those two weeks, arsenic levels were 15 and 29 ug/L.  *Id.*

## ARGUMENT

I.  **AGC Failed to Achieve Substantial Compliance**

    A.  AGC Failed to Take Corrective Action

Despite the Court's explicit direction that AGC must do more to improve the treatment system at the Adit, AGC has failed to show it has taken all reasonable steps to do so. While AGC's first status report on October 30, 2017 (ECF No. 164) identified steps AGC could take to improve the system, AGC failed to develop and implement these or other substantial steps over the last year.

AGC's first status report mentions meetings with engineers and identifies three improvements AGC hoped to pursue, including a project to drill and dewater the Adit, a project to expand the Adit bed filter, and a project to pipe away water infiltrating the Adit. *See* ECF No. 164, ¶¶ 3–7. However, this first status report failed to provide any detailed plans or schedules for further investigating or completing the projects.

Two of these three project ideas—drilling and dewatering the Adit and expanding the Adit bed filter—are never discussed again by AGC after filing the second status report. AGC's filings do not show that the company ever pursued either idea.

The third project idea—piping water away from infiltrating the Adit—also disappeared from the status reports. However, this piping project was discussed more recently in the Russell Declaration filed on August 21, 2018, in support of AGC's motion to extend the CWA penalty payment deadline. Mr. Russell claimed that AGC took some action to pipe water away from entering the Adit and claimed it was a success. ECF No. 175-1, ¶ 11. However, AGC failed to provide details about this project, and failed to provide any documentation supporting Mr. Russell's claim that this was successful.

Tellingly, Mr. Russell went on in his August 21, 2018 declaration to discuss additional improvements AGC hopes to make in the future. Mr. Russell explained that AGC is looking into installing a land application and pond system "to provide additional capacity for water storage

during those times when run off is high." *Id.* at ¶ 12.  This shows AGC knows its treatment system still needs more improvements and that there are additional reasonable steps AGC can take.  This was the first time AGC mentioned this fourth project idea—just nine days before the new compliance deadline.  And like the other projects AGC previously mentioned, AGC provided no detailed description or documents in support of this new idea.

Throughout its status reports, AGC mentioned some monitoring, maintenance, and operations steps it took or plans to take.  However, these appear to be nothing more than the kinds of routine tasks AGC has performed in past years and tasks AGC is required to perform under the Permit.  *See, e.g.*, ECF No. 173, p. 6 (AGC's June 1, 2018 through July 31, 2018 update, discussing baseline sampling, treatment facility inspections, and effluent sampling).  Notably, AGC's fifth and final status report, filed on September 10, 2018, failed to identify, discuss, or provide detailed information about any improvements AGC made to the treatment system over the last year.

In sum, AGC should have done more by the Court-ordered deadline of August 30, 2018.  Over the last year, AGC identified ways to improve its treatment system but failed to follow through and take all reasonable steps to study, develop, and implement these or any other improvements sufficient to bring the system into compliance.  For this reason, AGC has failed to substantially comply with the Court's order to "improv[e] control of the volume of water to be treated so that the system is not overwhelmed, and improv[e] the effectiveness of the treatment of such effluent waters to meet the Permit limit[s]."  ECF No. 166, pp. 1–2.

B.   AGC Continues to Regularly Commit Serious Permit Violations

Whatever changes AGC may have made to the treatment system, AGC continues to perform poorly and has failed to achieve substantial compliance with the 10 ug/L arsenic effluent

limit in the Permit.  While AGC met the Permit limits from September 2017 through January 2018 when flows from the Adit are typically low, by February AGC began regularly and seriously violating the Permit's arsenic effluent limit.

From February 2018 through August 2018, AGC committed <u>56 new CWA violations</u>.  These are based on AGC's DMRs, which report that weekly samples exceeded the 10 ug/L arsenic effluent limit eight times during this period.  During these eight weeks of exceedances in 2018, AGC reported arsenic levels of: 11 (February); 15 (March); 27, 21, and 23 (May); 14 (July); 15 and 29 (August) ug/L.  Multiplying eight weekly violations by seven days per week equals 56 violations.  Notably, the majority of the 56 new violations since the Court's Contempt Order—42 of the violations—occurred during the most recent four months (May through August) leading up to the Court's August 30 compliance deadline.

To AGC's credit, the company did not report any iron violations, its reported arsenic violations are slightly less frequent than during the period at issue in the contempt proceedings, and its reported arsenic violations do not include the same kind of extreme spikes in arsenic that occasionally occurred before.  However, 56 CWA violations over the last seven months (February through August) is a far cry from substantial compliance.

These repeated ongoing violations show AGC is still unable to effectively treat water during months of higher flows, and the violations are serious.  Except for the February exceedance of 11 ug/L, all of AGC's exceedances were large, ranging from 140% to 290% of the allowable arsenic concentration.  For half of these new violations, AGC's arsenic discharges were more than twice the 10 ug/L concentration of arsenic allowed in the Permit.  These are not the kind of technical violations courts have excused in other CWA contempt proceedings.

For example, in *San Diego Baykeeper v. U.S. Department of Defense*, No. 02-CV-0499-IEG (AJB), 2010 WL 1838293 (S.D. Cal. May 6, 2010) the court found "substantial compliance," as the term was used in a CWA consent decree, where the defendant violated permit monitoring requirements but where the defendant did not violate any permit effluent limits, was out of compliance during only 1 of 12 months, and demonstrated recent compliance. Here, in sharp contrast, AGC violated the Permit's effluent limits, the violations occurred during 5 of the last 12 months, and most of AGC's violations occurred recently.

In *Puget Soundkeeper Alliance v. Rainier Petroleum Corp.*, No. C14-0829JLR, 2017 WL 6515970 (W.D. Wash. Dec. 19, 2017), the court held the defendant in contempt of a CWA consent decree even though the defendant had taken many steps to comply with other provisions of the consent decree and to protect Elliott Bay from pollution, because the facility still violated the applicable pollution discharge requirements. *See id.* at \*8–\*9. The Court emphasized that the "fundament purpose" and the "core requirement" of the consent decree was to "prevent the flow of polluted stormwater from the Facility into Elliott Bay" and "Rainer has not done that." *Id.* at \*9. Similarly here, the fundamental purpose of the Court's Contempt Decision and Second Injunction Order was to protect Montezuma Creek from unlawful pollution discharges, and AGC has not done that.

Arsenic is a harmful pollutant that threatens Montezuma Creek and the aquatic species and people that use Montezuma Creek and the Boise River. The 10 ug/L arsenic limit is based on Idaho's water quality standards. Water quality standards are set to ensure the protection and propagation of fish, shellfish, and wildlife, and to protect water supplies, recreation, and other values and uses of water. *See* 40 C.F.R. § 131.2.

In the July 19, 2012 Remedies Decision, this Court recognized arsenic is a harmful pollutant and found the facts of this case "are more than sufficient to demonstrate that irreparable harm to the environment will occur if the illegal discharges continue." *See* ECF No. 87, pp. 18–23.  Similarly, in the Contempt Decision, the Court was "not persuaded that any of the violations are so technical or minor in nature such as not to constitute contempt." ECF No. 159, p. 21.  The Court also stated, "[a]rsenic in water is obviously of significant concern at *any* level." *Id.* at 25 (emphasis in the original).  Once again, AGC's ongoing violations are not merely technical or minor, and irreparable harm to the environment will occur if AGC's illegal discharges continue.

For these reasons, AGC has not achieved substantial compliance with the Permit arsenic limits and this Court's Second Injunction Order.

## II.     Requested Relief

### A.     The Court Should Enforce Its Second Injunction Order

In the Second Injunction Order, the Court ordered that if AGC failed to achieve substantial compliance by August 30, 2018, then (a) the $251,000 contempt penalty against AGC will be immediately due to the Court; (b) the Court will hire independent experts to evaluate what should be done to achieve substantial compliance at the Adit; and (c) AGC will have to pay for the engineering costs as well as costs to implement recommended improvements to the water treatment system.  ECF No. 166, pp. 2–3.

Since AGC failed to achieve substantial compliance, the Court should enforce its Second Injunction Order and take all three steps, along with the additional relief requested below.  The Contempt Decision and Second Injunction Order clearly laid out the Court's expectations and requirements for AGC to come into compliance with the Permit and CWA, and those decisions (plus the record developed through the contempt briefings and hearing) abundantly document the

reasons for those steps.  Having put AGC on notice of what was expected and required of it, and having given AGC adequate time to achieve those requirements, it is now appropriate for the Court to enforce its rulings by imposing the three steps set forth in the Second Injunction Order.

> B. The Court Should Should Impose a $140,000 CWA Penalty for AGC's 238 CWA Violations Since February 2017

The CWA mandates civil penalties if violations of the Act are found.  33 U.S.C. § 1319(d).  The Court's Contempt Decision resolved AGC's Permit violations through February 2017.  The Court decided to "leave[] open the possibility of additional Clean Water Act penalties . . . (1) for violations that have occurred, if any, *after* February 2017 and up to the date of this decision; and (2) as to any violations that might occur after the date of this decision."  ECF No. 159, p. 28 (emphasis in original).  AGC's DMRs show it committed 238 more CWA violations from March 2017 through August 2018.

These 238 new violations include the 56 violations over the last year already discussed above, plus 182 violations AGC committed from March 2017 through August 2017.  As presented in ICL's September 14, 2017 Notice of Continuing Violations (and the DMRs filed therewith), AGC committed 161 violations (112 arsenic violations and 49 iron violations) from March 2017 through July 2017.  *See* ECF No. 157, pp. 1–2.  AGC committed another 21 arsenic violations in August 2017.  *See* ECF No. 164-1, p. 2 (Aug. 2017 DMR filed by AGC, showing three weekly arsenic sampling exceedances).

In the Contempt Decision, the Court ordered AGC to pay CWA penalties of $500 per iron violation; $500 per arsenic violation involving arsenic concentrations less than 150 ug/L; and $1,000 per arsenic violation involving arsenic concentrations of 150 ug/L or higher.  ECF No. 159, pp. 25–27.  Of AGC's 238 new violations, 42 were arsenic violations of 150 ug/L or higher.  *See* ECF No. 164-1 (AGC noncompliance report identifying six weekly samples where

arsenic concentrations exceed 150 ug/L).  Using the same penalty amounts here, AGC committed 49 iron violations at $500 each; 147 arsenic violations at $500 each; and 42 arsenic violations at $1,000 each.  This adds up to $140,000 in CWA penalties.

For these reasons, the Court should impose at least a $140,000 CWA penalty.[2]

### C. The Court Should Find AGC In Further Contempt

AGC's failure to achieve substantial compliance with the Court's Second Injunction Order is further contemptuous conduct for which AGC should be penalized.  The Court should hold AGC in contempt, again, and should use its broad contempt powers to impose on AGC any other sanctions, compliance deadlines, and other requirements this Court determines are necessary and appropriate to ensure AGC complies with the Permit.

At this juncture, after multiple rounds of CWA enforcement proceedings, the Court should consider increased contempt remedies to ensure that AGC finally comes into compliance with the CWA, its Permit, and the Court's prior orders.  This includes the Court's prior orders to come into compliance with the Permit limits and also includes the Court's prior orders to pay $2 million (ECF No. 88) and $251,000 (ECF No. 179) in CWA civil penalties to the U.S. Treasury.  Plaintiffs respectfully submit that such additional relief could include imposing monetary sanctions on AGC's corporate parent and/or holding its officers and directors personally liable for the ongoing violations and other contemptuous actions.  Doing so, of course, would expand the parties to this action and presumably require additional discovery or proof to pierce the

---

[2] ICL notes that the maximum CWA penalty has been adjusted upward to account for inflation for recent violations like those now at issue in this matter.  Under 33 U.S.C. § 1319(d), adjusted by 40 C.F.R §§ 19.2, 19.4, and 81 Fed. Reg. 43091 (Jul. 1, 2016), a violator is subject to a penalty of up to $37,500 per violation per day that occurred prior to August 1, 2016, and up to $51,570 per violation per day that occurred on or after August 1, 2016.

corporate veil. Plaintiffs request the opportunity to conduct such additional proceedings if the Court feels they are appropriate in light of the record of this case.

## CONCLUSION

For the reasons above, the Court should find that AGC is not in substantial compliance, enforce the Second Injunction Order, hold AGC in further contempt of Court, impose additional CWA penalties, and determine whether additional contempt relief is appropriate.

Dated this 24th day of September, 2018.                    Respectfully Submitted,

/s/ Bryan Hurlbutt
Bryan Hurlbutt (ISB #8501)
Laurence ("Laird") J. Lucas (ISB #4733)
*Advocates For The West*
P.O. Box 1612
Boise, ID 83701
(208) 342-7024 x206
(208) 342-8286 (fax)
bhurlbutt@advocateswest.org
llucas@advocateswest.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 24th day of September, 2018, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing:

Michelle R. Points, Attorney for Defendant Atlanta Gold Corp.
mpoints@pointslaw.com

William M. Humphries, Attorney for United States
bill.humphries@usdoj.gov

/s/ Bryan Hurlbutt
Bryan Hurlbutt