# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE and NORTHWEST ENVIRONMENTAL DEFENSE CENTER, | Case No.: 1:11-cv-161-REB |
| Plaintiffs, | |
| vs. | **MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE** |
| ATLANTA GOLD CORPORATION, | |
| Defendant. | |

## SUMMARY OF DECISION

This decision resolves the issue of whether Defendant Atlanta Gold Corporation ("Atlanta Gold") has substantially complied with the terms of an environmental permit as required by a prior order of this Court, relating to Clean Water Act violations at a mining site near Atlanta, Idaho.

On September 15, 2017, this Court held that Atlanta Gold was liable for violations of the Clean Water Act stemming from excessive iron and arsenic in the treated effluent flowing from the company's mine holdings, specifically at the 900 Level Adit[1] (the "Adit").  The levels of iron and arsenic in this discharge exceeded at times the amounts allowed under Atlanta Gold's National Pollutant Discharge Elimination System ("NPDES") permit (the "Permit").  (Dkt. 159.) This Court also held Atlanta Gold in civil contempt and ordered it to pay $251,000 to the District Court; however, the imposition of that order was held in abeyance until September 30, 2018 to

---

[1] An adit is "a nearly horizontal passage from the surface in a mine."  *Adit*, *Merriam-Webster.com.*  2019.  https://www.merriam-webster.com (15 August 2019).

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 1**

give Atlanta Gold an opportunity to purge its civil contempt by achieving substantial compliance with its NPDES Permit.  The order stated that the civil contempt payment would be rescinded if Atlanta Gold was successful in such efforts.  Atlanta Gold was ordered to file periodic status reports detailing its attempts to reach substantial compliance and reporting the results achieved. Atlanta Gold timely filed such status reports.  (Dkts. 164, 169, 172, 173, 174, 180.)

After the end of the abeyance time period, Plaintiff Idaho Conservation League ("ICL") and Atlanta Gold each submitted written argument and related materials to the Court concerning whether Atlanta Gold had achieved substantial compliance.  (Dkts. 181, 182, 183.)  An evidentiary hearing was held on January 9, 2019.  (Dkt. 186.)

After a careful consideration of the entire record, the Court concludes that Atlanta Gold has not achieved substantial compliance.  The treatment system remains incapable of treating the higher volumes of water associated with annual snow melt or other high-water events, such as heavy rains.  Progress has been made in reducing the number of violations of the Permit requirements and reducing the severity of the violations, but an improvement upon an abysmal record of non-compliance does not equal substantial compliance with what is required of Atlanta Gold by the NPDES Permit.  Additionally, Atlanta Gold repeatedly represented in its status reports that it had plans to begin improvements, or implied that it had already started making such improvements.  However, most of such described improvements were not implemented. Indeed, some of the improvements Atlanta Gold discussed in the filings and testimony leading to this Decision are the same improvements Atlanta Gold has discussed, but has never implemented, dating back at least seven years.

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 2**

However, Atlanta Gold has succeeded in reducing the frequency and magnitude of Permit exceedances, and although those improvements do not rise to the level of substantial compliance they do justify a reduction in the amount of the civil contempt penalty.  Accordingly, the $251,000 civil contempt penalty Atlanta Gold was previously ordered to pay if it failed to achieve substantial compliance is reduced to $125,500.  The case will be closed, but the Court will retain jurisdiction to ensure compliance with its orders.

## BACKGROUND[2]

Gold was first discovered near Atlanta, Idaho in 1863 and mining has been occurring in that area, off and on, since then.  Simmons Aff. ¶ 2 (Dkt. 20-5).  Atlanta Gold is a mining company pursuing mineral exploration and development; it has extensive ownership interests in a historic mining site (the "Project Site") located at the top of Atlanta Hill.  *Id.* at ¶ 3.  The Project Site was once known as the Talache Mine and consists of various patented and unpatented mining claims, lode claims, and mill site claims, which total approximately 2,159 acres.  *Id.* at ¶ 4.

The 900 Adit was first opened in 1917, as an ore haulage tunnel.  *Id.* at ¶¶ 6 & 7.  The Adit is situated alongside Montezuma Creek, which flows downstream through the town of Atlanta and into the Middle Fork of the Boise River.  Compl. ¶ 33 (Dkt. 1).  The Middle Fork joins with two other forks of the Boise River and eventually flows through the city of Boise and other areas of southwest Idaho, with its waters eventually reaching the Snake River.

---

[2] This factual background, drawn from the Court's Memorandum Decision on Plaintiffs' Motion for Remedies (Dkt. 87), adds important context to the continuing issues over Atlanta Gold's compliance with federal and state environmental laws.

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 3**

Atlanta Gold first obtained an interest in the Adit site in 1985.  Simmons Aff. ¶ 2 (Dkt. 20-5).  Atlanta Gold never has processed or produced ore at the Adit site; however, it has over the years done exploration through core drilling and excavation.  *Id.* at ¶¶ 2, 5.  Beginning in 1988, Atlanta Gold reopened about 200 feet of the previously collapsed Adit.  Glaspey Aff.  ¶¶ 8–11 & Hawley Decl., Exh. 26 (Dkt. 22-5).  In 1994, in a joint venture with Ramrod Gold USA, Atlanta Gold submitted a Plan of Operation, approved by the Forest Service, for exploration at the Project Site to include opening and further excavation of the 900 Adit.  *Id.* at ¶ 19.

Once that further excavation was completed, the Adit portal was to be kept open to allow for future exploration.  *Id.* at p. 21.  In 1998, the Forest Service approved a Plan of Operation to conduct exploratory drilling.  Hawley Decl., Exh. 26 (Dkt. 22-5).  Under both the 1994 Plan and the 1998 Plan, the Forest Service required Atlanta Gold to treat the polluted water flowing from the Adit to meet applicable state and federal water quality standards.  *Id.*

For many years, Atlanta Gold dealt with pollution in Adit waters either by piping the water through a single settling pond to filter out suspended solids or by using a land-application system of disposal.  Glaspey Aff. ¶¶ 9, 15, 19–21 (Dkt. 20-12); Hawley Decl., Exh. 26 (Dkt. 22-5).  In 2005, the company worked with the Environmental Protection Agency ("EPA") to draft a Consent Order covering various discharges within the Project Site, including those from the 900 Adit.  Simmons Aff. ¶¶ 8–10 (Dkt. 20-5).  However, before a Consent Order was finalized, the Idaho Conservation League filed a lawsuit alleging that Atlanta Gold was illegally discharging pollutants from the 900 Adit in violation of the Clean Water Act.  *See Idaho Conservation League v. Atlanta Gold Corp.*, Case No. 1:05-cv-212-EJL.  This prior litigation between ICL and Atlanta Gold resulted in a Consent Decree in which Atlanta Gold agreed to construct a Pilot

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 4**

Water Treatment Facility (the "PWTF") to treat the waters issuing from the 900 Adit.  Simmons

Aff. ¶ 12 & Exh. A (Dkts. 20-5, 20-6).  Further, Atlanta Gold agreed to apply to the EPA for an

NPDES permit that would authorize discharge of pollutants from the 900 Adit subject to specific

limits.  *Id.*, Exh. A, (Dkt. 20-6).  The EPA issued the Permit on August 6, 2009, with an effective

date of July 1, 2007, placing limits of no more than 10 μg/L (micrograms per liter) for arsenic

and no more than 1,000 μg/L for iron in treated effluent.  Hawley Decl., Exh. 1 (Dkt. 22-1).

The PWTF consists primarily of two lined settling ponds and associated pipework.

Contaminated water coming out of the Adit is routed through these ponds and then remains long

enough for the pollutants to precipitate out, a process that is aided by the addition of a chemical

coagulant mixture.  After being treated in the settling ponds, the waters are discharged into

Montezuma Creek.  Simmons Aff., Exh. 1, p. 9 (Dkt. 20-6).

Monitoring of the arsenic and iron levels in the effluent is required by the Permit.  Torf

Decl. ¶¶ 8–9 (Dkt. 25).  Atlanta Gold records that data once each week and sends it to the EPA in

monthly "Discharge Monitoring Reports" ("DMRs").  *Id.* ¶ 10.  The PWTF has never been able

to consistently treat the polluted waters to meet the requirements of the Permit.  For example, the

effluent data collected between August 2009 and January 2012 showed that the arsenic levels in

the discharge waters had ranged from three-hundred to four-hundred times greater than the 10

μg/L daily effluent limitation.  *See id.* ¶¶ 7–17, 21; Benner Decl. ¶¶ 14–19 (Dkt. 63).  On

average, each day the *treated* Adit effluent released into Montezuma Creek contained 265 μg/L

of arsenic – over twenty-six times the maximum allowable amount.  Benner Decl. ¶ 16 (Dkt. 63).

The highest measured level of arsenic during that period was 3,070 μg/L.  *Id.*  The situation with

iron was similar, as the monthly DMRs for the period beginning in August of 2009 showed

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 5**

levels far exceeding the 1,000 μg/L Permit limit.  Torf Decl. ¶ 13 (Dkt. 25); Hawley Decl., Exhs. 16–21 (Dkt. 22-3).

In 2009, the Idaho Department of Environmental Quality designated certain waters of the Middle Fork of the Boise River as "impaired," because of arsenic pollution in Montezuma Creek. Hayes Decl., Exhs. 3, 4 (Dkt. 22-1); Third Hayes Decl. ¶ 18 (Dkt. 62).  The 900 Adit is one source of this problem, but not the only source.  The Adit site is adjacent to the Talache Mine Tailings Reclamation Site, a Superfund site which Atlanta Gold describes as an additional source of direct discharges into Montezuma Creek containing arsenic contamination.  Simmons Aff. ¶ 33 (Dkt. 20-5).  People living in Atlanta use the creek's waters to irrigate their crops and lawns. Third Hayes Decl. ¶ 29 (Dkt. 62).  Some of the flow of the creek is diverted into open irrigation ditches that run directly through the town.  *Id.*

The state of Idaho regulates water quality in both Montezuma Creek and the Middle Fork of the Boise River to protect certain beneficial uses of their waters.  For Montezuma Creek, one such beneficial use is "primary contact recreation" which requires "water quality appropriate for prolonged and intimate contact by humans or for recreational activities when the ingestion of small quantities of water is likely to occur."  IDAPA 58.01.02(100)(02)(a).  In addition, Idaho's water quality standards recognize that Montezuma Creek could be used as an agricultural water supply and, therefore, the "water quality [must be] appropriate for the irrigation of crops or as drinking water for livestock."  IDAPA 58.01.02.100.03(b).

Water quality standards for the Middle Fork of the Boise River also protect designated uses, including primary contact recreation and the protection of aquatic life.  IDAPA 58.01.02(140)(09).  Additionally, the Middle Fork carries a "domestic water supply" designation,

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 6**

which means that water quality must be appropriate for drinking supplies.  Third Hayes Decl. ¶
19 (Dkt. 62); *see also* IDAPA 58.01.02(140)(09), 58.01.02(100)(03)(a).

When it was constructed, the PWTF was not intended to be a permanent solution to
arsenic and iron pollution from the 900 Adit.  *See* Atlanta Gold's Statement of Material Facts at
pp. 8–9 (Dkt. 20-2); *see also* Fereday Aff., Exh. F (Dkt. 20-11) and Hawley Decl., Exh. 13. p. 2
& Exh. 14, p. 6 (Dkt. 21-2).  The treatment facility is able to remove significant amounts of
pollutants from the Adit waters at times; however, it was never designed to meet the applicable
arsenic effluent limitation of 10 μg/L contained within the NPDES Permit.  Simmons Aff. ¶ 27
(Dkt. 20-5).  In fact, Atlanta Gold originally intended to operate the PWTF only until November
15, 2008, after which time it anticipated constructing a more permanent water treatment facility.
Simmons Aff. ¶¶ 19, 20 (Dkt. 20-5) & Exh. E at p. 33 (Dkt. 20-6).

In the years after the PWTF was built, Atlanta Gold told governmental agencies that
more permanent steps would be taken to address contamination at the 900 Adit.  For example, in
the 2006 Supplemental Plan of Operations (upon which the Forest Service authorized the
construction and operation of the PWTF), Atlanta Gold promised construction of a permanent
treatment facility by November 2008.  *Id.*  In October 2009, Atlanta Gold said in its Quality
Assurance Project Plan submitted to the EPA and the Idaho Department of Environmental
Quality that "the PWTF was built as a temporary structure which will be replaced in the near
future by a permanent WTF."  Hawley Decl., Exh. 14 at p. 6 (Dkt. 22-2 at p. 30).

Atlanta Gold never did install such a permanent facility. It did, over a period of years,
obtain proposals from contractors and engineers designed to address water treatment issues on a
more permanent basis.  Third Reuther Decl., Exhs. 43–49 (Dkt. 64).  Some predate the

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 7**

construction of the PWTF and some do not.  In 2005, Atlanta Gold had a company known as

Blue Water Technologies do a study involving bench-scale tests of water samples taken from the

Project Site, which succeeded in lowering arsenic levels to less than the applicable 10 μg/L

standard.  *Id.* at Exh. 46, pp 1–3.  Then, in 2009, a company known as "AdEdge" tested a

temporary filtration system which Atlanta Gold said was able to treat the Adit discharge to

arsenic levels "between non-detectable and 10 ppb."  *Id.* at Exh. 47, p. 6, ¶ 8.  This temporary

filtration system was installed at the Adit site and operated approximately eight hours a day for

three weeks, with these comments about the results:

> The current treatment process employed using coagulation/lime addition and
> gravity settling (using the impoundments as clarifier(s)) does appear to provide
> some benefit for reducing arsenic from the raw Adit 900 water.  However, this
> treatment alone is clearly not achieving the desired targets.  Additional or
> substitutionary treatment is needed.  [Atlanta Gold] could elect to utilize a
> combination of this existing treatment system coupled with the AdEdge AD26/E33
> integrated system for a total solution or eliminate the pretreatment altogether if
> desired.

*Id.* at pp. 4, 5.

In 2009, Atlanta Gold purchased a water treatment plant from another mining company.

Referred to as "the Newmont Plant," Atlanta Gold told the EPA that the plant would be installed

by 2012.  Third Ruether Decl., Exh. 52, pp. 18–20 (Dkt. 67-2).  That never happened.  Atlanta

Gold said there were too many obstacles to installing the Newmont Plant.  *Id.* at pp. 17–37.

As would be expected, each option for treating the water involved some lesser or greater

degree of challenge in getting something accomplished.[3]  However, when Atlanta Gold has

---

[3] Atlanta Gold's then-Chief Operating Officer, Ernest W. Simmons, said in his March 2012
deposition that the Newmont Plant: (1) was too big to get over the area roads without "cutting it
in half"; (2) Atlanta Gold lacked private land to put it on; (3) because power sources in the

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 8**

discussed an anticipated construction of the more permanent water treatment facility, it also anticipated the start of active mining operations.  Third Ruether Decl., Exh. 51 at p. 14 (Dkt. 67-1); *see also* Simmons Aff. ¶ 20 (Dkt. 20-5).  Indeed, the company has insisted that long-term water treatment can only be a component of a mine plan.  Simmons Aff. ¶ 43 (Dkt. 20-5).  For instance, in 2006 Atlanta Gold said that it would construct a more permanent water treatment facility to replace the PWTF as part of its plan to conduct a heap leach mining operation.  Its Plan of Operations submitted to the Forest Service at that time represented that the permanent treatment facility would be working by November 2008.  Simmons Aff. ¶ 20 (Dkt. 20-5).  However, in 2008, Atlanta Gold withdrew that plan.  *Id.* ¶¶ 20, 22.

Plaintiffs filed this lawsuit on April 18, 2011.  Compl. (Dkt. 1).  Ten days later, Atlanta Gold said it would not exercise its option to purchase the mining claims upon which the 900 Adit is located.  Points Aff. ¶¶ 2–4 (Dkt. 20-3).  Atlanta Gold then attempted to terminate its NPDES Permit on May 2, 2011, saying it no longer had any interest in the site.  *Id.* ¶ 6 & Exh. B.  In a letter dated June 9, 2011, the EPA informed Atlanta Gold that the Permit "does not automatically terminate upon notification."  Hawley Decl., Exh. 25 (Dkt. 22-5).  On June 19, 2012, Atlanta Gold told the EPA that it would continue operation under the Permit and "request[ed] extension of coverage of that permit for an unspecified period of time."  (Dkt. 86).  The EPA granted this request on June 28, 2012.  Plfs.' Notice of Factual Development (Dkt. 85.)

---

Atlanta, Idaho area were insufficient, the plant would have required the installation of 18 miles of power line or the constant use of noisy generators; and (4) Atlanta Gold did not have the ability to collect and hold sufficient quantities of water to feed the plant on a continuous basis.  Simmons Depo., Third Reuther Decl., Exh. 52, at pp. 18–24 (Dkt. 67-2).  Mr. Simmons also cited insufficient ponding capacity to manage the water as a reason that proposals such as those from Blue Water and AdEdge were never implemented.  *Id.* at 34–37.

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 9**

On May 1, 2012, Atlanta Gold submitted a Supplemental Plan of Operations to the Forest Service ("the 2012 Supplemental Plan") proposing to close the Adit and reclaim the site. This plan also contained a new proposal for treating the Adit waters until the adit closure and reclamation work was completed. Third Simmons Decl., Exh. A (Dkt. 77). The plan also said Atlanta Gold could bring the discharged effluent into compliance with the terms of the NPDES Permit by October 2012 by: (1) diverting Montezuma Creek above the 900 Adit to reduce the flow of water through the Adit;[4] (2) constructing another settling pond to increase holding capacity and settling times at the PWTF so that more arsenic and iron could precipitate out; and (3) adding a layer of sand to the floor at the mouth of the Adit to assist in the removal of toxins. Third Simmons Decl., Exh. A, pp. 1–2 (Dkt. 77-3). At the same time, Atlanta Gold would install a bulkhead to seal off the Adit by 2013, with reclamation of the site to be complete by 2014. *Id.* Finally, this plan provided that "[i]f the proposed settling pond and sand filtration system are unable to meet required water quality parameters, a future filtration system will be constructed downstream of the ponds." *Id.* Atlanta Gold referred to this potential future filtration system as a "contingency filter."

The 2012 Supplemental Plan was approved, in part, and Atlanta Gold performed some, but not all, of the work it said it would do. Simmons Decl. ¶ 2 (Dkt. 103-1). Specifically, Atlanta Gold installed a Zero Valent Iron filtration system but did not install a third

---

[4] Per the 2012 Supplemental Plan's executive summary, this would entail "realignment of USFS Road #207 and diversion of Montezuma Creek commencing at the 600 Level at elevation 6330' ± above mean sea level" in June through October of 2012. (Dkt. 77-3 p. 1.) The expectation was that "the diversion of Montezuma Creek at the elevation of 6330 will reduce and prevent the migration of sedimentation and mine waste into the waters of Montezuma Creek." *Id.* at 2.

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 10**

sedimentation pond at the PWTF for weather-related reasons.  *Id.*  Mr. Simmons said in December 2012 that Atlanta Gold would begin implementation of the remaining parts of the approved portions of the 2012 Supplemental Plan in Spring 2013.  *Id.*  However, that did not happen.  Indeed, Atlanta Gold's subsequent filings, including status reports, say nothing about the other work promised in the 2012 Supplemental Plan.  (Dkts. 106, 111, 117.)

In July 2012, the Court issued its Memorandum Decision on Plaintiffs' Motion for Remedies (Dkt. 87),[5] granting an injunction and ordering Atlanta Gold to pay a partial penalty of $2,000,000.  The Court noted that, because of "the longstanding, serious, and ongoing nature of the violations, and considering [Atlanta Gold's] history of attempting to delay compliance until it had its mine up and running, an injunction may well be the only way to ensure that the company complies with the CWA in a timely fashion."  *Id.* at 18.  The Court entered an Injunction Order (Dkt. 88) on July 27, 2012 requiring Atlanta Gold to bring arsenic and iron concentrations into compliance with its NPDES Permit by October 31, 2012.  The Court retained jurisdiction over the matter to enforce the injunction order.

The compliance deadline was extended, first through the end of November 2012 (Dkt. 96) and then again until December 15, 2012 (Dkt. 87).  Atlanta Gold reported in a status report filed on December 6, 2012 (Dkt. 103) that "through the installation of the Zero Valent Iron passive filtration system" Atlanta Gold had "achieved compliance with the referenced effluent limits" as of November 8, 2012 and had "maintained compliance with the NPDES permit since that time with few exceptions."  After reviewing this status report, the Court required Atlanta

---

[5] This Decision was authored by U.S. Magistrate Judge Mikel H. Williams.  The undersigned began presiding over the case on November 7, 2016.

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 11**

Gold to file a subsequent status report on June 1, 2013 so that the Court could "determine whether the fixes implemented by [Atlanta Gold] continue to be effective, and in particular, to determine whether they remain effective during the spring run-off season."  (Dkt. 105).

For its part, ICL filed a status report pointing out that Atlanta Gold's own monitoring established that the maximum permitted arsenic levels had been exceeded in 16 of 19 weekly samples taken between December 15, 2012 and April 31, 2013.  (Dkt. 113.)

Atlanta Gold's June 2013 status report reported what it called "substantial compliance" with the arsenic and iron effluent limits in its NPDES Permit.  (Dkt. 111.)  The status report included invoices, timesheets, and spreadsheets documenting Atlanta Gold's expenses incurred in treating the Adit discharge.  It also included a Discharge Monitoring Report from April 2013 indicating that there were two weekly exceedances (each of 12 µg/L) that month.  Atlanta Gold said it had "recently experienced some clogging issues in the [Zero Valent Iron] Filter, which have resulted in some 'spikes' in test results from the discharge.  In order to address these issues and to further improve removal of arsenic and iron from the treatment of water, [Atlanta Gold] plans to install a supplemental solids filter to remove additional suspended solids from the effluent prior to the water being routed into the final Filter."  (Dkt. 111 at 3.)  Atlanta Gold also said the "Filter" was working as designed, but that the volume of solids entering the Filter from the settling ponds had shortened the anticipated life expectancy of the Filter media due to clogging.  It described a plan to decrease the solids entering the PWTF by performing maintenance on the settling ponds and installing two solids removal filters in June 2013.  *Id.*  The Court required an additional status report, filed in August 2013, which contained DMRs for May

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 12**

and June 2013 (Dkt. 117).  That status report indicated that there were no arsenic exceedances in

May 2013 and two arsenic exceedances (of 13 µg/L and 11 µg/L) in June 2013.

Ultimately, the Court did not impose additional penalties and entered final judgment in

the previously-assessed amount.  (Dkts. 122, 125.)  The case was then closed in September 2013.

A little more than three years later, in November 2016, Plaintiffs moved to reopen the

case and asked the Court to hold Atlanta Gold in civil contempt for additional Clean Water Act

violations related to arsenic contamination (Dkts. 127, 128).  Plaintiffs alleged at least 497

identified daily violations (represented by 71 weekly exceedances, alleged as seven daily

violations) and sought enforcement remedies, additional Clean Water Act civil penalties, and

civil contempt sanctions.  An evidentiary hearing was held in April 2017 (Dkts. 155, 156).

Before a decision on Plaintiffs' motion was issued, Plaintiffs filed a Notice of Continuing

Violations (Dkt. 157).  That Notice alleged 16 weekly arsenic exceedances between March and

July 2017, including exceedances as high as 807 µg/L in May 2017 and 409 µg/L in June 2017.

It also alleged seven weekly iron exceedances in May and June 2017, including exceedances as

high as 7,230 µg/L in May 2017 and 3,130 µg/L in June 2017.

A Memorandum Decision and Order on Motion for Civil Contempt was issued on

September 15, 2017 (Dkt. 159), ordering Atlanta Gold to pay $251,000 in additional Clean

Water Act penalties and an additional $251,000 for civil contempt.  The civil contempt amount,

however, was held in abeyance until September 30, 2018 to allow Atlanta Gold an opportunity to

comply with its NPDES Permit and with the Court's orders and thereby purge its civil contempt.

If Atlanta Gold achieved substantial compliance, the civil contempt payment would not be owed.

Atlanta Gold was to file periodic status reports "detailing the steps it has taken to reach

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 13**

compliance with the terms of the Permit and the results achieved (including all relevant DMRs)." A Second Injunction Order (Dkt. 166) and Judgment (Dkt. 167) were subsequently issued.

Atlanta Gold filed periodic status reports, the contents of which are discussed in detail below. This Decision resolves the question of whether Atlanta Gold has achieved substantial compliance with its NPDES Permit and whether, therefore, the reason for the $251,000 civil contempt penalty has been purged, such that the contempt order should be rescinded or amended.

## LEGAL STANDARD

Congress enacted the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.,* "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," including by regulating the discharge of pollutants.  33 U.S.C. § 1251(a).  Such regulation is done through a permitting process called the National Pollutant Discharge Elimination System (NPDES), implemented at 33 U.S.C. § 1342, and corresponding regulations appearing in Title 40 of the Code of Federal Regulations.  Atlanta Gold sought and received an NPDES permit allowing discharges of pollutants from the Adit to Montezuma Creek, subject to specific limits.  (Dkt. 22-1.)  Among other things, the water discharged into Montezuma Creek was limited to arsenic levels of no more than 10 μg/L per day and iron levels of no more than 1,000 μg/L per day, to be verified by weekly sampling.

Violation of the effluent limitations of an NPDES permit are subject to civil penalties under 33 U.S.C. § 1319(d) in an amount not to exceed $25,000 per day for each violation.  When deciding an appropriate penalty amount, a court must consider "the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 14**

impact of the penalty on the violator, and such other matters as justice may require."  33 U.S.C. § 1319(d).

This Court's September 15, 2017 Memorandum Decision and Order on Motion for Civil Contempt (Dkt. 159) defined "substantial compliance" as "improving control of the volume of water to be treated so that the system is not overwhelmed and improving the effectiveness of such treatment in general."  (Dkt. 159 at 30.)  In deciding whether Atlanta Gold has substantially complied with its obligations, the Court will consider the weekly compliance (and, by extension, the daily compliance within such weeks) from September 15, 2017 through August 30, 2018, as well as the overall extent of compliance over time, in light of the specific circumstances, challenges, and improvements implemented and not implemented.

## DISCUSSION

As described above, Atlanta Gold continued to violate the Clean Water Act by failing to consistently keep iron and arsenic levels discharged from the Adit within its NPDES Permit limits.  To allow an adequate opportunity for Atlanta Gold to achieve substantial compliance with the Permit, the Court set a new compliance deadline of August 30, 2018.  The order also required submission of periodic status reports "detailing the steps…taken to reach compliance with the terms of the Permit and the results achieved (including all relevant DMRs)."  (Dkt. 159.)

After the filing of the last status report called for by the prior Order, the Court required an additional status report for the months of July and August 2018 and requested each party to file a written memorandum upon the question of whether Atlanta Gold had substantially complied with its NPDES Permit, all of which were filed.  (Dkts. 176,181, 182, 183.)

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 15**

The Court set an evidentiary hearing and required that Atlanta Gold's acting president R. David Russell, who had signed the status reports and submitted a declaration describing proposed and/or executed improvements to the water treatment process at the Adit, appear and testify at the evidentiary hearing.  In his August 21, 2018 declaration (Dkt. 175-1), Mr. Russell identifies himself as the acting president of both Atlanta Gold Inc. and Atlanta Gold Corporation.[6]  He describes a relationship between Atlanta Gold and Jipangu, Inc., a Japanese company that Russell said was raising money for Atlanta Gold project development, marketing, and legal expenses.  Exhibit A to his declaration is a plan to raise funds for Atlanta Gold by selling cryptocurrency tokens in an initial "coin" offering.  Based on a 2012 "mineral resource estimate," the fundraising plan estimates that the Atlanta Gold mining property can produce 80,000 ounces of gold per year, for revenue of $104,000,000 at a gold price of $1,300 per ounce. Russell Decl. Ex. A at 20 (Dkt. 175-1).  The fundraising plan also describes Mr. Russell as "Interim President & CEO and Director of Atlanta Gold Inc."  *Id.* at 23.  Finally, and significantly, the fundraising plan says that Atlanta Gold is already a "consolidated subsidiary" of Jipangu and the plan is "to outsource operation management of Atlanta Gold Inc. to Jipangu." *Id.* at 29.

Exhibit B to Mr. Russell's declaration (Dkt. 175-1 p. 42) is a document titled "Environmental – PWTF, Filter System, Well Monitoring, Water Sampling January 1, 2013 – December 2017."  It purports to show expenses in a variety of categories, mostly in the subcategory of operating expenses.  Total expenses of $1,899,016 are indicated for the five years

---

[6] Any distinction between these entities is not clear in the record.  Atlanta Gold Corporation is the Defendant in this action.

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 16**

identified; this number is broken down on the page to reflect average monthly expenses of $31,650 and average annual expenses of $379,803.  Mr. Russell's declaration describes this exhibit as a true and correct copy of the costs associated with running the PWTF.  He states that "[s]ince the time the Court entered its Second Injunction Order on November 6, 2017, costs associated with running the PWTF have been paid by shareholders of [Atlanta Gold] in the form of loans."  Russell Decl. ¶ 6 (Dkt. 175).  Finally, Mr. Russell states that "[i]mprovements will continue to be made over the Spring, Summer and Fall (weather permitting) to the filter system and a potential land application and pond system may be put in place to provide additional capacity for water storage during those times when run off is high."  *Id.* ¶ 12.

At the hearing, Mr. Russell testified that he had been the acting president and CEO of Atlanta Gold from Summer 2017 through September 2018, but he then resigned the position and became an independent consultant to Atlanta Gold.  He said he visited the Adit in June 2017 with Ernest Simmons, the prior Atlanta Gold CEO.  Applying his own expertise in mining feasibility, he said the effluent water treatment at the Adit was successful most of the time, but he expressed concern about run-off conditions and questioned what could be done.

Mr. Russell described several proposed projects to improve the water treatment that were either not undertaken or were not particularly successful.  He mentioned a bid from a company called StanTech Corporation which was rejected because the proposed work, which would have involved plugging the tunnel, would have taken too much time and was too costly.  Another company from Quebec designed a modular plant that would have replaced the existing plant, but

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 17**

that proposal, with a cost of approximately $750,000, also was rejected as too expensive.[7]  Mr. Russell stated that the majority shareholder could not afford that expense.

Next Mr. Russell testified that in late summer 2017 arsenic levels tripled and water began coming out of a "secondary" pipe rather than the main discharge point of the Adit, possibly due to a cave-in inside the mine.  This prompted an examination of the treatment plant, which Mr. Russell said concluded that the plant was not being utilized fully and properly.  Mr. Russell said changes were made to the pipeworks which improved treatment performance.  Specifically, Mr. Russell said that within three weeks arsenic levels stabilized despite the higher amount of arsenic in the discharge coming out of the Adit as compared to historical levels.

Mr. Russell then discussed how Atlanta Gold had sought to shift from "reactive maintenance" to proactive, "scheduled maintenance," including with respect to the zero valent iron filter.  Mr. Russell explained that zero valent iron filters work very well, but without regular, extensive maintenance their efficacy diminishes substantially.  He said that the changes in maintenance had the result of improving the treatment process.

Next, Mr. Russell said that near the 600 Level Adit (not the Adit at issue here), an enormous amount of annual spring run-off disappears immediately into the ground and is not pumped out.  He said that although it is hard to tell where this water flows under the surface, he believed that there would be a benefit from diverting such water so that it would not go into the ground and also not into the mine where it potentially would pick up contaminants and then emerge from the Adit.  Mr. Russell said that such a diversion would reduce the amount of water

---

[7] This plant is not the same as the Newmont plant proposed in 2009, discussed *supra*.

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 18**

the treatment plant had to process.  In his declaration, Mr. Russell stated that Atlanta Gold "has

diverted surface water at or near the 600 Level Adit from running through the 900 Level Adit,

which has substantially reduced the volume of water in the tunnel and dramatically improved

[Atlanta Gold's] ability to successfully remove the requisite amount of Arsenic and Iron to be in

compliance with its NPDES permit."  Russell Decl. ¶ 11 (Dkt. 175-1).

After describing the actual, proposed, or considered treatment changes, Mr. Russell

testified about Atlanta Gold's position on whether it had achieved substantial compliance with its

NPDES Permit.  He maintained that Atlanta Gold was well within the range of substantial

compliance until May, when a spike of arsenic concentrations occurred which Mr. Russell

associated with the significantly higher discharges resulting from with the spring melt run-off.

He said that with more time, Atlanta Gold could work out the issue of controlling arsenic even in

times of increased water flows.

However, for the specific period of June through August 2018, Mr. Russell said that

discharge flows did not decrease as he would have expected, which he said likely was caused by

water backed up somewhere in the Adit, possibly due to a cave-in.  He suggested that the

treatment system was being "worked harder" than the data indicated it should be.   During high-

flow times, he said, the treatment cells can quickly become plugged (and therefore ineffective) so

visual inspections are necessary twice per day.

Next Mr. Russell testified as to the cost of making improvements to the treatment system.

He said that Jipangu, whom he described as the Japanese investors, had financed what they could

afford, focusing on paying for employees and supplies.  He said that Allan Folk, Atlanta Gold's

chairman, had contributed some of his own money.  Mr. Russell also said that he had waived his

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 19**

own fees since October 2017.  He further said that the owners are aware of the need to fix the water treatment system and comply with the NPDES Permit.  He described sending weekly emails identifying what work needed to be done and how much it would cost, and getting responses from Jipangu as to what Jipangu said it could afford.  Mr. Russell said Atlanta Gold has no "going concern" business activity other than the prospect of reopening the Atlanta mine. He also said that Atlanta Gold had made every effort to achieve substantial compliance, and he said that the exceedances during the run-off period in 2018 were far less severe than in prior years.

On cross-examination, Plaintiffs' counsel questioned Mr. Russell about the various improvements proposed or discussed in the status reports. Mr. Russell said that lack of time and lack of money hindered several of the ideas.  Some ideas, he said, were also hindered by the need for additional environmental work and permitting.  Mr. Russell said that the scope of the problem requires a very large treatment system and that logistical issues, including a lack of on-site power, presented significant difficulties.

Mr. Russell testified that the single project he had recommended first be done would expand "flooring cells" in the tunnel, a project that would take 60 to 90 days to complete at a cost of $250,000 to $300,000.  He said that he identified this project in his response to the "investors'" question about what could be done quickly with available funds.

In answering questions posed to him by the Court, Mr. Russell testified that Atlanta Gold had spent between $500,000 and $600,000 on operations at the Adit site during the year, with perhaps $250,000 for improvements to the treatment system rather than on other costs.  He described contemplated improvements to the system as plugging the tunnel, bringing in a

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 20**

modular treatment system, using filters more efficiently, changing piping, adding flow-through in-ground cells outside the Adit, and slowing down the flow to better handle the arsenic.  He said some projects are inherently difficult because of the limited physical space available and the need to protect the hillside.

Because the record was not clear as to what had been done, and what had been only talked about, the Court asked Mr. Russell to specifically identify what improvements had been made to the treatment system and what had not been done.  Mr. Russell answered that Atlanta Gold had made changes to the piping system so as to change the movement of water in the treatment system and had cleaned filter cells.  However, he said additional floor tunnel cells to extend the treatment of the water while still in the Adit tunnel had not been installed, that there had not been a determination of the location of any cave-ins (in part, he suggested, because it suspected the cave-in was under Forest Service property and the Forest Service declined to grant permission to drill a borehole to test).

As to other improvements, Mr. Russell admitted that although his status reports had described many different improvements as having been made, or soon to be made, nothing more actually had been done. He testified that he requested funds in late October 2017 from Mr. Folk and Jipangu to extend the Adit filters and was told that they were working on raising the money and would be in touch.  No money was ever provided for that project.  This was a recurring theme: for each of the proposals or impliedly underway projects referenced in the filed status reports about which the Court asked, Mr. Russell testified that the proposal went no further, or the project did not proceed, due to a lack of funding.  Mr. Russell said he did the best he could

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 21**

with the funds that were available to him.  He said that Jipangu's ability to raise funds was more difficult after its CEO died.

Near the end of the hearing, Mr. Russell was recalled to the witness stand to testify regarding Atlanta Gold's finances.  When asked whether there was any money in the accounts besides funds from Mr. Folk or Jipangu, he said virtually everything was funded by loans from Mr. Folk or Jipangu.  He testified, however, that he had not seen Jipangu's financial statements.

Based on the evidence and argument presented at the evidentiary hearing, the Court is persuaded that Mr. Russell had the expertise to understand and oversee efforts to improve the water treatment system at the Adit.  However, he was not able to accomplish what he felt was appropriate to meet that goal; beyond some limited changes, the company did not provide the money to do so.  Mr. Russell suggested several times that there was no money to make such improvements.  But he also testified that he did not know anything about the financial circumstances of Jipangu itself, nor anything specific about what efforts were made to raise capital or provide existing capital to Atlanta Gold for improving the treatment facility.  He communicated with the people in Japan by email and occasionally by call.  He said he personally knew the late head of the company but said nothing about whether anyone associated with Jipangu had ever visited the Atlanta Gold holdings at the historic Talache Mine site, or otherwise sought to learn more about the mine operations and the treatment facility issues.

In sum, even though Mr. Russell said that Jipangu was very dedicated to raising money for its investment in Atlanta Gold, the facts in the record do not support such a characterization.[8]

---

[8] Significantly, Mr. Russell said early on in his testimony that Atlanta Gold was not considering bankruptcy, apparently – to paraphrase Mr. Russell's testimony at the evidentiary hearing –

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 22**

There was no evidence of Jipangu's finances (even though an exhibit to Mr. Russell's declaration said that Atlanta Gold had become a subsidiary of Jipangu), and Mr. Russell did not have any sort of reliable, much less first-hand, information about what efforts were actually being made (apart from his declaration exhibit describing a proposal to use cryptocurrency) to raise money or what money was available that was not being provided.  He said he did not know about Jipangu's finances, although he made repeated requests for money to pursue treatment system improvements – requests that were met, for the most part, with apparent silence.

Moreover, the record contains very limited evidence of the cost, estimated or otherwise, of the additional improvements which could have been pursued, particularly as to increasing the volume capacity of the treatment system.[9]  There is simply insufficient evidence to persuade the Court that Atlanta Gold had made both a commitment and a follow-through (whether in part or in whole) to implement any such improvements.

Separate and apart from the indefiniteness of efforts to improve the treatment quality of the system, the other problem – the fact that spring snow melt and heavy rain events have caused run-off to overwhelm the treatment system – has been known for years.  The need for the treatment system to contain such run-off was emphasized in prior proceedings and made a specific part of what was expected of Atlanta Gold in order to bring its treatment system into

---

because the ore deposits at the site (and presumably also the potential value and value of the mining rights controlled by Atlanta Gold) were substantial. Mr. Russell testified that he told the owners of the company that it was essential to not only improve the treatment facility because of this Court's prior Order that the company do so, but also because it needed to be done in order to begin mining operations.

[9] As discussed *supra*, Mr. Russell did describe the estimated cost of a plan to expand "flooring cells" inside the Adit tunnel.  But this was the exception rather than the rule, and, regardless, this plan was not implemented.

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 23**

compliance with the NPDES Permit – the Court's prior order expressly defined "substantial compliance" to include "improving control of the volume of water to be treated *so that the system is not overwhelmed*."  (Emphasis added.)

In other words, substantial compliance includes undertaking the necessary steps to ensure that the treatment system is not overwhelmed.  That is, Atlanta Gold's obligation is to comply with effluent limitations even during the higher flows that occur at times of the year when the flows are much higher than usual.  The evidence in the record is that steps to comply with such obligation have not been taken, and high flows continue to overwhelm the system, even if not to the same degree as previously has been true.

To be clear, the Permit limitations are not arbitrary.  In 2012, Plaintiffs filed a declaration by Dr. Shawn Benner, a professor in the Department of Geosciences at Boise State University. Benner Decl. ¶ 2 (Dkt. 63).  Dr. Benner is an expert in the treatment of acid mine drainage and has written about arsenic contamination in various locations.  *Id.* ¶ 4.  He states that the EPA has established a drinking water standard of 10 μg/L but also notes that no well-established minimal risk level exists for arsenic and likely there are negative health consequences of drinking water containing arsenic even below the regulatory drinking water standard of 10 μg/L.  *Id.* ¶¶ 9, 10. Dr. Benner describes arsenic as a "particularly versatile toxin."  *Id.* ¶ 9.

Dr. Benner also says that "[c]hronic exposure to arsenic, even at relatively low concentrations, has a measurable health impact on fish, including inhibiting enzymatic and metabolic function and immune response."  *Id.* ¶ 12.  Further, he describes that the EPA establishes limits for arsenic exposure to aquatic life; the limit for short-term, acute exposure (continuous exposure of 96 hours or less) is 340 μg/L and the limit for long-term, chronic

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 24**

exposure (continuous exposure longer than 96 hours) is 150 µg/L.  *Id.* ¶ 11. Arsenic dramatically reduces immune response in fish, depresses growth rates, and negatively impacts gallbladder and liver function.  *Id.* ¶¶ 12, 13.

Finally, according to Dr. Benner, any increase in arsenic concentration will also produce an increase in toxicity.  He states that the EPA assumes a "linear dose response curve," such that a 10-fold increase in arsenic concentration leads to a 10-fold increase in toxicity.  *Id.* ¶ 20.  Dr. Benner says that "it is highly likely that some fraction of the discharged arsenic is accumulating in the sediments of Montezuma Creek, providing a second vector of impact via fish consumption of metal-impacted macroinvertebrates."  *Id.* ¶ 21.  Thus, the past distribution of arsenic from the Adit effluent carries deleterious impacts into the future, making every exceedance more significant and problematic than it might otherwise be.  Indeed, Dr. Benner stated that "[e]ven with termination of the discharge, impacts on fish that feed on macroinvertebrates will continue for years into the future."  *Id.* ¶ 22.

Against this backdrop, the Court now examines and decides whether Atlanta Gold substantially complied with the requirements of its NPDES Permit.  As discussed above, this analysis will consider compliance based upon Atlanta Gold's weekly reports, which run from September 15, 2017 through August 30, 2018, as well as the overall extent of compliance over time, considering the specific circumstances, challenges, and improvements implemented, as well as those considered but not implemented.

### 1.  Weekly Exceedances

Measurements from eight different weeks exceeded Permit limits.  Compliance with NPDES permits is mandatory and therefore when Atlanta Gold failed to effectively manage

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 25**

water treatment, its actions cannot be excused.  However, in the context of whether substantial compliance has been achieved, the Court will consider whether a violation is *de minimis* in nature.

Atlanta Gold's verified status report for September 2017 (Dkt. 164) indicates that there were no exceedances that month.  Although the same status report indicates multiple exceedances during August 2017, those readings are outside the period at issue.[10]

Atlanta Gold's verified status report for October 2017 through January 2018 (Dkt. 169) indicates that it complied with Permit limits for arsenic and iron.  There were no exceedances during this period.

Atlanta Gold's verified status report for February 2018 through May 2018 (Dkt. 172) records several violations.  For the week of February 12, 2018, the arsenic concentration was measured at 11 µg/L, which Atlanta Gold acknowledges constitutes a violation.  However, the samplings from the week immediately before and after were each less than 5 µg/L.  Because this measurement was just outside of compliance and the week on each side was in compliance, it will be treated as *de minimis* for purposes of this Decision.

For the week of March 12, 2018, the arsenic concentration was measured at 15 µg/L, again despite adjacent samplings of no more than 5 µg/L of arsenic.  Atlanta Gold suggests in its status report that this exceedance could be the result of sample contamination or filter failure

---

[10] However, as described during the evidentiary hearing, the Court will consider the information in the record about compliance/exceedances in the months before and after the September 15, 2017 through August 30, 2018 period for purposes of context in deciding whether there has been substantial compliance with improving the treatment system, to include the capacity of the treatment system.

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 26**

(after considering and rejecting various possibilities for sampling error), but this is conjecture and there is no specific evidence to support such a claim.  This exceedance was not *de minimis*, in that a measurement of 15 µg/L means there was 50% more arsenic in the sample than the maximum of 10 µg/L allowed by the Permit.

Samplings during the rest of March and all of April 2018 complied with the Permit. Weekly measurements in May, however, did not.  Arsenic levels of 27 µg/L and 21 µg/L were recorded on May 7 and 14, respectively.  Moreover, the next status report (Dkt. 173) showed an arsenic level of 33 µg/L on May 21.  Atlanta Gold introduced a chart at the evidentiary hearing (Dkt. 186-1) illustrating that peak May influent flow and effluent flow occurred in the same time as these three arsenic violations – specifically, it showed that flows into the treatment system were more than three times what they had been during the previous eight months.

Atlanta Gold offers the increased inflow into the system as the explanation, and by implication as the excuse, for arsenic levels significantly greater than the NPDES Permit limit. That fact – *i.e.*, the failure of the treatment system to adequately treat the effluent waters during spring run-off – has been a central flaw of Atlanta Gold's efforts to treat the contaminated water for decades.  The Court, however, expressly conditioned a showing of substantial compliance to include "improving control of the volume of water to be treated *so that the system is not overwhelmed*."  (Emphasis added.)  There were improvements considered to the treatment system intended to improve control over the volume of water to be treated.  Some minor improvements were made, but nothing Atlanta Gold did gives the Court confidence that it did all it could to comply with its obligations.  For the improvements Atlanta Gold did undertake, the details about such projects were sparse – including as to the work actually performed as well as

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 27**

the costs and results.  This is simply not sufficient to persuade the Court that Atlanta Gold substantially complied with its obligations.  There is no surprise that water flow levels are higher in certain months – May is known to Atlanta Gold and everyone else in the vicinity of the Adit as a period of high spring snowmelt and run-off.  Hence, there is nothing in the fact that the expected high-flow of water did occur during the period that would justify treating the high levels of arsenic measured during those weeks as *de minimis*.

Further, the magnitude of the violations (27, 21, and 33 µg/L) range from 2.1 to 3.3 times the maximum allowed under Atlanta Gold's Permit.  They are not *de minimis*, notwithstanding that measurements taken in high flow during years prior to July 2012 were even higher.[11]

According to Atlanta Gold's third verified status report (Dkt. 173), June measurements showed no violations, but there was a violation in July – a measurement of 14 µg/L of arsenic on July 2, 2018.  Atlanta Gold suggests this may have resulted from the water becoming unsettled due to the filter tanks being cleaned, but the speculation about that possibility without more neither excuses the violation nor, or course, is it evidence of substantial compliance. It is also possible that there could have been a heavy rainfall in the area of the Adit, which in past years has caused the volume of water to overwhelm the treatment system.  Regardless, the magnitude of the violation precludes a finding that it is *de minimis*.

Atlanta Gold's final verified status report (Dkt. 180) shows a measurement of 15 µg/L of arsenic on August 6, 2018, which as previously discussed is not *de minimis*.  Finally, Atlanta

---

[11]  "The discharge waters from the 900 Adit indicated an average arsenic concentration of 265 µg/L, with a maximum observed value of 3070 µg/L."  Mem. Decision on Plfs.' Mot. for Remedies 20 (Dkt. 87).

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 28**

Gold's Exhibit 1 from the evidentiary hearing shows a measurement of 29 µg/L of arsenic on August 20, 2018, also not *de minimis*.

All told, there were eight weekly arsenic violations greater than the 10 µg/L NPDES Permit limit, but no violation of the iron limit, between September 15, 2017 and August 30, 2018.  One arsenic violation was *de minimis*; the others were not.  In total, there were seven weekly arsenic violations (totaling 49 daily violations) during the 49-week period under review, which contained arsenic levels between 14 and 33 µg/L.

### 2.  Overall Compliance

Atlanta Gold contends that it has achieved substantial compliance because it has made "improvements to the Pilot Water Treatment Facility ('PWTF'), and improved water treatment generally, at the 900 level mine adit site in Atlanta, Idaho."  Def.'s Mem. Re: Substantial Compliance 2 (Dkt. 181).  There were only "a few occasions," according to Atlanta Gold, "where the sample results for Arsenic and Iron exceeded the respective NPDES Permit limits, which were very minimal in ug levels."  *Id.*

As to work done at the treatment facility, Atlanta Gold says that:

> In compliance with the Court's instruction, [Atlanta Gold] completed a surface water diversion at the 600 level adit through a designed pipe installation, after it was determined that a substantial amount of water from higher elevations was flowing directly into the 900 level adit, particularly during periods of high run off. This, along with increased maintenance of the filter tanks, changing the order in which the effluent runs though the respective filters, and changing the aggregate and sand filter material with increased frequency has allowed [Atlanta Gold] to better control the flow of water through the PWTF and improve the effectiveness of that treatment. [Atlanta Gold] also stopped using zero valent iron in the filter process, which has improved the effectiveness of the filter material inside the filter tanks and inside the bed of the adit.

*Id.*

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 29**

ICL agrees that Atlanta Gold "did not report any iron violations, its reported arsenic violations are slightly less frequent than during the period at issue in the contempt proceedings, and its reported arsenic violations do not include the same kind of extreme spikes in arsenic that occasionally occurred before." Plfs.' Brief on Substantial Compliance, 10 (Dkt. 182).  On the other hand, ICL disputes that Atlanta Gold has substantially complied in that it has "failed to take all reasonable steps to improve its wastewater treatment system at the 900 Level Adit, and the system continues to perform poorly and unlawfully pollute Montezuma Creek with arsenic." *Id.* at 1.  ICL contends that Atlanta Gold committed 56 additional Clean Water Act violations after September 15, 2017, including 42 that occurred during the four months prior to the compliance deadline.  Substantively, ICL asserts that Atlanta Gold's verified status reports discuss ideas and plans rather than accomplished action.  It faults Atlanta Gold for not including "detailed documents regarding the investigation, planning, and implementation of any" projects mentioned in the reports.  *Id.* at 5.

ICL argues that 56 new Clean Water Act violations over seven months "is a far cry from substantial compliance."  *Id.*  ICL contends that Atlanta Gold is responsible for 238 daily violations at the Adit between March 2017 and August 2018, including 56 daily violations during the period at issue in this decision and 182 additional daily violations between March 2017 and August 2017.  *Id.* at 13.  Of these, ICL says, 42 were arsenic violations of 150 µg/L or higher and 49 were iron violations.[12]

---

[12] The six weekly violations of 150 µg/L or higher were all in May and June 2017, prior to the Court's order mandating compliance by August 2018.  (Dkt. 164-1.)

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 30**

The Court concludes that Atlanta Gold has improved the effectiveness of the treatment facility, as reflected by the improvements shown in the monthly reports sent to the EPA when compared to prior years.  Both the number of violations and the severity of the violations have been reduced, and Atlanta Gold's overall compliance with the Permit has improved in some respects when compared to the multitude of extreme violations in prior years.  However, Atlanta Gold has not achieved substantial compliance in "improving control of the volume of water to be treated so that the system is not overwhelmed and improving the effectiveness of such treatment in general."  (Dkt. 159 at 30.)

As discussed above, sampling indicates that the Adit discharge was out of compliance with respect to arsenic concentrations in seven of the 49 weeks considered here, a non-compliance rate of more than 14%. Atlanta Gold appropriately seeks to put the best possible light upon what efforts have been made.  However, when Mr. Russell was pressed for specificity his testimony was clear that there were numerous steps Atlanta Gold could have undertaken – but did not – to improve the treatment system's ability to filter arsenic *and* to contain and treat the full volume of discharge that years of experience have proven is likely to occur at certain times of the year.

The Court is mindful that almost any improvement to the treatment system requires a financial investment and that the expense of making improvements is part of what the Court should consider.  But, Atlanta Gold's fundamental obligation to comply with the Permit limitations has not changed since the Permit was issued over a decade ago.  The Adit was

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 31**

reopened in 1988, more than 30 years ago, and Atlanta Gold has had the responsibility to treat the Adit discharge since 1994.[13]

Moreover, the need to treat the Adit's water discharge was known even prior to 1988. Atlanta Gold's agent Doug Glaspey said "[a]ll agencies involved with [Atlanta Gold's] proposed activities at the Project Site recognized that the Adit effluent is a historical problem that existed for several years prior to [Atlanta Gold] coming onto the Project Site." Glaspey Aff. ¶ 7 (Dkt. 20-12).

Atlanta Gold proposed or discussed various improvements to the water treatment system in the 2005 to 2009 time frame, but none was accomplished. Most significant of these was the replacement of the "temporary" PWTF with a permanent treatment system, which still has not happened. But Atlanta Gold also discussed a successful bench-scale test in 2005 from Blue Water Technologies that was not deployed on site. In 2009, it contemplated – but did not implement – the "AdEdge AD26/E33 integrated system." Also in 2009, Atlanta Gold purchased a water treatment plan from Newmont, which it told the EPA would be installed by 2012. It was never installed. (This mirrors Mr. Russell's testimony at the 2019 evidentiary hearing during which he mentioned Atlanta Gold having considered, but rejected, a plan to purchase a modular plant that would have replaced the PWTF.)

Similarly, Atlanta Gold proposed to close the Adit in 2012, facilitating its target of achieving compliance with its NPDES Permit by October 2012. The Adit was not closed in 2012, or at any time since. But now, in addition to other concepts or proposals Atlanta Gold has

---

[13] Prior to the NPDES Permit's issuance in August 2009, the arsenic and iron effluent limits were substantially less stringent.

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 32**

mentioned, Mr. Russell testified that Atlanta Gold had again considered but rejected a plan to close the Adit as a means of achieving compliance.

Atlanta Gold also proposed in its 2012 Supplemental Plan to divert Montezuma Creek above the Adit to reduce the volume of water flowing through the Adit, but that project was not implemented.  Now, Mr. Russell testifies that in April and May 2018 Atlanta Gold installed some pipe work to divert water near the 600 Level so that it did not seep into the mineworks to discharge, ultimately, from the 900 Level Adit.  The goal was to redirect snowmelt run-off that might otherwise collect arsenic and then flow out of the Adit.  This project, he said, appeared to reduce the discharge flow by perhaps 5 to 8 gallons per minute; however, he said he could only assume that this diversion project would reduce the discharge from the Adit during the run-off season and that he could not estimate by how much the discharge might be reduced.

Mr. Russell's testimony on this point at the evidentiary hearing was remarkably sparse on details and the work was not described beyond a cursory fashion in any of Atlanta Gold's status report filings.  When Mr. Russell was questioned about references in the status reports to a "pump system," Mr. Russell said that was not the project he was describing as a water diversion at the 600 Adit level.  But when the Court asked Mr. Russell to describe what was done, Mr. Russell testified about a "concept" of drilling holes into the tunnel and using cameras and pumping water to determine whether there were any cave-ins.  He described this as a longer-term project and his testimony was not at all clear whether or how the 600 Level diversion project and the project to investigate a possible cave-in were related.

As to the "diversion" project, one of Mr. Russell's status reports indicated that the company had "recently identified a drainage located Southeast of the 600 Level platform, just

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 33**

above the Bascom road, that appears to be draining directly into the mine workings." (Dkt. 164 ¶ 5.) The report went on to say that Atlanta Gold had purchased pipe and supplies to divert the drainage run-off onto its private land and that it hoped the diversion would substantially decrease run-off entering the mine workings. *Id.* At the evidentiary hearing, Mr. Russell testified that Atlanta Gold had done a "piping exercise" to divert melt water onto private ground owned by the company rather than continuing to let it flow down a drainage and into the ground, where he presumed it might be going into the mine. He said that was done in "about April–May of 2018" and "it was a pretty good project, had to bury pipes and things like that."

Then Mr. Russell's August 2018 declaration describes that "as set forth in the several status reports filed with the Court, [Atlanta Gold] has diverted surface water at or near the 600 Level Adit from running through the 900 Level Adit, which has substantially reduced the volume of water in the tunnel and dramatically improved [Atlanta Gold's] ability to successfully remove the requisite amount of Arsenic and Iron to be in compliance with its NPDES permit." (Dkt. 175-1 ¶ 11.) But, even if some work was done to lead to a reduction (as Mr. Russell testified) of five to eight gallons per minute at a time when Mr. Russell also said the outflow could range from 150 to 1,000 gallons per minute, the result might be an improvement, but not a "dramatic" improvement. Further, there is no specificity as to the detail and the scope of the diversion project; rather, the only reference in the status reports says that the company "purchased pipe and necessary supplies to divert the drainage runoff." (Dkt. 164.)

The Court has considered the fact that Atlanta Gold did complete a project of some sort to divert surface water near the 600 Level Adit. But on balance the evidence is that, at best, Atlanta Gold made only a start at controlling the flow from the Adit into the treatment plant; the

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 34**

project that was described, with its uncertain details as to what, where, how and when, simply does not demonstrate that Atlanta Gold substantially complied with its responsibility to improve control of the volume of water so that the system is not overwhelmed.

Moreover, returning to the larger point, the improvements that Mr. Russell said that Atlanta Gold was considering appear to be the very same proposed improvements that have been discussed and, in some cases, *promised* by Atlanta Gold going back for ten years or more.  It bears repeating that Atlanta Gold acknowledged from the outset that, as described *supra*, the PWTF was not intended to be a permanent solution – Atlanta Gold originally said it would construct a more permanent water treatment facility by November 15, 2008.  Yet the "temporary" PWTF still remains in place, treating the contaminated Adit discharge with varying degrees of success, albeit with some recent improvement in the frequency and quality of that success.  And, the repeated and revolving nature of such unfulfilled commitments means that the Court can give no meaningful credibility to Atlanta Gold's renewed mention of such plans when deciding whether Atlanta Gold has substantially complied with the requirements of its NPDES Permit.  Rather, the record illustrates a company perhaps making a better effort than it has made in the past to comply with the Permit, but at the same time a company either unwilling or unable to do what is required of it.  It is, of course, Atlanta Gold's burden to demonstrate substantial compliance. There continue to be numerous violations of the Permit's arsenic limits and nearly all of the violations are significant in the amount.  Additional improvements (beyond what has been described) as to both the quality of the treatment process and the control of the volume of water going into the treatment plant could have been accomplished.  Even if such improvements could not have been completed within the time period, they at least could have been underway.

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 35**

But they were neither accomplished nor started.  Finally, the Court is not persuaded from the evidence put before it that it was economically impossible for the company to do such work, or to begin such work.

It is remarkable that this pattern continues when Atlanta Gold is now apparently controlled by a new entity, Jipangu, an entity which had Mr. Russell serve as a stand-in for the persons who control the company, with Mr. Russell testifying that there is no financial ability to improve the treatment facility to meet the Permit requirements while testifying at the same time that he has no direct knowledge of the actual financial resources of the "new investors."  This is particularly troubling when at least one project – what Mr. Russell proposed as expanding "flooring cells" in the tunnel, could have been done quickly (in 60 to 90 days) at a cost of $250,000 to $300,000.  Mr. Russell recommended that this be done in a response to Jipangu's question about what could be done quickly with available funds.  But the flooring cells project was not done nor even undertaken, even though Atlanta Gold's plan to raise funds, also as described in one of Mr. Russell's declarations filed with the Court, relied upon estimates that the company's mining properties "can produce 80,000 ounces of gold per year, for revenue of $104,000,000 at a gold price of $1,300 per ounce."  Russell Decl. Ex. A at 20 (Dkt. 175-1).

The record indicates that Atlanta Gold continues to spend money to operate the treatment facility, with some improvement, but the evidence does not persuade the Court that Atlanta Gold has substantially complied with its responsibility to make the treatment system sufficient to meet treatment requirements or to effectively handle the seasonal high flows running out of the Adit.  The plant must be able to treat whatever discharge comes out of the Adit, at whatever time of year, within the arsenic and iron contamination limits allowed by the NPDES Permit.  That is

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 36**

what the Court's prior order required Atlanta Gold to do.  That is what Atlanta Gold has failed to accomplish.

Nonetheless, the Court is persuaded that Atlanta Gold has made progress toward meeting its full responsibilities, with the changes in the treatment process and treatment plant maintenance being the most significant.  Contrasting the six months prior to the period at issue here highlights that progress.  Atlanta Gold went from 49 iron violations to no iron violations.  It went from 42 weeks of arsenic violations at or more than 150 µg/L to no such violations of that magnitude.  (Indeed, the highest arsenic violation in the time period at issue here – while still problematic – was 33 µg/L, well below the 150 µg/L threshold that Dr. Benner said is the point the EPA deems as dangerous chronic exposure to aquatic life.)  Additionally, in the prior period, Atlanta Gold had 147 arsenic violations of less than 150 µg/L; in the most recent period at issue here that number dropped to 56.  Moreover, the reporting data show no arsenic violations at all during much of the year, including one stretch of over four months.

At the same time, Atlanta Gold still has not implemented a water treatment system capable of handling the increased water volumes associated with high run-off.  The ability to handle the full volume of discharge at all times is equally important to the ability to effectively treat and remove the hazardous contaminants in the discharge.  One cannot argue that substantial compliance with the terms of an NPDES permit is demonstrated by meeting permit restrictions for part or even most of a year, when violations for the other part of the year put people and the environment at risk in the very manner against which the environmental laws are intended to protect.

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 37**

When the Court made its prior decision upon the Clean Water Act penalties and the civil contempt amount, the Court considered the statutory penalties – *i.e.*, that persons who violate the effluent limitations of an NPDES permit may be subject to civil penalties under 33 U.S.C. § 1319(d) in an amount not to exceed $25,000 per day for each violation.  In deciding an appropriate penalty amount, the Court evaluated "the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require."  33 U.S.C. § 1319(d). Here, as described at length in this Decision, the violations are serious.  The economic benefit resulting from the violations flows directly to Atlanta Gold, in that the company has not done what it must do to comply with its NPDES Permit and therefore also has not spent the necessary money to do so.  Over a course of many years, the company has first promised to make the required changes, then been forced by regulatory and judicial action to make such improvements, then promised again to comply and even at one point put forward its plans to complete the improvements as part of a plan to resume mining, only to follow that with a plan to plug the Adit to stop any discharge from the mine workings.  More legal action followed.

The Court's prior order defined substantial compliance as "improving control of the volume of water to be treated so that the system is not overwhelmed and improving the effectiveness of such treatment in general."  (Dkt. 159 at 30.)  On this record, Atlanta Gold has not achieved substantial compliance.  But Atlanta Gold has made progress toward substantial compliance, in that the number and magnitude of exceedances have declined in a material degree because of changes in the treatment process and in operation of the treatment facility.  In other

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 38**

words, Atlanta Gold has partially purged its civil contempt.  For that reason, Atlanta Gold will be relieved of the burden of $125,500.00, or one-half of the civil contempt amount previously imposed of $251,000.  Further, the Court will not seek to obtain independent recommendations as to the actions necessary to bring the treatment of the Adit discharge under control at Atlanta Gold's expense, as was contemplated as one possible option in the prior order.

However, as described earlier, Atlanta Gold has not done what reasonably could have been done to improve the treatment process, nor has it improved control of the volume of water to be treated so that the system is not overwhelmed.  The system remains incapable of treating the higher volumes of water associated with annual spring run-off or other events that increase the amount of water flowing from the Adit, such as heavy rain events, all of which are well-known as a matter of historical weather patterns and actual experience at the Adit location.

Atlanta Gold was given a year-long opportunity to demonstrate substantial compliance. It did not.  For this reason, Atlanta Gold will be required to pay the other half of the $251,000 civil contempt.  Further, for purposes of reference and as a further benchmark framing one of the reasons for the Court's decision, in the exercise of its discretion on this issue, the Court refers again to Mr. Russell's testimony that, at the request of "the investors," he "early on" recommended expansion of the so-called "flooring cells" inside the Adit tunnel, where contaminants could be removed before water flowed out from the Adit.  Such a project, Mr. Russell said, could be done quickly with "available funds, at a cost of $250,000 to $300,000. Yet, that project was never pursued, much less completed.  If it had been, the decision on the question of substantial compliance might have been a closer call.

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 39**

## ORDER

(1) Defendant Atlanta Gold has not substantially complied with the requirements of its Clean Water Act NPDES Permit at the 900 Level Adit.

(2) This Court's prior order dated September 15, 2017 (Dkt. 159) ruled that Atlanta Gold was in civil contempt.  By partially improving the treatment processes at the 900 Level Adit treatment facility, Atlanta Gold also has partially purged the conduct which led to such civil contempt.

(3) Due to Atlanta Gold's partial purge of the conduct which led to civil contempt, paragraph 3 of the "Order" section of this Court's September 15, 2017 order (Dkt. 159) is AMENDED, *nunc pro tunc*, by reducing the civil contempt payment amount from $251,000 to $125,500. Atlanta Gold is hereby ordered to pay the sum of $125,500 for civil contempt to the United States District Court for the District of Idaho.  This amount is due and payable immediately.

(4) The Clerk's Office is directed to close this case.  However, this Court continues to retain jurisdiction over this matter, which may be reopened at any time upon the Court's own action, or upon motion of a party for good cause, for purposes of ensuring compliance with the Court's orders.

DATED:  **September 19, 2019.**

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER RE: SUBSTANTIAL COMPLIANCE – 40**