# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE and NORTHWEST ENVIRONMENTAL DEFENSE CENTER, | Case No.: 1:11-cv-161-REB |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER RE:** |
| vs. | **MOTION FOR AWARD OF ATTORNEY FEES AND LITIGATION EXPENSES (DKT. 191)** |
| ATLANTA GOLD CORPORATION, | |
| Defendant. | **MOTION FOR ENTRY OF DEFAULT JUDGMENT (DKT. 198)** |

Pending are Plaintiffs' Motion for Award of Attorney Fees and Litigation Expenses Re: Contempt Proceedings (Dkt. 191) and Plaintiffs' Motion for Entry of Default Judgment Awarding Attorney Fees and Litigation Expenses (Dkt. 198).  Having reviewed the briefing and supporting filings, and otherwise being fully advised, the Court enters the following Decision and Order.

## BACKGROUND

Plaintiffs filed suit for injunctive and declaratory relief and civil penalties under the Clean Water Act ("CWA") against Defendant, a mining company, for alleged violations of the conditions of its National Pollutant Discharge Elimination System ("NPDES") Permit related to excessive iron and arsenic contaminants in wastewater discharge from a particular mine adit into Montezuma Creek, a tributary of the Middle Fork of the Boise River.  The effluent from this mine adit has been the subject of multiple proceedings between these parties, dating back to 2005.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 1**

This particular case has many chapters.  The lawsuit was filed on April 18, 2011.  Cmpl. (Dkt. 1).  In July 2012, the Court[1] issued its Memorandum Decision on Plaintiffs' Motion for Remedies (Dkt. 87), granting an injunction and ordering Atlanta Gold to pay a partial penalty of $2,000,000.  The Court described the "longstanding, serious, and ongoing nature of the violations, and considering [Atlanta Gold's] history of attempting to delay compliance until it had its mine up and running," and concluded that "an injunction may well be the only way to ensure that the company complies with the CWA in a timely fashion."  *Id.* at 18.  An Injunction Order (Dkt. 88) issued on July 27, 2012 requiring Atlanta Gold to bring arsenic and iron concentrations into compliance with its NPDES Permit by October 31, 2012.  The Court retained jurisdiction over the matter to enforce the injunction order.  Additionally, a Judgment (Dkt. 102) was entered in Plaintiffs' favor, awarding $240,000 in attorneys' fees and costs on November 28, 2012.

The compliance deadline was extended, first through the end of November 2012 (Dkt. 96), then until December 15, 2012 (Dkt. 87).  Atlanta Gold filed a status report on December 6, 2012 (Dkt. 103) which reported that "through the installation of the Zero Valent Iron passive filtration system" Atlanta Gold had "achieved compliance with the referenced effluent limits" as of November 8, 2012 and had "maintained compliance with the NPDES permit since that time with few exceptions."  After reviewing the status report, the Court ordered Atlanta Gold to file a subsequent status report on June 1, 2013 so that the Court could "determine whether the fixes

---

[1] At that time, this matter was before U.S. Magistrate Judge Mikel H. Williams.  The undersigned took over the case on November 7, 2016.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 2**

implemented by AGC continue to be effective, and in particular, to determine whether they remain effective during the spring run-off season."  (Dkt. 105).

In the meantime, ICL filed a status report asserting that Atlanta Gold's own monitoring established that its discharge exceeded the arsenic effluent limit in 16 of 19 weekly samples taken between December 15, 2012 and April 31, 2013.  (Dkt. 113.)

Atlanta Gold represented in its June 2013 status report that it had achieved "substantial compliance" with the arsenic and iron effluent limits in its NPDES permit.  (Dkt. 111.)  The status report included invoices, timesheets, and spreadsheets documenting Atlanta Gold's expenses incurred in treating the Adit discharge.  It also included a Discharge Monitoring Report ("DMR") from April 2013 indicating that there were two weekly exceedances (each of 12 µg/L) that month.  Atlanta Gold said it had "recently experienced some clogging issues in the [Zero Valent Iron] Filter, which have resulted in some 'spikes' in test results from the discharge.  In order to address these issues and to further improve removal of arsenic and iron from the treatment of water, AGC plans to install a supplemental solids filter to remove additional suspended solids from the effluent prior to the water being routed into the final Filter."  (Dkt. 111 at 3.)  Atlanta Gold also said the "Filter" was working as designed, treating 25–100 gallons of water per minute, but that the volume of solids entering the Filter from the settling ponds had shortened the anticipated life expectancy of the Filter media due to clogging.  It described a plan to decrease the solids entering the PWTF by performing maintenance on the settling ponds and installing two solids removal filters in June 2013.  *Id.*

Pursuant to a subsequent Court order (Dkt. 115), Atlanta Gold filed an additional status report in August 2013 which contained DMRs for May and June 2013 (Dkt. 117).  That status

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 3**

report indicates that there were no arsenic exceedances in May 2013 and two arsenic exceedances (of 13 µg/L and 11 µg/L) in June 2013.

Ultimately, the Court declined to impose penalties beyond the previously-ordered $2,000,000 penalty, and final judgment was entered in that amount.  (Dkts. 122, 125.)  The case was then closed in September 2013.

Approximately three years later, in November 2016, Plaintiffs moved to reopen the case and asked the Court to find Atlanta Gold in civil contempt for additional Clean Water Act violations related to arsenic exceedances (Dkts. 127, 128).  Plaintiffs alleged at least 497 identified daily violations (represented by 71 weekly exceedances, each of which Plaintiffs counted as seven daily violations) and sought enforcement remedies, additional Clean Water Act civil penalties, and civil contempt sanctions.

The Court presided over a two-day evidentiary hearing held in April 2017 (Dkts. 155, 156).  Before a decision on Plaintiffs' motion was issued, Plaintiffs filed a Notice of Continuing Violations (Dkt. 157).  That Notice documented 16 weekly arsenic exceedances between March and July 2017, including exceedances as high as 807 µg/L in May 2017 and 409 µg/L in June 2017.  It also documented seven weekly iron exceedances in May and June 2017, including exceedances as high as 7,230 µg/L in May 2017 and 3,130 µg/L in June 2017.

A Memorandum Decision and Order on Motion for Civil Contempt was issued on September 15, 2017 (Dkt. 159), in which this Court granted Plaintiffs' motion, ordered Atlanta Gold to pay $251,000 in additional Clean Water Act penalties, and ordered Atlanta Gold to pay an additional $251,000 for civil contempt.  However, the $251,000 civil contempt payment was held in abeyance until September 30, 2018 to allow Atlanta Gold an opportunity to comply with

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 4**

its NPDES permit; if Atlanta Gold achieved substantial compliance such civil contempt payment was to be rescinded. Atlanta Gold was further ordered to file periodic status reports "detailing the steps it has taken to reach compliance with the terms of the Permit and the results achieved (including all relevant DMRs)." A Second Injunction Order (Dkt. 166) was subsequently issued.

Atlanta Gold filed periodic status reports, the contents of which were discussed in detail in the Court's decision resolving the issue of whether Atlanta Gold had achieved substantial compliance (Dkt. 187). In that decision, the Court held that Atlanta Gold had not substantially complied with the requirements of its NPDES permit at the subject adit. The decision also held that Atlanta Gold had partially improved the treatment process at the adit and had thereby partially purged the conduct which led to the civil contempt. For that reason, the civil contempt payment amount was reduced from $251,000 to $125,500. The case was closed, although the Court retained jurisdiction over the matter.

Now, Plaintiffs seek an award of attorney fees and litigation expenses under the Clean Water Act, 33 U.S.C. § 1365(d). Because Atlanta Gold did not respond to the motion for fees, Plaintiffs subsequently moved for entry of default judgment on the fee motion. The motions will be taken up in reverse order, which the Court finds to be appropriate given their relationship to each other. This decision shall constitute the Court's findings of fact and conclusions of law, consistent with Federal Rules of Civil Procedure 54(d)(2)(C) and 52(a).

## LEGAL STANDARD

Federal Rule of Civil Procedure 54 governs the award of attorneys' fees. After determining that a basis in law exists for a proper award of attorney fees to a prevailing party, the Court must calculate a reasonable fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 5**

Generally, the Court utilizes the "lodestar figure," which multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate.  *Id.*; *see also Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 977 (9th Cir. 2008).  "Although in most cases, the lodestar figure is presumptively a reasonable fee award, the district court may, if circumstances warrant, adjust the lodestar to account for other factors which are not subsumed within it."  *Id.* (quoting *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1147–48 (9th Cir. 2001)).  But, the plaintiff's degree of success is the most important factor in determining the reasonableness of the award.  "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.  Normally, this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified.... The result is what matters."  *Hensley*, 461 U.S. at 435.  *See also Farrar v. Hobby*, 506 U.S. 103, 114 (1992) (holding that "'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained'") (quoting *Hensley*, 461 U.S. at 436).

## DISCUSSION

### 1.  **Plaintiffs' Motion for Default Judgment Is Denied.**

Plaintiffs' Motion for Default Judgment accurately indicates that Defendant did not file any response or opposition, timely or otherwise, to their motion for fees.  Plaintiffs quote Local Civil Rule 7.1(e)(1), which provides in pertinent part that "if an adverse party fails to timely file any response documents required to be filed under this rule, such failure may be deemed to constitute a consent to the … granting of said motion or other application."  On this basis, Plaintiffs seek entry of judgment for the full amount they request in their fee motion.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 6**

Whether to grant or deny a motion for the entry of default judgment is within the discretion of the court.  *Lau Ah Yew v. Dulles*, 236 F.2d 415, 416 (9th Cir. 1956).  Notwithstanding Defendant's lack of objection, the Court nonetheless denies Plaintiffs' motion for entry of default judgment because the Court has an independent obligation to review the request for litigation costs.  33 U.S.C. § 1365(d) allows a court to award costs in citizen suits brought under the Clean Water Act "whenever the court determines such award is appropriate."  Moreover, litigation costs under such section must be "reasonable."  Thus, Plaintiffs' request for litigation costs is subject to this Court's consideration of the reasonableness of the request.  Accordingly, Plaintiffs have not established that they are entitled as a matter of law to default judgment in the amount they seek.  The motion for default judgment will therefore be denied.

### 2.  <u>Plaintiffs' Motion for Attorney Fees Is Granted.</u>

The Clean Water Act provides that in any citizen suit brought pursuant to its provisions, the Court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such an award is appropriate."  33 U.S.C. § 1365(d).  To award attorney fees under § 1365(d), "a district court must make two findings.  First, it must find that the fee applicant is a 'prevailing or substantially prevailing party.'  Second, it must find that an award of attorney's fees is 'appropriate.'"  *Saint John's Organic Farm v. Gem Cnty. Mosquito Abatement Dist.*, 574 F.3d 1054, 1058 (9th Cir. 2009).  As to the first question, "[t]he threshold for sufficient relief to confer prevailing party status is not high."  *Id.* at 1059.  Indeed, "[i]f the plaintiff has succeeded on any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit, the plaintiff has crossed the threshold to a fee award of some kind."  *Id.* (citation omitted).  As to the second

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 7**

question, an award of attorney's fees under § 1365(d) is "appropriate" unless special circumstances would render such an award unjust; such fee awards "should be the rule rather than the exception." *Id.* at 1062.

Here, Plaintiffs argue that they are a prevailing party because they were successful in moving to reopen this case in 2016 and they sought and were granted additional relief under the Clean Water Act in the form of the Court's Second Injunction Order in November 2017 (Dkt. 166) and Memorandum Decision and Order Re: Substantial Compliance in September 2019 (Dkt. 187). Such Orders, Plaintiffs note, required Defendant to achieve and maintain substantial compliance with its NPDES Permit and they imposed substantial financial obligations upon Defendant in the form of Clean Water Act penalties and contempt amounts. Moreover, as discussed *supra*, Defendant did not oppose Plaintiffs' motion and is therefore deemed to consent to Plaintiffs' position that it is a prevailing party in this litigation. For these reasons, the Court agrees that Plaintiffs are prevailing parties in this matter for purposes of 33 U.S.C. § 1365(d).

The Court further finds that no special circumstances in this case would render an award of litigation expenses unjust and that an award under § 1365(d) is therefore appropriate in this case.

Plaintiffs seek a total of $130,883.26 in litigation expenses. This amount is the sum of $8,527.26 for an expert witness fee for mining engineer James Kuipers, $47,810.00 for work by attorney Laird J. Lucas, $65,825.00 for work by attorney Bryan Hurlbutt, and $8,721.00 for work by attorney Andrew Hawley. A declaration of counsel attaching timesheets for each timekeeper and confirming under oath that such fees were reasonable and necessarily incurred was filed with

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 8**

the fee motion.  The declaration also describes the attorneys' extensive experience litigating environmental matters.  The requested fees for each timekeeper will be considered separately.

First, however, it is important to note that the Plaintiffs in this matter have pursued their claims against Defendant for over a decade.  The fee motion at issue here covers their representation since 2016.  Over the course of this matter, including since the case was reopened in 2016, Plaintiffs' counsel obtained the sought-after results for their clients in the form of multiple orders holding Defendant accountable for NPDES Permit violations.  Plaintiffs' diligence has served the public good by resulting in improved treatment of contaminated adit effluent, thereby reducing iron and arsenic contaminants in water entering Montezuma Creek and, ultimately, the Middle Fork of the Boise River.  The Court's analysis of the requested fees, therefore, is in the context of Plaintiffs' substantial success in this litigation.

### A.  *Mr. Kuipers's Expert Witness Fees*

First, Plaintiffs seek $8,527.26 in fees for James Kuipers, a mining engineer who served as an expert witness in this matter and who billed Plaintiffs $150.00 per hour plus actual travel costs.  Plaintiffs say that Mr. Kuipers "assisted counsel in evaluating Atlanta Gold's non-compliance with the prior Court orders, analyzed the inadequacy of its remedial measures, and testified before the Court at the initial contempt hearing in April 2017." (Dkt. 191-1 at 9.)  They say the requested cost of $8,527.26 is the actual fee charged by Mr. Kuipers for those services, which they say were "relevant and necessary to Plaintiffs' success." *Id.*  In a supporting declaration of counsel, Plaintiffs note that Mr. Kuipers's testimony was cited in the Court's Memorandum Decision and Order on Motion for Civil Contempt.  Lucas Decl. ¶ 41 (Dkt. 191-2) (citing Dkt. 159).  Indeed, Mr. Kuipers's testimony is the subject of more than two pages of the

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 9**

32-page decision, and the decision states that the Court found such testimony "persuasive on the most important question at issue" in the motion.  (Dkt. 159 at 17.)

An invoice for Mr. Kuipers's services appears in the record as an exhibit attached to a declaration of counsel.  (Dkt. 191-6.)  The invoice reflects that he billed Plaintiffs $150.00 per hour for 42 hours of time, plus $483.00 in travel expenses and $544.36 in lodging expenses.

Mr. Kuipers's invoice charged Plaintiffs for consulting services provided between March 17, 2017 and April 26, 2017.  From March 17, 2017 through April 7, 2017, he billed 16 hours over seven calendar days, with "task descriptions" primarily indicating that he reviewed documents, briefing, and data and that he spoke with Plaintiffs' counsel.  Although the task descriptions could be more precise, they all nonetheless are properly connected to the core subject matter of the case.  Moreover, the discrete tasks were billed in varying increments between 1 and 3 hours, which eliminates concern over any unreasonableness in the amount of time claimed for such tasks, when the time is compared against the description of the work performed.

The other tasks for which Mr. Kuipers billed Plaintiffs occurred from April 23, 2017 through April 26, 2017 and span a total of 38 billed hours.  These tasks include travel time to and from Boise, additional document review and meeting with Plaintiffs' counsel, and attending and testifying at the evidentiary hearing held on April 25 and 26, 2017.

The Court finds that Mr. Kuipers's hourly rate of $150 per hour is reasonable based on his demonstrated expertise as a mining engineer and consultant as well as the value this Court previously placed on his testimony.  The Court further finds that the hours he expended in this matter are reasonable and appropriate to the litigation purpose.  His invoice reflects that his

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 10**

efforts were highly focused on, and near in time to, the April 2017 evidentiary hearing.  There is

no indication that he billed for unrelated, duplicative, or administrative tasks.

The travel-related line items on Mr. Kuipers's invoice show 483 miles each way, billed at

$0.50 per mile, between the relatively remote location of Wisdom, Montana (located in the far

southwestern corner of the state) and Boise, Idaho.  These are reasonable travel expenses,

particularly given the combined automobile and air travel that would have been the only

alternative.  The Court finds these travel expenses reasonable under the circumstances.  The

Court also notes that Mr. Kuipers billed for only one trip to Boise and that the 3-day trip was no

longer than necessary, given that the evidentiary hearing lasted two days.  The $544.36 in

lodging expenses is supported by an invoice from the hotel at which he stayed.  (Dkt. 191-6 at 2.)

The Court finds the lodging expenses reasonable and necessary.

For these reasons, Plaintiffs' request for an award as to Mr. Kuipers's actual-charged

costs of $8,527.26 will be granted in full.

### B.  *Mr. Lucas's Attorney Fees*

Second, Plaintiffs seek $47,810.00 for 111.7 hours of work by attorney Laird J. Lucas,

for an average rate of $428.02 per hour.  His declaration (Dkt. 191-2) reflects that he graduated

from Yale Law School and has practiced law for over 30 years.  For at least the last 25 years, he

has focused his practice in the area of environmental law, involving litigation of numerous

federal environmental cases in Idaho and other districts, including before this Court.  He is the

founder and executive director of Advocates for the West, a "public interest, nonprofit

environmental law firm that works on public lands, water, wildlife, and similar issues throughout

the West."  *Id.* ¶ 8.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 11**

With respect to Mr. Lucas's billable hours, Plaintiffs seek $425.00 per hour for 28.6 hours in 2016 and 69.6 hours in 2017, plus $450.00 per hour for 5.0 hours spent in 2018 and 8.5 hours spent in 2019.  Mr. Lucas describes such hourly billing rates as "consistent with hourly rates that were sought and achieved in numerous settlements of fee claims" in cases within this District (Dkt. 191-2 ¶ 35).  Although the declaration cites several such cases, it does not identify any particular docket entry in any case that documents the requested rates.  In general, such cases were dismissed by stipulation pursuant to a private settlement, or, in cases where settlement terms appear in the record, any award of attorney fees is identified as a lump sum without disclosing the billable rate for any individual attorney who may have worked on the case.  However, the declaration separately cites to a July 2017 decision by U.S. Magistrate Judge Candy Dale of the District of Idaho approving rates for Mr. Lucas of $400 per hour in 2015 and $425 per hour in 2016.  *Id.* ¶ 36 (citing *Idaho Rivers United v. Probert*, No. 3:16-cv-102-CWD (D. Idaho, July 21, 2017), ECF No. 75).

Mr. Lucas's declaration attaches 12 pages of time entries for his work on this matter between 2016 and 2019.  The 28.6 hours billed in 2016 largely relate to client and co-counsel discussions regarding the strategy, timing, and other details of moving to reopen the case and to file a motion for contempt against Defendant.  In particular, the timesheets indicate the motion for contempt was reviewed and revised several times prior to its filing.  However, in the context of this case, where such a motion was akin to preparing a new complaint in a new proceeding, and where Defendant's ongoing NPDES permit violations necessitated updating and revising the motion until it was filed, multiple revisions are neither excessive nor unnecessarily duplicative.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 12**

The Court is satisfied that Mr. Lucas's 2016 legal work was reasonably connected to the issues raised in the lawsuit, although it is easier for some entries than others to draw such a connection.

For example, on December 21, 2016, Mr. Lucas billed 0.5 hours with the task description "Review AGC website re financing, structure and other issues; review AGC financial statements; conf w/ B. Hurlbutt re revising reply on contempt motion to address recent AGI financing, etc." (Dkt. 191-3 at 4.)  The second half of this description is clearly connected to the lawsuit, but the connection for the first half, regarding Defendant's financing and structure, is not immediately as apparent.  However, the record in the case does reveal issues regarding ownership changes in the corporate structure surrounding Atlanta Gold.  Hence, the Court is satisfied that there is a reasonable and appropriate connection, and this time entry will not be rejected.  A recurring question throughout this litigation has been whether Defendant has the financial resources to take the steps necessary to bring the adit discharge into compliance with its NPDES permit.  This question was highlighted by the fact that Defendant itself represented that its financial ability to comply with the permit was dependent upon external investment into the company.  In such a setting, the Court is satisfied that Mr. Lucas's devoting no more than 30 minutes to apprise himself of Defendant's financial condition had a sufficient connection to the lawsuit such that it is compensable.

The lion's share of Mr. Lucas's work in this matter was billed in 2017, during which a two-day evidentiary hearing was held.  Most of his billings for the year occurred in the weeks leading up to and including the hearing and consist of routine motion practice, witness and exhibit preparation, and similar tasks.  All time entries for the year are reasonable and connected to the subject matter of the lawsuit.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 13**

Although there are numerous time entries (in Mr. Lucas's timesheets as well as those of his co-counsel) involving editing or revising co-counsels' work and/or repeatedly discussing and re-discussing the strategy and execution for the key filings in this case, the Court recognizes that this was a high-stakes lawsuit where Plaintiffs' allegations of Defendant's environmental violations resulted in multiple penalties and civil contempt orders involving hundreds of thousands of dollars.  If this case were more straightforward, involved less weighty issues, or were resolved more quickly, such time entries might raise concerns of duplication of efforts.  But Plaintiffs achieved the success they did by filing pertinent and specific motions and declarations. The factual support and legal analysis of the same (to include the time necessary to make them singularly focused on the most important issues, which generally takes more time than less time) would justify multiple reviews and revisions from and between counsel.

In 2018 and 2019, for which Plaintiffs seek an hourly rate of $450.00 for Mr. Lucas's time, he billed a total of 13.5 hours.  The five hours billed in 2018 relate to reviewing Defendant's status reports and additional motion practice.  The 8.5 hours billed in 2019 relate to reviewing court filings and to pursuing recovery of fees, both by discussing a settlement with opposing counsel and by preparing the instant fee motion.  Approximately seven hours of Mr. Lucas's time entries mention seeking recovery of fees, although many of these entries also document efforts unrelated to pursuing fees but nonetheless connected to the litigation.

Based upon a careful review of all of Mr. Lucas's time entries, while considering the degree of success achieved, the Court is persuaded that all of Mr. Lucas's time entries are reasonable.  As to Mr. Lucas's billable rate, the Court finds, based upon his decades of practice in the area of environmental law, his expertise in the same, and the successful results achieved

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 14**

for the client, that the requested rates of $425.00 per hour for work performed in 2016 and 2017 and $450.00 per hour for work performed in 2018 and 2019 are reasonable.

Plaintiffs' requested fees will be granted in full with respect to Mr. Lucas.

### C.  *Mr. Hurlbutt's Attorney Fees*

Third, Plaintiffs seek $65,825.00 for 287.0 hours of work by attorney Bryan Hurlbutt, for an average rate of $229.36 per hour.  Mr. Lucas's declaration says that Mr. Hurlbutt is a staff attorney for Advocates for the West who acted as the lead attorney for much of the contempt proceedings.  Mr. Hurlbutt graduated from Columbia Law School in 2010 and was admitted to the Idaho Bar that same year.  After serving as a judicial law clerk for the Honorable Roger Burdick of the Idaho Supreme Court, Mr. Hurlbutt joined Advocates for the West in late 2011. He has "researched, developed, and successfully prosecuted numerous environmental cases under federal environmental laws," and he has "negotiated numerous out-of-court settlements to avoid litigation … and has brought numerous successful cases in the District of Idaho over mining and other environmental threats."  (Dkt. 191-2 ¶ 17.)

With respect to Mr. Hurlbutt's billable hours, Plaintiffs seek $225.00 per hour for 120.8 hours in 2016 and 116.2 hours in 2017, plus $250.00 per hour for 32.1 hours spent in 2018 and 17.9 hours spent in 2019.  Mr. Lucas's declaration represents that such rates "are consistent with, or indeed below, the rates charged by attorneys in private practice in Boise that have similar experience, skills, and expertise as Mr. Hurlbutt."  (Dkt. 191-2 ¶ 19).

Mr. Hurlbutt's time records (Dkt. 191-4) begin in January 2016 and run through September 2019.  They bear out Mr. Lucas's representation that Mr. Hurlbutt was primarily responsible for much of the work on the contempt proceedings in this case.  Further, Mr.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 15**

Hurlbutt was the attorney most carefully and thoroughly keeping track of Defendant's permit violations, as he has several time entries related to reviewing Defendant's DMRs and status reports, as well as creating and maintaining a table to organize and track Defendant's violations. Additionally, he frequently communicated or coordinated with co-counsel about his findings and analysis of Defendant's data, which is to be expected in this type of case.

Mr. Hurlbutt was the primary drafter of most of Plaintiffs' significant documents in this case.  In 2016, he drafted the notice letter, the motion to reopen the case, and the contempt motion and its supporting memorandum and declarations.  Three time entries totaling 11 hours on August 1, 2016 relate to writing the memorandum supporting the contempt motion.  Although this was more than three months before the motion was ultimately filed on November 3, 2016 (Dkt. 128), the Court is satisfied the time expended was reasonable.

Some of Mr. Hurlbutt's time entries, however, lack a contextual context to this case, even if such a contextual context could have been supplied.  Specifically, on October 26, 2016 he has two time entries with descriptions of "Reviewing contempt cases; e-mailing Reed Super (Super Law Group) re recent Riverkeeper CWA contempt case" for 0.3 hours and "Reviewing Riverkeeper contempt case filings and decisions; call w Nick Tapert (Super Law Group) re that case" for 1.5 hours.  These time entries do not display a sufficient connection to the case to evidence either that the time was connected to this case, or that the time was reasonable and necessary.  The burden of providing that foundation, of course, is upon the party seeking to recover such fees from the opposing party.  Therefore, the fees associated with these time entries will not be allowed.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 16**

As with Mr. Lucas, Mr. Hurlbutt billed a substantial number of hours in early 2017 in preparation for the two-day evidentiary hearing in late April of that year.  He coordinated with the expert witness Mr. Kuipers, he gathered and reviewed documents for the hearing, and he spent time reviewing the case history and prior filings. Some of the tasks in this time period seem like they could have been performed by a legal assistant rather than a licensed attorney.  For instance, on March 16, 2017, Mr. Hurlbutt billed 2.5 hours for "gathering and reviewing AGC online news releases of interest."  On April 10, 2017 he recorded 2.4 hours for "finishing my full electronic folder of hearing exhibits and sharing w L Lucas" and 0.1 hours "E-mailing ICL witness list to [AUSA] Bill Humphries."  The next day, he billed 1.0 hour for "finding and adding additional exhibits to our exhibits files and thumb drive and e-mailing to L Lucas."  Later in the year, he billed 0.7 hours on September 6, 2017 to "creat[e] PDFs of ECHO effluent charts for J Hayes declaration."  The Court concludes after its careful review of the time entries from this period that nine hours of time Mr. Hurlbutt billed in 2017 involved work that could have been performed by a paraprofessional.  As to these nine hours, the Court will reduce the hourly rate by 50% to reflect that such work could have been done by a paraprofessional.  The Court is satisfied that such work was necessary; however, the amount Plaintiffs request to recover for such work is not reasonable.  Plaintiffs can certainly have a lawyer do that work, but that does not entitle them to recover the full fees charged by the lawyer in doing that work.  Hence, the reduction.

Mr. Hurlbutt billed substantially fewer hours in 2018 and 2019 than he did in the prior two years.  The 50 hours billed in 2018 and 2019 are all reasonably connected to the subject matter of the case in that they involve reviewing Defendant's DMRs and other filings, briefing

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 17**

and arguing the issue of substantial compliance to the Court, and performing routine tasks necessary in any lawsuit.

Some of the work described in the time entries from this timeframe, however, could appear to be duplicative. For instance, on September 11, 2018 Mr. Hurlbutt billed 1.1 hours for "gathering and starting review of files on all AGC status reports since 2017 decision for brief on substantial compliance," even though he has earlier time entries in 2018 reviewing the same reports. In addition, on September 19, 2018 he billed 6.2 hours for "reviewing all DMRs since last filing with court; reviewing all prior decisions in this case; continuing to draft ICL brief on substantial compliance." Thus, it is beyond dispute that over the span of this case he has billed multiple times to review, at least in part, the same filings, including Defendant's DMRs and status reports as well as various court decisions. However, the Court finds, in an exercise of its discretion, that any such "re-review" was warranted given both the complexity and the duration of this case. This case was originally filed in April 2011, and the dispute between these parties goes back several years even further than that. In addition, the evidence in this case involved myriad data points involving years of weekly scientific measurements. Moreover, the time entries involving review that could be considered duplicative are not excessive in either number or duration. In short, the Court will not eliminate or discount Mr. Hurlbutt's time entries based on his reviewing the same documents months or years apart.

Based upon a careful review of all of Mr. Hurlbutt's time entries, the Court is persuaded that of the 287.0 hours Mr. Hurlbutt billed in this matter, Plaintiffs are entitled to recover all of Mr. Hurlbutt's time except as noted above – 1.8 hours of time in 2016 are non-compensable and 9 hours of time in 2017 will be awarded at 50%. As to Mr. Hurlbutt's billable rate, the Court

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 18**

finds, based upon the over 5 years of environmental litigation experience he had in 2016 when the contempt motion was filed, that the requested rates of $225.00 per hour for work performed in 2016 and 2017 and $250.00 per hour for work performed in 2018 and 2019 are reasonable. Thus, of the $65,825.00 Plaintiffs' request for Mr. Hurlbutt's fee, $64,407.50 will be awarded for the reasons described above.

### D. *Mr. Hawley's Attorney Fees*

Finally, Plaintiffs seek $8,721.00 for 30.6 hours of work by attorney Andrew Hawley, for an average rate of $285.00 per hour. Mr. Lucas's declaration says that Mr. Hawley was a staff attorney for the Northwest Environmental Defense Center who appeared in this matter in 2016 and 2017 but who withdrew when he became employed elsewhere. Mr. Hawley graduated from Lewis and Clark Law School, and from 2004 to 2008 he was a legal fellow and then staff attorney at Defenders of Wildlife in Washington, D.C. He worked with the Northwest Environmental Defense Center from 2008 to 2017.

With respect to Mr. Hawley's billable hours, Plaintiffs seek $285.00 per hour for 29.8 hours in 2016 and 0.8 hours in 2017. Mr. Lucas's declaration represents that such rate is "consistent with, or indeed below, the rates charged by attorneys in private practice in Boise that have similar experience, skills, and expertise as Mr. Hawley." (Dkt. 191-2 ¶ 21).

Mr. Hawley's timesheets (Dkt. 191-5) run from April of 2016 through March of 2017. He withdrew from the case on March 23, 2017 (Dkt. 146), approximately one month before the two-day evidentiary hearing on Plaintiffs' motion for contempt. Nonetheless, despite Mr. Hawley's withdrawal at that relatively early stage of the case, his timesheets support Mr. Lucas's declaration that he assisted in the "early – and pivotal – phases of the contempt proceedings."

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 19**

(Dkt. 191.2 at ¶ 25.)  Most of his time entries involve editing and revising briefs prior to filing or to researching concrete issues related to nuances of the legal issue of civil contempt.  He also has two entries involving correspondence with clients and one time entry reflecting his participation in a status hearing.

Based upon a careful review of all of Mr. Hawley's time entries, the Court is persuaded that the 30.6 hours Mr. Hawley billed in this matter were necessarily incurred and reasonable in amount.  Mr. Hawley's requested rate of $285.00 per hour is reasonable given the length of his legal experience in environmental litigation.  Accordingly, the requested fee of $8,721.00 for Mr. Hawley's work will be awarded in full.

## CONCLUSION

As described herein, Plaintiffs are awarded $8,527.26 in fees for expert witness James Kuipers, $47,810.00 in fees for attorney Laird J. Lucas, $64,407.50 in fees for attorney Brian Hurlbutt, and $8,721.00 in fees for attorney Andrew Hawley.  In total, Plaintiffs are awarded $129,465.76 in fees.

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 20**

## ORDER

Based on the foregoing, **IT IS HEREBY ORDERED** as follows:

1.  Plaintiffs' Motion for Entry of Default Judgment Awarding Attorney Fees and Litigation Expenses (Dkt. 198) is **DENIED**.

2.  Plaintiffs' Motion for Award of Attorney Fees and Litigation Expenses Re: Contempt Proceedings (Dkt. 191) is **GRANTED**.  Judgment will be entered separately in Plaintiffs' favor in the amount of $129,465.76.



DATED:  **September 30, 2020.**

_____

Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTIONS – 21**